Wesley M. Griffith, SBN 286390
John R. Parker, Jr., SBN 257761
**ALMEIDA LAW GROUP LLC**
3550 Watt Ave, Suite 140
Sacramento, CA 95821
Telephone: 530-490-3178
E-mail: wes@almeidalawgroup.com
            jrparker@almeidalawgroup.com

Christopher Nienhaus, *pro hac vice* to be filed
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave
Chicago, IL 60614
Telephone: 708-529-5418
E-mail: chris@almeidalawgroup.com

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON MOORE, ZHICHENG ZHEN, and JONATHAN SMITH, individually and on behalf of others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR MONETARY AND INJUNCTIVE RELIEF** |
| vs. | **Jury Trial Demanded** |
| DRAFTKINGS, INC., AND DOES 1-20, | |
| Defendants. | |

-1-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**INTRODUCTION**

1.     For years, Defendant DraftKings, Inc. ("DraftKings"), has been operating mobile gambling applications and websites within California (collectively, the "Gambling Websites"), representing to customers and the public that its "Daily Fantasy Sports" contests and "Pick6" contests are legal forms of gambling in California. They are not.

2.     Plaintiffs Brandon Moore, ZhiCheng Zhen, and Jonathan Smith (collectively "Plaintiffs"), on behalf of themselves and the proposed class of similarly situated Californians, bring this lawsuit to stop the unlawful gambling that occurs on DraftKings' Gambling Websites in California and to recover the money that DraftKings has unlawfully taken from them.

**PARTIES**

**A.     Plaintiffs.**

3.     At all times relevant to this action, Plaintiff Brandon Moore was over the age of 18 and was a resident of San Francisco, California.

4.     At all times relevant to this action, Plaintiff ZhiCheng Zhen was over the age of 18 and was a resident of Oakland, California.

5.     At all times relevant to this action, Plaintiff Jonathan Smith was over the age of 18 and was a resident of California, presently residing in Napa County.

**B.     Defendants.**

6.     Defendant DraftKings, Inc. is a Delaware Corporation with its headquarters in Boston, Massachusetts. DraftKings regularly conducts business within California and this District, including by running the Gambling Websites that are the subject of this litigation.

7.     On information and belief, Does 1-20 are individuals and/or entities who facilitate DraftKings' unlawful practices described in this Complaint. The identities of Does 1-20 are not presently known to Plaintiffs. The Doe defendants, along with defendant DraftKings, are collectively referred to in this Complaint as "Defendants."

8.     Plaintiffs expressly reserve their right to amend this Complaint to add the Doe defendants by name, once their identities are known.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

10.      The United States District Court for the Northern District of California has personal jurisdiction over the parties in this matter because Plaintiff Moore resides in San Francisco County, Plaintiff Zhen resides in Alameda County, and Plaintiff Smith resides in Napa County.  DraftKings regularly conducts business within this District, including by engaging in the unlawful gambling practices that are at the center of this action.

11.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c) because Plaintiff Moore resides in San Francisco County, Plaintiff Zhen resides in Alameda County, and Plaintiff Smith resides in Napa County, and DraftKings' unlawful actions, which are the subject of this action, occurred in San Francisco County, Alameda County, and Napa County, among other locations within California.

12.      Pursuant to California Civil Code Section 1780(d), a declaration from Plaintiff Moore is attached as **Exhibit A**, confirming that venue is proper.

**DIVISIONAL ASSIGNMENT**

13.      Pursuant to Local Rules 3.2(c) and 3.5(b), Plaintiffs further state that assignment to the San Francisco and Oakland Division of this Court is proper because Plaintiff Moore resides in San Franscisco County, Plaintiff Zhen resides in Alameda County, and Plaintiff Smith resides in Napa County, and many of the events at issue in this lawsuit occurred in San Francisco County, Alameda County, and Napa County, which pursuant to Local Rule 3-2(d) provides for assignment to this Division.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## **FACTUAL ALLEGATIONS**

**A.     California's Longstanding Ban on Gambling.**

14.     For over 150 years, California has broadly prohibited commercialized gambling.

15.     For example, in 1872, California enacted Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . *any banking or percentage game* played with . . . *any device*, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330 (emphasis added).

16.     A "banking game" refers to a situation where the "house" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v. Fox,* 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants, but is not directly involved in game play. *See id. at* 679.

17.     Similarly, California Penal Code Section 337a prohibits additional conduct, including:

- "*Pool selling* or *bookmaking*, with or without writing, at *any time or place*." CAL. PENAL CODE § 337a(a)(1) (emphasis added).

- "*[R]eceiv[ing], hold[ing], or forward[ing]* . . . in *any manner whatsoever*, any *money . . . staked, pledged, bet or wagered*, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance of *person* or animal, or between *persons*, animals, or *mechanical apparatus*, or *upon the result, or purported result, of any* lot, chance, casualty, *unknown or contingent event whatsoever.*" *Id.* at (a)(3) (emphasis added).

- "[A]t *any time or place, record[ing], or register[ing] any bet* or bets, *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of *skill*, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*, or upon the

-4-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

result, or purported result, *of any* lot, chance, casualty, *unknown or contingent event whatsoever.*" *Id.* at (a)(4) (emphasis added).

- "*[O]ffer[ing] or accept[ing] any bet* or bets, or *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus.*" *Id.* at (a)(6) (emphasis added).

18.     The terms used in Section 337a have their commonsense meanings. For example, the California Court of Appeal has explained that "'[p]ool selling' is the selling or distribution of shares or chances in a wagering pool," such as when money wagered by all participants is combined into a single pool and the winnings are distributed based on predetermined rules. *See Finster v. Keller,* 18 Cal. App. 3d 836, 846 (1971) (cleaned up). And "'[b]ookmaking' is the making of a betting book and includes the taking of bets, [and] [t]he taking of one bet is sufficient" to constitute "bookmaking." *People v. Thompson*, 206 Cal. App. 2d 734, 739 (1962) (cleaned up).

19.     Similarly, "bet" and "wager" have their commonsense meanings. For example, the Judicial Council of California Criminal Jury Instructions (2025 Edition) provides that a "bet is a wager or agreement between two or more people that if an uncertain future event happens, the loser will pay money to the winner or give the winner something of value. A bet includes a wager made on the outcome of any actual or purported event, including but not limited to any kind of sporting contest." CALCRIM No. 2993, Receiving or Holding Bets (CAL. PENAL CODE § 337a(a)(3)) (cleaned up).[1]

20.     "Bets" and "wagers" include entry fees paid in online fantasy sports. *Los Angeles Turf Club v. Horse Racing Labs, LLC,* 2017 WL 11634526, at *8 (C.D. Cal. May 15, 2017).

21.     Put simply, a company violates California Penal Code Section 337a when it engages in pool selling, bookmaking, or accepts or records any bets or wagers on the result of any contest

---

[1] Available online at https://www.justia.com/criminal/docs/calcrim/2900/2993/ (last visited June 1, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

and/or any unknown or contingent event whatsoever—including, without limitation, bets associated with the performance of persons, such as in fantasy sports.[2]

22.    Moreover, various sections of the California Penal Code prohibit "lotteries" and "games of chance."

23.    For example, Penal Code Sections 320 and 321 make the operation of a lottery unlawful: "Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor"[3] and "[e]very person who sells, gives, or in any manner whatever, furnishes or transfers to or for any other person any ticket, chance, share, or interest, or any paper, certificate, or instrument purporting or understood to be or to represent any ticket, chance, share, or interest in, or depending upon the event of any lottery, is guilty of a misdemeanor."[4] Penal Code Section 319 defines a lottery broadly to include "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." CAL. PENAL CODE § 319.

24.    Similarly, Penal Code Section 330a makes it unlawful to own or operate any "contrivance, appliance, or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded . . . [that] is won or lost . . . dependent upon hazard or chance." CAL. PENAL CODE § 330a.

25.    And Penal Code Section 337j makes it unlawful to operate a "game of chance" or to "receive, directly or indirectly, any compensation" for operating such a game "*without having first procured . . . all federal, state, and local licenses required by law.*" CAL. PENAL CODE § 337j. (emphasis added).

---

[2] While Section 337a does include exemptions in certain circumstances for non-commercial gambling in amounts below $2,500, the Section 337a exemptions expressly do "not apply to . . . [a]ny bet, bets, wager, wagers, or betting pool or pools made online." CAL. PENAL CODE § 336.9(b)(1).

[3] CAL. PENAL CODE § 320.

[4] CAL. PENAL CODE § 321.

26.     In fact, as the legislature re-affirmed in 2008, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

**B.      Supermajorities of the California Electorate Rejected the Gambling Industry's Attempts to Legalize Sports Betting in 2022.**

27.     In 2022, two ballot initiatives were put to the California voters to legalize certain additional forms of gambling in the state, including various forms of sports betting: Proposition 26 and Proposition 27.

28.     **Proposition 26** was primarily sponsored by California's Native American tribes, and, among other things, would have:

- Legalized in-person sports betting at tribal casinos.
- Allowed additional gambling at tribal casinos, including roulette and dice games like craps.
- Established certain taxes and fees associated with sports betting.

29.     Proposition 26, however, was soundly rejected in November 2022, with approximately 67% of the California electorate voting "no."

30.     **Proposition 27** aimed to legalize online sports betting in California, and was primarily sponsored by the online sports betting industry, with the Washington Post reporting that "DraftKings, FanDuel and BetMGM alone contributed $95 million toward supporting the California [Proposition 27] measure, and the industry ultimately spent $150 million on political ads."[5]

31.     Among other things, Proposition 27 would have:

- Legalized and regulated online sports betting in California.
- Established a new division within the California Department of Justice to set license requirements and oversee the industry.

---

[5] Gus Garcia-Roberts, *Inside the $400 million fight to control California sports betting,* WASH. POST (Nov. 3, 2022), https://www.washingtonpost.com/sports/2022/11/03/prop-26-27-california-sports-betting/ (last visited June 1, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

- Imposed a 10% tax on sports betting revenue and established licensing fees.

- Allocated revenue from online gambling to a homelessness prevention.

32.    Proposition 27 was also soundly rejected in November 2022, with 82% of the electorate voting "no," making it one of the largest margins of defeat in California ballot proposition history.

**C.    California's Ongoing Investigation into Daily Fantasy Sports Betting.**

33.    Despite the resounding defeats at the ballot box, online sports betting operators, like DraftKings, have continued to operate in California.

34.    In particular, "daily fantasy sports" betting has proliferated in the state.

35.    Daily fantasy sports, which are often referred to by the abbreviation "DFS," are a subset of fantasy sports games that are generally played online through gambling websites:

> As with traditional fantasy sports games, [in daily fantasy sports], players compete against others by building a team of professional athletes from a particular league or competition while remaining under a salary cap, and earn points based on the actual statistical performance of the players in real-world competitions.
>
> Daily fantasy sports are an accelerated variant of traditional fantasy sports that are conducted over short-term periods, such as a week or single day of competition, as opposed to those that are played across an entire season.
>
> Daily fantasy sports are typically structured in the form of paid competitions typically referred to as a "contest"; winners receive a share of a pre-determined pot funded by their entry fees. A portion of entry fee payments go to the provider as rake revenue.[6]

36.    According to the California Business Journal, "California residents are estimated to contribute as much as 10% of the total entries in DFS contests nationwide. This popularity has translated into substantial revenue, with DFS platforms raking in approximately $200 million in entry fees annually [in California]."[7]

---

[6]    *Daily    Fantasy    Sports,*    Wikipedia,    available    online    at https://en.wikipedia.org/wiki/Daily_fantasy_sports#cite_ref-sg-dk500k_1-0 (last visited June 1, 2025).

[7] *Unfenced Playground: A Peek into California's Daily Fantasy Sports Landscape, California Business Journal,* available online at https://calbizjournal.com/unfenced-playground-a-peek-into-

37.     In response to these massive ongoing daily fantasy sports betting operations in California, on or about October 5, 2023, State Senator Scott Wilk wrote to the California Department of Justice and requested an investigation into daily fantasy sports betting:

> I write to request a legal opinion as to whether California law prohibits the offering and operation of daily fantasy sports betting platforms with players physically located within the State of California, regardless of whether the operators and associated technology are located within or outside of the State.
>
> Pursuant to California law, no one may operate "any game of chance" without the required federal, state, and local licenses. No one has "the right to operate a gambling enterprise except as may be expressly permitted by the laws of this state and by the ordinances of local governmental bodies."
>
> In 2022, California voters overwhelmingly rejected Proposition 27 to legalize online sports wagering. Although sports wagering in all forms remains illegal in California, online daily fantasy sports betting is proliferating throughout the state. Through these online platforms, a participant pays to enter a contest in which they may win a prize depending on how well athletes perform. Although the participant may utilize their knowledge of a particular sport in choosing their "team" of players, how well those players perform during a game is completely out of the participant's control. As such, *daily fantasy sports appears to be a game of chance not otherwise permitted by the laws of California.*

(Cleaned up; footnotes omitted; emphasis added).[8]

/ / /

/ / /

/ / /

---

californias-daily-fantasy-sports-landscape/#:~:text=In%20fact%2C%20California%20residents%20are,million%20in%20entry%20fees%20annually (last visited June 1, 2025).

[8] A copy of the letter is publicly available online at https://www.legalsportsreport.com/wp-content/uploads/2023/11/OU-23-1001-Sen.-Wilk-request-1.pdf (last visited June 1, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

38.    Consistent with the Senator's request, the California Department of Justice directed the Attorney General's Opinion Unit to address the following question:

> Does California law prohibit the offering and operation of daily fantasy sports betting platforms with players physically located within the State of California, regardless of whether the operators and associated technology are located within or outside of the State?

Opinion Request No. 23-1001.[9]

39.    As of the time of the filing of this lawsuit, no opinion has issued from the Attorney General's Office.[10]

**D.    DraftKings' California Gambling Operations.**

40.    DraftKings has been operating in California since approximately 2012 through the Gambling Websites, which consist of at least the DraftKings Daily Fantasy mobile apps for Android and IOS and the DraftKings website, DraftKings.com, and associated subpages. The primary gambling products that DraftKings currently offers in California are "Daily Fantasy Sports" and "Pick6." DraftKings consistently and explicitly represents to its customers that both Daily Fantasy Sports and Pick6 are legal in the state. They are not.

**1.    Daily Fantasy Sports.**

**a.    Traditional Daily Fantasy Sports.**

41.    A fantasy sport is a game where participants assemble imaginary teams composed of real professional sports players. These imaginary teams "compete" based on the statistical performance of those players in actual games, such as rushing yards, receiving yards, or points scored. This performance is converted into points that are compiled and totaled according to rules agreed to amongst the players.[11]

---

[9] Available online at https://oag.ca.gov/opinions/monthly-report (last visited June 1, 2025).

[10] Plaintiffs' counsel have "subscribed" to the Legal Opinions of the Attorney General Monthly Opinion Report and understand that they will receive an email notification once an opinion issues. Plaintiffs' counsel will promptly notify the Court regarding any relevant updates they receive.

[11] *See generally, Daily Fantasy Sports,* Wikipedia, available online at https://en.wikipedia.org/wiki/Daily_fantasy_sports#cite_ref-sg-dk500k_1-0 (last visited June 1, 2025).

42.     Traditional fantasy sports were played with friends and family over the course of a sports season, for small amounts of collectively pooled money or for no money at all.

43.     In traditional fantasy games involving money, one participant may have held money for the group to payout at the end of the season, but all participant money was distributed to other players (and not any third-party) at the end of the season.[12]

**b.     The Daily Fantasy Sports Offered by DraftKings in California.**

44.     On the Gambling Websites, DraftKings describes its Daily Fantasy Sports contests as follows:

## What is daily fantasy sports?

Daily Fantasy Sports (DFS) mirrors season-long fantasy sports but condenses it into a shorter, more sweat-inducing format. Heart-throttling contests range from a day to a week depending on the sport. Competitors draft a player roster and those athletes earn points based on their in-game performance. Sweat the sweat each and every play. Test your skills with friends or with other fans nationally and let victory chase you for a change.

DraftKings DFS is legal in most US states. Check out **where DraftKings DFS is legal.**

45.     In short, according to DraftKings, Daily Fantasy Sports are similar to traditional fantasy sports, but the reality is that there are many critical differences.

46.     First, unlike traditional fantasy sports that are played between friends and family, DraftKings Daily Fantasy Sports sets up contests between strangers through its Gambling Websites. Many of the Daily Fantasy Sports contests offered by DraftKings include hundreds, thousands, or tens of thousands of participants, as compared to traditional fantasy sports, that might have had around a dozen participants.

---

[12] This type of non-commercialized, small scale fantasy sports betting is exempted from many of the criminal law prohibitions discussed in Section A, above. See also Cal. Penal Code § 336.9(b)(1).

47.    Here is an example of how the Daily Fantasy Sports interface appears on desktop, reflecting some of the available contests in California, with total participant positions ranging from several hundred to over half a million:



/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

48.     And here is an example of how the Daily Fantasy Sports interface appears on mobile, reflecting some of the available contests in California, with total participant positions ranging from 10,000 to over 882,000:



49.     Second, unlike traditional fantasy sports, in Daily Fantasy Sports, DraftKings receives, pools, documents (i.e., books), and holds all participant bets and wagers until the end of the contest, when DraftKings uses its records (i.e., DraftKings' betting book) to distribute a portion of the pooled bets and wagers to the winner(s).

50.     Third, unlike traditional fantasy sports, in Daily Fantasy Sports, DraftKings takes a portion of each pool of bets and wagers, even though it is not a direct participant in the game.

51.     Fourth, unlike traditional fantasy sports, in Daily Fantasy Sports, the size of the bets and wagers, the number of participants, the pool size of bets and wagers, the prize pools made

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

available as "winnings," and the portions of the bets, wagers, and pools kept by DraftKings are all set by DraftKings.

52.     Fifth, unlike traditional fantasy sports, in Daily Fantasy Sports, the size of the bets and wagers, the number of participants, the pool sizes of bets and wagers collected, the prize pools made available as "winnings," and the portions of the bets, wagers, and pools kept by DraftKings vary dramatically, even when betting on the same underlying professional sporting event.

53.     For example, on May 2025, DraftKings offered thousands of Daily Fantasy Sports contests in California, with varied bet and wager amounts, pool sizes, and rakes percentages paid to DraftKings. Here are the terms on three fantasy contests DraftKings offered in California on the New York Knicks versus the Indiana Pacers NBA basketball game:

      a.     "NBA Showdown Single Entry $5 Double Up (NYK @ IND)." There were 229 participant slots available, each for a $5 wager, forming a pool of $1,145. However, only $1,000 in "Total Prizes" were available to be distributed to participants, with DraftKings keeping $145 of the pool for itself. That $145 rake represents a percentage take of 12.7%.

      b.     "NBA Showdown $30k Showtime [Single Entry] (NYK @ IND)." There were 334 participant slots available, each for a $100 wager, forming a pool of $33,400. However, only $30,100 in "Total Prizes" were available to be distributed, with DraftKings keeping $3,300 of the pool for itself. That $3,300 rake represents a percentage take of approximately 10%.

      c.     "NBA Showdown $500k Shootaround [$100k to 1st] (NYK @ IND)." There were 29,411 participant slots available, each for a $20 wager, forming a pool of $588,220. However, only $500,000 in "Total Prizes" were available to be distributed to participants, with DraftKings keeping $88,220 of the pool for itself. That $88,220 rake represents a percentage take of approximately 15%.

54.     Sixth, unlike traditional fantasy sports, in Daily Fantasy Sports, DraftKings maintains records of all bets and wagers placed on Daily Fantasy Sports, and uses those records (i.e., the betting books) to calculate post-contest payouts to participants from the pool of bets and wagers.

55.     Seventh, unlike traditional fantasy sports, which generally last throughout an entire sports season (e.g., the NFL regular football season), Daily Fantasy Sports, as the name suggests, generally involve short periods of participation and are designed to entice multiple rounds of repeat betting over the course of a day, a weekend, or a week.[13]

56.     Eighth, unlike traditional fantasy sports, DraftKings offers a number of contest types simultaneously, including:



57.     Ninth, DraftKings, offers products that it calls Daily Fantasy Sports, which are actually just direct bets on player statistics:



---

[13] In fact, DraftKings is facing lawsuits across the country related to the addictive nature of its online betting platforms. While those claims are not at issue in this lawsuit, because California law categorially prohibits Daily Fantasy Sports under the Penal Code, the California legislature has also expressly noted the addictive nature of gambling: "Gambling can become addictive and is not an activity to be promoted or legitimized as entertainment for children and families." Cal. Bus. & Prof. Code § 19801(c).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

58.     Finally, unlike traditional fantasy sports, in Daily Fantasy Sports, DraftKings offers users the opportunity to enter contests across a multitude of sporting types at the same time. For example, in May 2025, DraftKings offered Daily Fantasy Sports contests for MLB, the WNBA, the NBA, NHL, NFL, UFC, Soccer, NASCAR, and the PGA Tour, among others, on the Gambling Websites in California. Indeed, DraftKings even offered (in fact, enticed) California customers in May to make early bets and wagers on sports that would not be in season for months, including bets on the fall season of the NFL.

59.     Ultimately, regardless of which Daily Fantasy Sports contest-type DraftKings customers select, they have no control over the outcome of the fantasy game they have wagered on. The outcome is determined entirely based on athletes' actual in-game performances (i.e., the athletes' performances in the actual sporting events) and are entirely outside the control of the participants of Daily Fantasy Sports.[14]

60.     Moreover, "[c]hance affects the result not only as to the person or persons to receive the pool proceeds, but as to the amount received by any winning player, since more than one player may have selected the [same winning combination on] a particular day." *Finster*, 18 Cal. App. 3d at 845.

61.     Put simply, the outcomes of the Daily Fantasy Sports contests are contingent and unknown at the time the bets and wagers are collected, recorded (i.e., booked), and pooled by DraftKings. And as a result, DraftKings' Daily Fantasy Sports violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j.

/ / /

/ / /

/ / /

---

[14] Plaintiffs note that they are specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make their allegations in the alternative, and accordingly, allege that the gambling contests offered in California by DraftKings constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

-16-

        **c.**       **DraftKings Falsely Assures Customers that Daily Fantasy Sports Are Legal in California.**

62.    Well aware that customers would otherwise refuse to play its Daily Fantasy Sports contests if they knew and understood those contests violated California criminal law, on its Daily Fantasy Sports website, DraftKings repeatedly assures prospective customers that Daily Fantasy Sports are legal in California.

63.    For example, on the main DraftKings landing page, DraftKings.com, one of the featured "above the fold" menu options is a "Where is DFS legal" button:



/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

64.     If a California user follows the link to "where is DFS legal," he[15] is taken to a page[16] which displays the following information, reflecting that Daily Fantasy Sports are legal in California, among many other states:



65.     DraftKings further represents on this page that it carefully monitors state and federal law and regulations to ensure that its practices are in compliance with applicable law:

**Experience DraftKings Daily Fantasy Sports for yourself.**

DraftKings is a global sports technology and entertainment company whose Daily Fantasy Sports contests are governed by both federal and state law. Federal law specifically exempts fantasy sports contests from the prohibitions of the Unlawful Internet Gambling Enforcement Act, or UIGEA. At the state level, legislation and regulation vary state-to-state. In recent years, many state legislatures have passed laws confirming and clarifying the legality of Daily Fantasy Sports contests. DraftKings monitors new developments and acts quickly to ensure it is in compliance with the laws in any jurisdiction where it operates. As laws change or regulations are implemented, DraftKings will take steps to ensure its continued compliance, and changes to this site may take place to reflect any such new laws or regulations.

---

[15] Men make up more than 2/3 of sports bettors in the United States. *See* https://bircheshealth.com/resources/sports-betting-demographics-in-the-u-s (last visited June 1, 2025).

[16] https://www.draftkings.com/where-is-draftkings-legal (last visited June 1, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

66.    DraftKings next includes a list of states where Daily Fantasy Sports are (supposedly) legal, which expressly identifies California as a "legal" jurisdiction:

**DraftKings Daily Fantasy Sports is legal in the following US states and Canadian provinces / territories:**

| | |
|---|---|
| Alabama | North Carolina |
| Alaska | North Dakota |
| Arizona | Ohio |
| Arkansas | Oklahoma |
| California | Pennsylvania |
| Colorado | Rhode Island |
| Connecticut | South Carolina |
| Delaware | South Dakota |
| Florida | Tennessee |
| Georgia | Texas |
| Illinois | Utah |
| Indiana | Vermont |
| Iowa | Virginia |
| Kansas | West Virginia |
| Kentucky | Wisconsin |
| Louisiana | Wyoming |
| Maine | Alberta |
| Maryland | British Columbia |
| Massachusetts | Manitoba |
| Michigan | New Brunswick |
| Minnesota | Newfoundland and Labrador |
| Mississippi | Northwest Territories |
| Missouri | Nova Scotia |
| Nebraska | Nunavut |
| New Hampshire | Prince Edward Island |
| New Jersey | Quebec |
| New Mexico | Saskatchewan |
| New York | Yukon |

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

67.    Substantively identical representations are made to customers on the "DraftKings Fantasy" mobile app:











CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**2.**    **DraftKings Pick6.**

**a.**    **DraftKings Pick6 Contests.**

68.    DraftKings "Pick6" is a proprietary contest that DraftKings developed, on information and belief, in an attempt to circumvent state laws that prohibited traditional sports betting while still allowing participants to place bets on whether individual professional athletes will either meet the "under" or the "over" in certain statistical categories.

69.    DraftKings describes its Pick6[17] contests as a "fantasy game where you build an entry of 2+ players (3+ in Colorado) and select whether or not you believe each will outperform their listed stat projection. Once you craft your picks and choose your entry fee, your picks are entered into Pick6 contests to compete against those of other users. Get enough picks correct and win a share of huge cash prizes!":

## What is DraftKings Pick6?

Pick6 is a peer-to-peer fantasy game where you build an entry of 2+ players (3+ in Colorado) and select whether or not you believe each will outperform their listed stat projection. Once you craft your picks and choose your entry fee, your picks are entered into Pick6 contests to compete against those of other users. Get enough picks correct and win a share of huge cash prizes!

70.    On the same informational webpage, DraftKings also provides step by step information on "how to play" Pick6.

71.    First, a user makes selects his players and whether they will perform "over" or "under" a particular statistical category:



**Make your Picks**
Build your entry of 2+ picks (3+ picks in Colorado). Your picks must contain athletes from the same sport and pick group (a set of picks available from a group of games/competitions). For each player, simply select if you think they'll have more or less than their listed stat projection. Please note: you can not pick the same player twice and you must pick players from at least two different teams.

---

[17] https://pick6.draftkings.com/how-to-play-pick6 (last visited June 1, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

72.    Next, the user chooses how much to bet and wager:



**Choose your Entry Fee**
Once you finalize your picks, choose your entry fee amount. Your entries will be automatically distributed into available contests, subject to your confirmation. Get your picks in today for as little as $1!

73.    Third, the user is encouraged to follow his bets and wagers in real time to see how the bets and wagers perform:



**Sweat your Picks**
When the games go live, use the My Picks tab to follow your picks in real time to track how your players are performing against their projections and how they stack up against other users. View your estimated prizing update in real time as picks in your contests are graded as wins or losses!

74.    Finally, DraftKings notes the available prize pools collected and paid from participant bets and wagers:



**Compete for Prizes**
Get enough correct picks and win a share of the contests' guaranteed prizes. Any prizes won will be credited to your DraftKings account after contests are finalized. View our **Pick6 Prizes page** to see what customers have won in recent days!

75.    Pick6 contests offered by DraftKings in May 2025 included events on MLB, the WNBA, the NBA, NHL, UFC, Soccer, NASCAR, and the PGA Tour, among others.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

76.     Here is an example of how the Pick6 user interface appeared in California on desktop in May 2025,[18] with two sample players selected from the MLB tab:[19]



/ / /

/ / /

/ / /

---

[18] https://pick6.draftkings.com/ (last visited May 31, 2025).

[19] Despite advertising that bets can be placed for $1 on earlier DraftKings webpages, DraftKings instead defaults the users into a higher dollar value bets, here $10. In the fine print (which the user most scroll down and click through to see), the interface notes that the $10 bet will actually be divided into ten $1 entries, meaning there is no reason (other than to induce higher levels of betting) for the DraftKings interface to default to $10 instead of $1.

77. And here are examples of how Pick6 displayed on the DraftKings mobile app in California in May 2025 from the MLB and NBA tabs:

 

/ / /

/ / /

/ / /

78.    Here is a step-by-step example of a Pick6 transaction conducted on desktop. The mobile app interface is materially identical.

79.    **First,** the user selects a sporting type (e.g., NBA, WNBA), specific athletes, and whether to bet the "over" or "under" on each athlete. Here the user has selected the WNBA, the "over" on Thornton, the "over" on Fagbenle, the "under" on McBride, and the "over" on Smith:



80.    The statistical line for each player that the user is betting the "over" or "under" on is pre-determined by DraftKings.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

81.    **Second,** the user chooses how much to bet. It is only after the wager amount is selected that the user is informed of the potential pooled prize that is available based on the bet. Here are two examples, one reflecting a potential bet of $30 resulting in potential winnings of $1,824, and the second reflecting a wager of $80 resulting in potential winnings of $4,864:



/ / /

/ / /

/ / /

-26-

82.    **Third,** if the user scrolls to the fine print (which requires scrolling in a specific section of the screen where no scroll bar is provided), the user learns that regardless of how much he bets, in reality, his wager will be entered as a series of $1 bets, across multiple contests. The user must select "View Contest Breakdown" to learn the specific details of where and how the bets are distributed:



83.    In this example from June 2025, if "View Contest Breakdown" was selected, the user would learn that his bets are being spread across nine separate Pick6 contests, with each of the nine contests having 1,667 participant slots, with a total prize pool of $1,000 per contest, meaning that DraftKings would take a rake on each contest of $667, representing 40% of the total pool of funds collected. The user has no control over which specific pools his bets and wagers were entered into or who is he is playing against. DraftKings selects both for him.

84.    **Fourth,** if the user then completes the wager, he has a chance to win from the pooled funds. However, because multiple users could choose the same combination of players in a given contest, "[c]hance affects the result not only as to the person or persons to receive the pool proceeds,

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

but as to the amount received by any winning player, since more than one player may have selected the [same winning combination]." *Finster*, 18 Cal. App. 3d at 845.

85.    **Finally**, after the underlying sports competitions resolve, DraftKings uses its records (i.e., its betting book) to determine the winners and losers and make payments to participants from the pooled wagers.

86.    Ultimately, regardless of which Pick6 sporting event type DraftKings customers select, the specific athletes' "overs" and "unders" chosen, or the amounts bet, the customers have no control over the outcome of the contest they have wagered on. The outcome is determined entirely based on athletes' actual in-game performances (i.e., the athletes' performance in the actual underlying sporting events) and are entirely outside of the customers' control.[20]

87.    Put simply, the outcomes of the Pick6 contests are contingent and unknown at the time the bets and wagers are collected, recorded (i.e., booked), and pooled by DraftKings.  And as a result, DraftKings' Pick6 contests violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j.

---

[20] Plaintiffs note that they are specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make their allegations in the alternative, and accordingly, allege that the gambling contests offered in California by DraftKings constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

b.    **DraftKings' False Assurances that DraftKings Pick6 Is Permitted in California.**

88.    Well aware that customers would otherwise decline to play DraftKings Pick6 if they knew and understood those contests to violate California criminal law, on DraftKings' Pick6 website, DraftKings repeatedly assures prospective customers that DraftKings Pick6 can be played in California.

89.    For example, if a California user follows the link to "Where is Pick6 Available" he is taken to a page[21] which displays the following information, reflecting that Pick6 is available in California, among many other states:



---

[21] https://pick6.draftkings.com/where-is-pick6-available (last visited June 1, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

90.    DraftKings next includes a list of states where Daily Fantasy Sports are available, which expressly identifies California as an "available" jurisdiction, leading users to believe use of Pick6 is legal in California:

**DraftKings Pick6 is available in the following US states and Canadian provinces / territories:**

Last updated 5/22/25

| | |
|---|---|
| Alabama | Oklahoma |
| Alaska | Rhode Island |
| Arizona | South Carolina |
| Arkansas | South Dakota |
| California | Tennessee |
| Colorado | Texas |
| Connecticut | Utah |
| Delaware | Vermont |
| District of Columbia | Virginia |
| Georgia | West Virginia |
| Illinois | Wisconsin |
| Indiana | Alberta |
| Kansas | British Columbia |
| Kentucky | Manitoba |
| Maine | New Brunswick |
| Massachusetts | Newfoundland and Labrador |
| Minnesota | Northwest Territories |
| Missouri | Nova Scotia |
| Nebraska | Nunavut |
| New Hampshire | Prince Edward Island |
| New Mexico | Quebec |
| North Carolina | Saskatchewan |
| North Dakota | Yukon |

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

91.    Substantively identical representations are made to customers on the "DraftKings Fantasy" mobile app



**E.    DraftKings' Half-Billion Dollar Advertising Budget.**

92.    According to Scaleo.com, DraftKings is estimated to spend between $500 to $600 million per year on advertising and marketing, among the highest spends in the industry.[22]

93.    The reason DraftKings spends hundreds of millions of dollars each year on advertisements and marketing is to expand and maintain its userbase, including within California.

94.    Examples of DraftKings' advertising and marketing tactics within California include:

a.    Sponsorship of Established Sports Leagues: According to its own website, "DraftKings is both an official daily fantasy and sports betting partner of the NFL, NHL, PGA TOUR, and UFC, as well as

---

[22] *How Much Sportsbooks Spend on Marketing (2025 Updated Stats!),* available online at https://www.scaleo.io/blog/how-much-sportsbooks-spend-on-marketing-2024-updated-stats/ (last visited June 1, 2025)

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1    an official daily fantasy partner of NASCAR, an official sports betting

2    partner of the NBA and an authorized gaming operator of MLB."[23]

3    b.    Traditional TV Ads: DraftKings runs extensive traditional TV

4    advertisements featuring celebrities and promotional products and

5    offers to attract new customers.[24]

6    c.    Digital Marketing: DraftKings invests heavily in online digital

7    advertising, including Google Ads and social media advertising to

8    target specific demographics and interests.

9    d.    Promotional Offers: DraftKings uses new user bonuses, deposit

10    matches, and referral programs, among other tactics, to incentivize

11    sign-ups.

12    e.    Seasonal Campaigns: DraftKings strategically times ad campaigns

13    around major sporting events (e.g., the NBA Finals) to maximize

14    potential reach and engagement.

15    f.    User Interface Design and Personalization: On information and belief,

16    DraftKings utilizes data analytics to personalize marketing messages

17    and platform experiences based on user preferences.

18    g.    Loyalty Programs: DraftKings incentivizes repeat engagement and

19    loyalty through rewards programs, exclusive contests, and

20    promotions.

21    h.    Content Creation: DraftKings provides content like sports news,

22    player updates, expert analysis, and tips to drive potential customer

23    engagement with its products.

24

25

---

[23] *DraftKings Becomes an Official Sports Betting and Daily Fantasy Partner of the WNBA,* available online at https://www.draftkings.com/draftkings-becomes-an-official-sports-betting-and-daily-fantasy-partner-of-the-wnba (last visited June 1, 2025).

[24] For example, DraftKings ran the following ad featuring Kevin Hart during the 2024 Super Bowl: https://www.youtube.com/watch?v=SLZ8Dl_G7k4 (last visited June 1, 2025).

i.      Direct Customer Marketing: DraftKings sends emails, texts, and push-notifications to its existing customers, particularly when existing customers decrease their use of the Gambling Websites.

95.    Further, DraftKings has expanded its marketing efforts in California to include co-branded products, including products that can be purchased and used by minors.

96.    For example, here is a picture of a DraftKings advertisement on a bag of Ruffles potato chips:



97.    Put simply, DraftKings has a comprehensive marketing and customer solicitation plan, that it spends approximately a half-billion dollars a year on, designed to entice new and existing customers to use the DraftKings products, including the Gambling Websites within California.

**F.    Plaintiffs' Experiences.**

**1.    Plaintiff Brandon Moore's Experience.**

98.    At all times relevant to this action, Plaintiff Brandon Moore has resided in San Francisco, California.

99.    In or about 2012, in response to advertisements he had seen online, Plaintiff Moore created an account with DraftKings. DraftKings represented to Plaintiff Moore that the products and services it offered in California were legal.

100.   Since that time, DraftKings has continued to represent to Plaintiff Moore including on the Gambling Websites themselves—that its services are legal in California.

-33-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

101.    In setting up and using his DraftKings account, Plaintiff Moore expressly relied upon DraftKings' representations that the services it provides in California are legal.

102.    If DraftKings had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff Moore would not have created an account with DraftKings in California and would not have placed bets while in California through the DraftKings Gambling Websites.

103.    Since May of 2023, Plaintiff Moore, has lost over $3,000 to DraftKings while in California.

104.    If DraftKings had not solicited bets and wagers from Plaintiff Moore while representing that such activities were legal in California (when, unknown to Plaintiff Moore at the time, they in fact were not legal), he would not have made any of those bets or wagers and would not have paid any money to DraftKings.

105.    Plaintiff Moore has played at least the following DraftKings games while in California and lost money to DraftKings on each: Daily Fantasy Sports and Pick6.

106.    In Plaintiff Moore's experience, DraftKings collects fees via Daily Fantasy Sports and Pick6 by pooling together all bets and wagers from participants, documenting the bets and wagers that were placed, and then pays out prizes from the bet and wager pool, less the amount DraftKings collects and keeps for itself. The difference between the total bets and wagers collected and the prizes paid out is DraftKings' take.

107.    Plaintiff Moore used the Gambling Websites while in California as recently as May 17, 2025, placing a bet of $20 on a Daily Fantasy Sports contest offered by DraftKings. There were 29,411 entry positions available for the contest, forming a total bet and wager pool of approximately $588,220, which was collected and held by DraftKings. Despite collecting $588,220 in bets and wagers, the payout pool made available by DraftKings to contestants like Plaintiff Moore was only $500,000, meaning that at least $88,220—about 15% of the total pool—was paid directly to and kept by DraftKings.

108.    While Plaintiff Moore has now discontinued the use of DraftKings while in California, he remains interested in online gambling in California. If online gambling contests such

-34-

as Daily Fantasy Sports and Pick6 become legal in California, Plaintiff Moore would continue to gamble online in California. Plaintiff Moore may be tricked by DraftKings in the future into engaging in unlawful gambling in California if DraftKings continues to claim that its practices are legal.

109.    Plaintiff Moore's sole reason for setting up an account with DraftKings and purportedly consenting to DraftKings' terms of service (which he did not review and was not aware he was purportedly agreeing to at the time of account creation or otherwise) was to gain access to the gambling services in California offered by DraftKings that he now understands violate California law.

110.    Said differently, to the extent a contract was formed between Plaintiff Moore and DraftKings, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

111.    Accordingly, Plaintiff Moore's contract with DraftKings (to the extent any such contract was otherwise ever formed), is void (and was void *ab initio*) pursuant to, among other authorities, California Civil Code Section 1667, which makes contracts invalid where the contract is: "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals."

**2.      Plaintiff ZhiCheng Zhen's Experience.**

112.    At all times relevant to this action, Plaintiff ZhiCheng Zhen has resided in Alameda County, California.

113.    In or about 2024, in response to advertisements he saw online and while watching NBA games on TV in California, Plaintiff Zhen created an account with DraftKings. DraftKings represented to Plaintiff Zhen that the products and services it offered in California were legal.

114.    Since the time of account creation, DraftKings has continued to represent to Plaintiff Zhen, including on the Gambling Websites themselves, that its services are legal in California.

115.    In setting up and using his DraftKings account, Plaintiff Zhen expressly relied upon DraftKings' representations that the services it provides in California are legal.

116.    If DraftKings had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff Zhen would not have created an account with DraftKings in California and would not have placed bets while in California through the DraftKings Gambling Websites.

117.    Since May of 2024, Plaintiff Zhen has lost approximately $1,000 to DraftKings while in California.

118.    If DraftKings had not solicited bets and wagers from Plaintiff Zhen while representing that such activities were legal in California (when, unknown to Plaintiff Zhen at the time, they in fact were not legal), he would not have made any of those bets or wagers and would not have paid any money to DraftKings.

119.    In Plaintiff Zhen's experience, DraftKings pools together all bets and wagers from participants, documenting the bets and wagers that were placed, and then pays out prizes from the bet and wager pool, less the amount DraftKings collects and keeps for itself. The difference between the total bets and wagers collected and the prizes paid out is DraftKings' take.

120.    Plaintiff Zhen has gambled with DraftKings as recently as February 12, 2025, while in California, playing NBA Pick6 and lost around $400.

121.    While Plaintiff Zhen has now discontinued the use of DraftKings while in California, he remains interested in online gambling in California, and if it becomes legal, he would continue to gamble online in California. Plaintiff Zhen may be tricked by DraftKings in the future into engaging in unlawful gambling in California if DraftKings continues to claim that its practices are legal.

122.    Plaintiff Zhen's sole reason for setting up an account with DraftKings and purportedly consenting to DraftKings' terms of service (which he did not review and was not aware he was purportedly agreeing to at the time of account creation or otherwise) was to gain access to the gambling services in California offered by DraftKings that he now understands violate California law.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

123.    Said differently, to the extent a contract was formed between Plaintiff Zhen and DraftKings, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

124.    Accordingly, Plaintiff Zhen's contract with DraftKings (to the extent any such contract was otherwise ever formed), is void (and was void *ab initio*) pursuant to, among other authorities, California Civil Code Section 1667, which makes contracts invalid where the contract is: "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals."

**3.    Plaintiff Jonathan Smith's Experience.**

125.    At all times relevant to this action, Plaintiff Jonathan Smith has resided in California, presently residing in Napa County.

126.    In or about 2019, in response to advertisements he had seen on television while watching the NBA, Plaintiff Smith created an account with DraftKings. DraftKings represented to Plaintiff Smith that the products and services it offered in California were legal.

127.    Since that time, DraftKings has continued to represent to Plaintiff Smith—including on the Gambling Websites themselves—that its services are legal in California.

128.    In setting up and using his DraftKings account, Plaintiff Smith expressly relied upon DraftKings' representations that the services it provides in California are legal.

129.    If DraftKings had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff Smith would not have created an account with DraftKings in California and would not have placed bets while in California through the DraftKings Gambling Websites.

130.    Since May of 2019, Plaintiff Smith, has lost a total of approximately $1,700 to DraftKings while in California.

131.    If DraftKings had not solicited bets and wagers from Plaintiff Smith while representing that such activities were legal (when, unknown to Plaintiff Smith at the time, they in fact were not legal), he would not have made any of those bets or wagers and would not have paid any money to DraftKings.

132.    Among other gambling options offered by DraftKings in California, Plaintiff Smith has played Daily Fantasy Sports through DraftKings while in California and lost money to DraftKings.

133.    In Plaintiff Smiths' experience, DraftKings pools together all bets and wagers from participants, documenting the bets and wagers that were placed, and then pays out prizes from the bet and wager pool, less the amount DraftKings collects and keeps for itself. The difference between the total bets and wagers collected and the prizes paid out is DraftKings' take.

134.    While Plaintiff Smith has now discontinued the use of DraftKings while in California, he remains interested in online gambling in California, and if it becomes legal, he would continue to gamble online in California. Plaintiff Smith may be tricked by DraftKings in the future into engaging in unlawful gambling in California if DraftKings continues to claim that its practices are legal.

135.    Plaintiff Smith's sole reason for setting up an account with DraftKings and purportedly consenting to DraftKings' terms of service (which he did not review and was not aware he was purportedly agreeing to at the time of account creation) was to gain access to the gambling services in California offered by DraftKings that he now understands violate California law.

136.    Said differently, to the extent a contract was formed between Plaintiff Smith and DraftKings, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

137.    Accordingly, Plaintiff Smith's contract with DraftKings (to the extent any such contract was otherwise ever formed), is void (and was void *ab initio*) pursuant to, among other authorities, California Civil Code Section 1667, which makes contracts invalid where the contract is: "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals."

**G.    DraftKings' Affirmative Misrepresentations Have Tolled the Statute of Limitations.**

138.    As detailed above, DraftKings has consistently and explicitly represented to the public and its customers, including Plaintiffs and the Class (as defined below), that its operation of the Gambling Websites in California is legal.

139.    Among other things, DraftKings has held itself out as being an expert on gambling law and regulations, and induced Plaintiffs and the Class to rely on its affirmative false representations and statements in order to secure Plaintiffs' and the Class's use of the Gambling Websites and to keep Plaintiffs and the Class using the unlawful Gambling Websites in California.

140.    As a direct and proximate result of DraftKings' affirmative misrepresentations and statements, Plaintiffs and the Class had no reason to believe that operation of the Gambling Websites was unlawful. In fact, just the opposite—they trusted and relied upon DraftKings' purported expertise in California gambling law and regulation.

141.    Plaintiffs and the Class were unable to discover—and in fact, did not discover—the true and unlawful nature of the Gambling Websites on their own, as, on information and belief, DraftKings and others in the online gambling industry have inundated the internet and other publicly available resources (e.g., news articles and legal blogs) with claims that daily fantasy sports betting contests and other betting contests, like Pick6, are legal in California.

142.    When Plaintiffs did finally learn the true unlawful nature of the Gambling Websites' operation in or about May of 2025, Plaintiffs promptly filed this lawsuit.

**H.    DraftKings Acted with Malice, Oppression, and Fraud.**

143.    As detailed in this Complaint, DraftKings has acted with malice, oppression, and fraud.

144.    DraftKings acted with malice, because, among other reasons and as otherwise detailed in this Complaint, DraftKings' conduct was despicable and was done with a willful and knowing disregard of the rights of the public, Plaintiffs, and the Class (as defined below) because DraftKings knew (or should have known) that its gambling operations in California were illegal, but despite that induced Plaintiffs and the Class to gamble and lose money through its Gambling Websites while in California. As the California legislature has repeatedly made clear, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

145.    DraftKings' conduct was oppressive because, among other reasons and as otherwise detailed in this Complaint, it was despicable and subjected Plaintiffs and the Class to cruel and

unjust hardship in knowing disregard of their rights, including by falsely inducing them to lose significant sums of money through the illegal gambling enterprise that DraftKings held out as being legal in California.

146.    DraftKings' conduct was fraudulent, because, among other reasons and as otherwise detailed in this Complaint, DraftKings intentionally misrepresented and concealed the true nature of its unlawful gambling enterprise from Plaintiffs and the Class by affirmatively representing that the Gambling Websites and associated contests were legal in California when DraftKings knew (or should have known) that such contests were not.

## **CLASS ALLEGATIONS**

147.    This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure Rule 23, including, without limitation, Sections (b)(1), (b)(2), and (b)(3) of Rule 23.

148.    Plaintiffs seek certification of the following class (the "Class"):

> All residents of California who placed a bet or wager on the Gambling Websites while in California.

149.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

150.    DraftKings' practices have resulted in actual injury and harm to the Class members in the amount of deposits made with DraftKings and/or losses incurred on the Gambling Websites for bets or wagers placed while in California.

151.    Plaintiffs explicitly reserve their right to amend, add to, modify, and/or otherwise change the proposed class definition as discovery in this action progresses.

152.    **Numerosity.** Plaintiffs are informed and believe that there are hundreds of thousands or potentially millions of members of the Class. The Class is so large that the joinder of all of its members is impracticable. The exact number of members of the Class can be determined from information in the possession and control of DraftKings.

153.    **Commonality.** DraftKings has acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on DraftKings and/or Plaintiffs and the Class. Numerous common issues of fact and law exist, including, without limitation:

      a.    What gambling contests DraftKings offers in California.

      b.    What mediums (e.g., website, app, in person, etc.) DraftKings offers its gambling contests through in California.

      c.    The dates and number of gambling contests offered by DraftKings in California.

      d.    Whether DraftKings violates California Penal Code Section 319 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

      e.    Whether DraftKings violates California Penal Code Section 320 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

      f.    Whether DraftKings violates California Penal Code Section 321 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

      g.    Whether DraftKings violates California Penal Code Section 330 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

h.      Whether DraftKings violates California Penal Code Section 330a by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

i.      Whether DraftKings violates California Penal Code Section 337a by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

j.      Whether DraftKings violates any additional sections of the California Penal Code or other applicable California law and/or regulation by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

k.      Whether DraftKings' violations of the California Penal Code give rise to liability under California's unfair competition law.

l.      Whether DraftKings is a "person" within the meaning of Section 1761(c) of the California Consumer Legal Remedies Act ("CLRA").

m.      Whether Plaintiffs are "consumers" within the meaning of Section 1761(d) of the CLRA.

n.      Whether DraftKings' practices violate the following CLRA Sections, among others:

   i.      "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

   ii.      "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

   iii.      "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

iv.      "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

v.      "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

vi.      "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

vii.      "Inserting an unconscionable provision in the contract" (a)(19).

o.      Whether DraftKings' operation of the Gambling Websites should be enjoined in California.

p.      The appropriate damages model for calculating restitution, disgorgement, and/or damages for violation of the unfair competition law and/or the CLRA.

q.      Whether DraftKings' affirmative misrepresentations that the Gambling Websites are legal tolled any otherwise applicable statutes of limitations.

r.      Whether any subset of claims held by the Class are barred by the statute of limitations.

154.    **Predominance.** These common issues predominate over individualized inquiries in this action because DraftKings' liability can be established as to all members of the Class as discussed herein.

155.    **Typicality.** Plaintiffs' claims against DraftKings and experience with DraftKings are typical, if not identical, to the claims and experiences of members of the Class because, among other reasons, Plaintiffs' claims arise from DraftKings' practices that are applicable to the entire Class.

156.    **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class

actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class lost money to DraftKings. Plaintiffs also have no interests antagonistic to those of the Class, and DraftKings has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

157.    **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to recover damages; the damages suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiffs and their counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

158.    Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## CAUSES OF ACTION

A.    **First Cause of Action: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, on Behalf of Plaintiffs and the Class.**

159.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 158, inclusive, of this Complaint.

160.    DraftKings, Plaintiffs, and Class are "persons" within the meaning of the UCL.

161.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

162.    DraftKings' practices of operating the Gambling Websites within California are "unlawful" within the meaning of the UCL because, among other things, the operation of the Gambling Websites violates California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and

-44-

337j because, among other reasons, in the course of business and in the course of trade and commerce, DraftKings has:

   a.   Operated illegal lotteries and/or games of chance in violation of Penal Code Sections 319, 320, 321, 330a, and 337j by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.[25]

   b.   Operated banking and/or percentage gambling games in violation of Penal Code Section 330 by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

   c.   Engaged in pool selling in violation of Penal Code Section 337(a)(1) by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

   d.   Engaged in bookmaking in violation of Penal Code Section 337(a)(1) by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

   e.   Violated Penal Code Section 337(a)(3) by "receiv[ing], hold[ing], or forward[ing] . . . money . . . staked, pledged, bet or wagered . . upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

---

[25] Plaintiffs note that they are specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make their allegations in the alternative, and accordingly, allege that the gambling contests offered in California by DraftKings constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

    f.    Violated Penal Code Section 337(a)(4) by "record[ing], or register[ing] any bet or bets, wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

    g.    Violated Penal Code Section 337(a)(6) by "[o]ffer[ing] or accept[ing] any bet or bets, or wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus" by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

163.    DraftKings' operation of the Gambling Websites is also unlawful within the meaning of the UCL because DraftKings has violated the CLRA, as alleged in the Second Cause of Action, below.

164.    DraftKings' operation of the Gambling Websites is also unlawful within the meaning of the UCL because DraftKings has violated the California Business and Professions Code, because "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

165.    The acts and practices of DraftKings as alleged herein also constitute "unfair" business acts and practices under the UCL because DraftKings' conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of DraftKings' conduct outweighs any conceivable benefit of such conduct.

166.    DraftKings has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing

operation of the Gambling Websites is lawful in California, when in fact, it is not, causing Plaintiffs and the Class to be tricked out of tens of millions of dollars.

167.    Plaintiffs and the Class have suffered injury in fact—in the form of all amounts paid to DraftKings and/or the total of net losses on the Gambling Websites run by DraftKings—as a result of DraftKings' unlawful and unfair business acts and practices and are at substantial risk of continuing to lose money and be injured by those acts and practices if the practices are not enjoined.

168.    Plaintiffs and the Class seek an order providing restitution and disgorgement in the form of all amounts paid to DraftKings by Plaintiffs and the Class and/or the total of net losses on the Gambling Websites by Plaintiffs and the Class.

169.    Plaintiffs and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiffs and the Class seek to enforce "an important right affecting the public interest" in bringing this cause of action.

**B.      Second Cause of Action: Violation of California's Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.,* on Behalf of Plaintiffs and the Class.**

170.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 158, inclusive, of this Complaint.

171.    At all relevant times, Plaintiffs and Class members were "consumers" within the meaning of the CLRA, as they were individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

172.    DraftKings' actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA, namely the selling of the unlawful gambling goods and services that are at issue in this action through the Gambling Websites.

173.    DraftKings violated the CLRA by, among other things:

      a.    "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

      b.    "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

c.   "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

d.   "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

e.   "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

f.   "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

g.   "Inserting an unconscionable provision in the contract" (a)(19).

174.   DraftKings' actions and misrepresentations were material, and DraftKings' violations of the CLRA were a substantial factor in causing Plaintiffs and the Class to lose money.

175.   As a direct and proximate consequence of these actions, Plaintiffs and the Class suffered injury.

176.   DraftKings' conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiffs and the Class for Defendants' own benefit to the detriment of Plaintiffs and the Class.

177.   The CLRA provides robust enforcement tools for consumers, including:

a.   Prohibiting the waiver of any substantive rights provided for under the CLRA. *Id.* § 1750

b.   Requiring that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760.

c.     Establishing a substantive right to litigate in the forum where the transaction occurred. *Id.* § 1780(d).

d.     Establishing a substantive right to pursue class claims. *Id.* § 1781; *see also id.* § 1752.

e.     Authorizing injunctive relief. *Id.* § 1780(a)(2)

f.     Authorizing actual damages. *Id.* § 1780(a)(1).

g.     Authorizing restitution of unlawfully taken sums. *Id.* § 1780(a)(3).

h.     Authorizing punitive damages. *Id.* § 1780(a)(4).

i.     Authorizing statutory damages of $1,000 per violation. *Id.* § 1780(a)(1).

j.     Authorizing statutory damages of $5,000 per injured individual, where the unlawful conduct was directed against the elderly or the disabled. *Id.* § 1780(b)(1).

k.     Requiring that the Court "shall award court costs and attorney's fees to a prevailing plaintiff in litigation." *Id.* § 1780(e).

178.    Plaintiffs seek all available remedies under the CLRA, except that, at this time, Plaintiffs do not seek any monetary damages for their CLRA cause of action.[26]

## **PRAYER FOR RELIEF**

179.    Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a.     Certifying the proposed Class pursuant to Rule 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b.     Declaring that DraftKings is financially responsible for notifying the Class members of the pendency of this suit;

---

[26] Pursuant to Section 1782(d) of the CLRA, Plaintiffs expressly reserve their right to amend their CLRA cause of action to add claims for monetary relief, including, without limitation, for actual, punitive, and statutory damages, at least 30 days after providing DraftKings the notice contemplated by Section 1782(a).

c. Declaring that DraftKings has committed the violations of law alleged herein;

d. Providing for any and all injunctive relief the Court deems appropriate;

e. Awarding monetary relief, including but not limited to restitution in an amount that the Court or jury will determine, in accordance with applicable law;

f. Providing for any and all other equitable monetary relief the Court deems appropriate;

g. Awarding Plaintiffs their reasonable costs and expenses of suit, including attorney's fees;

h. Awarding pre- and post-judgement interest to extent the law allows; and

i. Providing such further relief as this Court may deem just and proper.

j. Respectfully submitted,

Dated June 1, 2025                          By:  */s/ Wesley M. Griffith*
                                            Wesley M. Griffith, SBN 286390
                                            John R. Parker, Jr., SBN 257761
                                            **ALMEIDA LAW GROUP LLC**
                                            3550 Watt Ave, Suite 140
                                            Sacramento, CA 95821
                                            Telephone: 530-490-3178
                                            E-mail: wes@almeidalawgroup.com
                                                      jrparker@almeidalawgroup.com

                                            Christopher Nienhaus, *pro hac vice* to be filed
                                            **ALMEIDA LAW GROUP LLC**
                                            849 W. Webster Ave
                                            Chicago, IL 60614
                                            Telephone: 708-529-5418
                                            E-mail: chris@almeidalawgroup.com

                                            *Counsel for Plaintiffs and the Proposed Class*

1

## DEMAND FOR TRIAL BY JURY

2      Plaintiffs, on behalf of themselves and the putative Class, hereby respectfully demand a trial

3   by jury on all claims for which a jury trial is available.

4

5   Dated: June 1, 2025                    By:  */s/ Wesley M. Griffith*
                                             Wesley M. Griffith, SBN 286390
6                                            John R. Parker, Jr., SBN 257761
                                             **ALMEIDA LAW GROUP LLC**
7                                            3550 Watt Ave, Suite 140
                                             Sacramento, CA 95821
8                                            Telephone: 530-490-3178
                                             E-mail: wes@almeidalawgroup.com
9                                                    jrparker@almeidalawgroup.com

10                                           Christopher Nienhaus, *pro hac vice* to be filed
                                             **ALMEIDA LAW GROUP LLC**
11                                           849 W. Webster Ave
                                             Chicago, IL 60614
12                                           Telephone: 708-529-5418
                                             E-mail: chris@almeidalawgroup.com
13
                                             *Counsel for Plaintiffs and the Proposed Class*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL