Wesley M. Griffith, SBN 286390
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd, Suite 426
Long Beach, CA 90802
Telephone: 310-896-5813
E-mail: wes@almeidalawgroup.com

Margot P. Cutter, SBN 306789
**CUTTER LAW P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone: 916-290-9400
E-mail: mcutter@cutterlaw.com

F. Peter Silva II, SBN 348070
**TYCKO & ZAVAREEI LLP**
333 H Street, Suite 5000
Chula Vista, CA 91911
Telephone: 510-254-6810
E-mail: psilva@tzlegal.com

James Bilsborrow, *pro hac vice*
**WEITZ & LUXENBERG PC**
700 Broadway
New York, NY 10003
Telephone: 212-558-5500
E-mail: jbilsborrow@weitzlux.com

**[Additional Counsel on Signature Page]**

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ZHICHENG ZHEN and JONATHAN SMITH, individually and on behalf of others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>DRAFTKINGS, INC., JASON D. ROBINS, MATTHEW KALISH, PAUL LIBERMAN, CROWN GAMING, INC., AND DOES 1-20,<br><br>    Defendants. | Case No.  3:25-cv-04618-CRB<br><br>Related Cases: 5:25-cv-7211-CRB; 3:25-cv-10473-CRB; 25-cv-5542-CRB<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR MONETARY AND INJUNCTIVE RELIEF**<br><br>**Jury Trial Demanded**<br><br>Hon. Charles R. Breyer |

-1-

**INTRODUCTION**

1.      For years, Defendant DraftKings, Inc. ("DraftKings"), has been operating mobile gambling applications and websites within California (collectively, the "Gambling Websites"), representing to customers and the public that its "Daily Fantasy Sports" contests and "Pick6" contests are legal forms of gambling in California. They are not.

2.      Plaintiffs ZhiCheng Zhen and Jonathan Smith (collectively "Plaintiffs"), on behalf of themselves and the proposed class of similarly situated Californians, bring this lawsuit to stop the unlawful gambling that occurs on DraftKings' Gambling Websites in California and to recover the money that DraftKings and the other Defendants have unlawfully taken from them.

**PARTIES**

**A.    Plaintiffs.**

3.      At all times relevant to this action, Plaintiff ZhiCheng Zhen was over the age of 18 and was a resident and citizen of Oakland, California.

4.      At all times relevant to this action, Plaintiff Jonathan Smith was over the age of 18 and was a resident and citizen of California, presently residing in Napa County.

**B.    Defendants.**

5.      Defendant DraftKings, Inc. is a Delaware Corporation with its headquarters in Boston, Massachusetts. DraftKings regularly conducts business within California and this District, including by running the Gambling Websites that are the subject of this litigation.

6.      Defendant Jason D. Robins is the Chief Executive Officer and Chairman of the Board. Robins co-founded DraftKings in December 2011 and served as its Chief Executive Officer since, and has served as the Chief Executive Officer and Chairman of the Board since April 2020. Defendant Robins shares a business address with DraftKings Inc.

7.      Defendant Matthew Kalish is the President, DraftKings North America, and a director. Kalish co-founded the Company in December of 2011 and served as its Chief Revenue Officer from 2014 until December 2019. Kalish is on the Board of Directors. Defendant Kalish shares a business address with DraftKings Inc.

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

8.      Defendant Paul Liberman is the President, Global Technology and Product, and a director. Mr. Liberman co-founded the Company in December 2011 and served as its Chief Operations Officer ("COO") from 2015 to December 2019. Liberman is on the Board of Directors. Defendant Liberman shares a business address with DraftKings Inc.

9.      Defendant Crown Gaming, Inc. is a Delaware Corporation with its headquarters in Boston, Massachusetts. Crown Gaming, Inc. regularly conducts business within California and this District, including by maintaining the Gambling Websites that are the subject of this litigation.

10.     On information and belief, Does 1-20 are individuals and/or entities who facilitate DraftKings' unlawful practices described in this Complaint. The identities of Does 1-20 are not presently known to Plaintiffs. Defendants DraftKings, Crown Gaming, Robins, Kalish, Liberman, and the Does are collectively referred to herein as "Defendants."

11.     Plaintiffs expressly reserve their right to amend this Complaint to add the Doe defendants by name, once their identities are known.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under RICO, 18 U.S.C. § 1962(c). The Court has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367(a).

13.     The United States District Court for the Northern District of California has personal jurisdiction over the parties in this matter because Plaintiff Zhen resides in Alameda County and Plaintiff Smith resides in Napa County.  DraftKings regularly conducts business within this District, including by engaging in the unlawful gambling practices that are at the center of this action. The Court has personal jurisdiction over Defendants Robins, Kalish, and Liberman because they directed the unlawful gambling practices and services at issue in this case, and directed the marketing and advertising of these services within and to the state of California, including within the Northern District. The Court has personal jurisdiction over Defendant Crown Gaming, Inc.

-3-

because it participated in the unlawful gambling practices and services at issue in this case, and assisted in the directing the marketing and advertising of these services within and to the state of California, including within the Northern District.

14.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c) because Plaintiff Zhen resides in Alameda County and Plaintiff Smith resides in Napa County, and Defendants' unlawful actions, which are the subject of this action, occurred in Alameda County and Napa County, among other locations within California.

15.    Pursuant to California Civil Code Section 1780(d), a declaration from Plaintiff Zhen is attached as **Exhibit A**, confirming that venue is proper.

### DIVISIONAL ASSIGNMENT

16.    Pursuant to Civil L.R. 3-2(c) and 3-5(b), Plaintiffs further state that assignment to the San Francisco and Oakland Division of this Court is proper because Plaintiff Zhen resides in Alameda County and Plaintiff Smith resides in Napa County, and many of the events at issue in this lawsuit occurred in Alameda County and Napa County, which pursuant to Local Rule 3-2(d) provides for assignment to this Division.

### FACTUAL ALLEGATIONS

**A.    California's Longstanding Ban on Gambling.**

17.    For over 150 years, California has broadly prohibited commercialized gambling.

18.    For example, in 1872, California enacted Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . *any banking or percentage game* played with . . . *any device*, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330 (emphasis added).

19.    A "banking game" refers to a situation where the "house" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v. Fox,* 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants, but is not directly involved in game play. *See id. at* 679.

20.    Similarly, California Penal Code Section 337a prohibits additional conduct, including:

- "*Pool selling* or *bookmaking*, with or without writing, at *any time or place*." CAL. PENAL CODE § 337a(a)(1) (emphasis added).

- "*[R]eceiv[ing], hold[ing], or forward[ing]* . . . in *any manner whatsoever*, any *money* . . . *staked, pledged, bet or wagered*, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance of *person* or animal, or between *persons*, animals, or *mechanical apparatus*, or *upon the result, or purported result, of any* lot, chance, casualty, *unknown or contingent event whatsoever*." *Id.* at (a)(3) (emphasis added).

- "[A]t *any time or place, record[ing], or register[ing] any bet* or bets, *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of *skill*, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*, or upon the result, or purported result, *of any* lot, chance, casualty, *unknown or contingent event whatsoever*." *Id.* at (a)(4) (emphasis added).

- "*[O]ffer[ing] or accept[ing] any bet* or bets, or *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*." *Id.* at (a)(6) (emphasis added).

21.    The terms used in Section 337a have their commonsense meanings. For example, the California Court of Appeal has explained that "'[p]ool selling' is the selling or distribution of shares or chances in a wagering pool," such as when money wagered by all participants is combined into a single pool and the winnings are distributed based on predetermined rules. *See Finster v. Keller*, 18 Cal. App. 3d 836, 846 (1971) (cleaned up). And "'[b]ookmaking' is the making of a

betting book and includes the taking of bets, [and] [t]he taking of one bet is sufficient" to constitute "bookmaking." *People v. Thompson*, 206 Cal. App. 2d 734, 739 (1962) (cleaned up).

22.     Similarly, "bet" and "wager" have their commonsense meanings. For example, the Judicial Council of California Criminal Jury Instructions (2025 Edition) provides that a "bet is a wager or agreement between two or more people that if an uncertain future event happens, the loser will pay money to the winner or give the winner something of value. A bet includes a wager made on the outcome of any actual or purported event, including but not limited to any kind of sporting contest."   CALCRIM No. 2993, Receiving or Holding Bets (CAL. PENAL CODE § 337a(a)(3)) (cleaned up).[1]

23.     "Bets" and "wagers" include entry fees paid in online fantasy sports. *Los Angeles Turf Club v. Horse Racing Labs, LLC,* 2017 WL 11634526, at *8 (C.D. Cal. May 15, 2017).

24.     Put simply, a company violates California Penal Code Section 337a when it engages in pool selling, bookmaking, or accepts or records any bets or wagers on the result of any contest and/or any unknown or contingent event whatsoever—including, without limitation, bets associated with the performance of persons, such as in fantasy sports.[2]

25.     Moreover, various sections of the California Penal Code prohibit "lotteries" and "games of chance."

26.     For example, Penal Code Sections 320 and 321 make the operation of a lottery unlawful: "Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor"[3] and "[e]very person who sells, gives, or in any manner whatever, furnishes or transfers to or for any other person any ticket, chance, share, or interest, or any paper, certificate, or instrument purporting or understood to be or to represent any ticket, chance, share, or interest in,

---

[1] Available online at https://www.justia.com/criminal/docs/calcrim/2900/2993/ (last visited January 20, 2026).

[2] While Section 337a does include exemptions in certain circumstances for non-commercial gambling in amounts below $2,500, the Section 337a exemptions expressly do "not apply to . . . [a]ny bet, bets, wager, wagers, or betting pool or pools made online." CAL. PENAL CODE § 336.9(b)(1).

[3] CAL. PENAL CODE § 320.

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

or depending upon the event of any lottery, is guilty of a misdemeanor."[4] Penal Code Section 319 defines a lottery broadly to include "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." CAL. PENAL CODE § 319.

27.    Similarly, Penal Code Section 330a makes it unlawful to own or operate any "contrivance, appliance, or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded . . . [that] is won or lost . . . dependent upon hazard or chance." CAL. PENAL CODE § 330a.

28.    And Penal Code Section 337j makes it unlawful to operate a "game of chance" or to "receive, directly or indirectly, any compensation" for operating such a game "*without having first procured . . . all federal, state, and local licenses required by law.*" CAL. PENAL CODE § 337j. (emphasis added).

29.    In fact, as the legislature re-affirmed in 2008, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

**B.    Supermajorities of the California Electorate Rejected the Gambling Industry's Attempts to Legalize Sports Betting in 2022.**

30.    In 2022, two ballot initiatives were put to the California voters to legalize certain additional forms of gambling in the state, including various forms of sports betting: Proposition 26 and Proposition 27.

31.    **Proposition 26** was primarily sponsored by California's Native American tribes, and, among other things, would have:

- Legalized in-person sports betting at tribal casinos.

---

[4] CAL. PENAL CODE § 321.

- Allowed additional gambling at tribal casinos, including roulette and dice games like craps.
- Established certain taxes and fees associated with sports betting.

32.    Proposition 26, however, was soundly rejected in November 2022, with approximately 67% of the California electorate voting "no."

33.    **Proposition 27** aimed to legalize online sports betting in California, and was primarily sponsored by the online sports betting industry, with the Washington Post reporting that "DraftKings, FanDuel and BetMGM alone contributed $95 million toward supporting the California [Proposition 27] measure, and the industry ultimately spent $150 million on political ads."[5]

34.    Among other things, Proposition 27 would have:

- Legalized and regulated online sports betting in California.
- Established a new division within the California Department of Justice to set license requirements and oversee the industry.
- Imposed a 10% tax on sports betting revenue and established licensing fees.
- Allocated revenue from online gambling to a homelessness prevention.

35.    Proposition 27 was also soundly rejected in November 2022, with 82% of the electorate voting "no," making it one of the largest margins of defeat in California ballot proposition history.

C.    **Despite Losing at the Ballot Box, Fantasy Sports Betting Continued to Proliferate in California in the Years that Followed.**

36.    Despite the resounding defeats at the ballot box, online sports betting operators, like DraftKings, have continued to operate in California.

37.    In particular, "daily fantasy sports" betting has proliferated in the state.

---

[5] Gus Garcia-Roberts, *Inside the $400 million fight to control California sports betting,* WASH. POST (Nov. 3, 2022), https://www.washingtonpost.com/sports/2022/11/03/prop-26-27-california-sports-betting/ (last visited January 20, 2026).

38.     Daily fantasy sports, which are often referred to by the abbreviation "DFS," are a subset of fantasy sports games that are generally played online through gambling websites:

> As with traditional fantasy sports games, [in daily fantasy sports], players compete against others by building a team of professional athletes from a particular league or competition while remaining under a salary cap, and earn points based on the actual statistical performance of the players in real-world competitions.
>
> Daily fantasy sports are an accelerated variant of traditional fantasy sports that are conducted over short-term periods, such as a week or single day of competition, as opposed to those that are played across an entire season.
>
> Daily fantasy sports are typically structured in the form of paid competitions typically referred to as a "contest"; winners receive a share of a pre-determined pot funded by their entry fees. A portion of entry fee payments go to the provider as rake revenue.[6]

39.     According to the California Business Journal, "California residents are estimated to contribute as much as 10% of the total entries in DFS contests nationwide. This popularity has translated into substantial revenue, with DFS platforms raking in approximately $200 million in entry fees annually [in California]."[7]

**D.     In July 2025—After this Lawsuit Was Filed—the California Attorney General Confirmed that Daily Fantasy Sports Betting Violates California Law.**

40.     In response to these massive ongoing daily fantasy sports betting operations in California, on or about October 5, 2023, State Senator Scott Wilk wrote to the California Department of Justice and requested an investigation into daily fantasy sports betting:

> I write to request a legal opinion as to whether California law prohibits the offering and operation of daily fantasy sports betting platforms with players physically located within the State of California, regardless of whether the operators and associated technology are located within or outside of the State.

---

[6]     *Daily Fantasy Sports,* Wikipedia, available online at https://en.wikipedia.org/wiki/Daily_fantasy_sports#cite_ref-sg-dk500k_1-0 (last visited January 20, 2026).

[7]     *Unfenced Playground: A Peek into California's Daily Fantasy Sports Landscape, California Business Journal,* available online at https://calbizjournal.com/unfenced-playground-a-peek-into-californias-daily-fantasy-sports-landscape/#:~:text=In%20fact%2C%20California%20residents%20are,million%20in%20entry%20fees%20annually (last visited January 20, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

1
2
3

> Pursuant to California law, no one may operate "any game of chance" without the required federal, state, and local licenses. No one has "the right to operate a gambling enterprise except as may be expressly permitted by the laws of this state and by the ordinances of local governmental bodies."

4
5
6
7
8
9

> In 2022, California voters overwhelmingly rejected Proposition 27 to legalize online sports wagering. Although sports wagering in all forms remains illegal in California, online daily fantasy sports betting is proliferating throughout the state. Through these online platforms, a participant pays to enter a contest in which they may win a prize depending on how well athletes perform. Although the participant may utilize their knowledge of a particular sport in choosing their "team" of players, how well those players perform during a game is completely out of the participant's control. As such, *daily fantasy sports appears to be a game of chance not otherwise permitted by the laws of California.*

10

(Cleaned up; footnotes omitted; emphasis added).[8]

11    41.    Consistent with the Senator's request, the California Department of Justice directed

12  the Attorney General's Opinion Unit to address the following question:

13
14
15

> Does California law prohibit the offering and operation of daily fantasy sports betting platforms with players physically located within the State of California, regardless of whether the operators and associated technology are located within or outside of the State?

16  Opinion Request No. 23-1001.[9]

17    42.    On July 3, 2025, the California Attorney General released its opinion addressing

18  Senator Wilk's request, which confirms the central theory of Plaintiffs' case: **"California law**

19  **prohibits the operation of daily fantasy sports games…Such games constitute wagering on**

20  **sports in violation of Penal Code section 337a."** (Emphasis added.)[10]

21    43.    A true and correct copy of the Attorney General's Opinion is attached as **Exhibit B**

22  to this First Amended Complaint.

23

24

---

25
26

[8] A copy of the letter is publicly available online at https://www.legalsportsreport.com/wp-content/uploads/2023/11/OU-23-1001-Sen.-Wilk-request-1.pdf (last visited January 20, 2026).

27

[9] Available online at https://oag.ca.gov/opinions/monthly-report (last visited June 1, 2025).

28

[10] Opinion of the California Attorney General No. 23-1001 ("AG Opinion") at 1, available online at https://oag.ca.gov/system/files/attachments/press-docs/23-1001.pdf (last visited January 20, 2026).

**E.      Since Nearly the Inception of Statehood, California Has Allowed for the Recovery of Gambling *Losses* through the Statute of Anne.**

44.      In 1710, the Parliament of the United Kingdom passed the Gaming Act of 1710 ("Gaming Act"). The Gaming Act did two important things. First, Section One of the Gaming Act voided and outlawed all contracts relating to gambling contracts to extend money or credit to those gambling and outlawed their recovery. Second, Section Two of the Gaming Act specifically allowed those who lost money gambling to bring suit for losses incurred within the prior three months from the winners of that money.

45.      Section Two of the Gaming Act—commonly referred to as the Statute of Anne—was carried over from the United Kingdom in many states in the form of gambling loss recovery statutes.

46.      California was one of those states.

47.      Specifically, in 1850, California enacted a statute that the "[t]he common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all the courts of the state." That enactment remains the law of California and is currently codified at Civil Code § 22.2.

48.      A recent binding decision of the Court of Appeal confirms that the Statute of Anne was carried over as part of the 1850 enactment of Civil Code Section 22.2: "California imported not only the whole body of judge-made decisional law of the English courts, but also the written statutes enacted by Parliament. Among the enactments of Parliament adopted as California common law was the Statute of Anne, which declared all gambling debts utterly void, frustrate, and of none effect, to all intents and purposes whatsoever." *Tak Chun Gaming Promotion Co. v. Long*, 96 Cal. App. 5th 1027, 1033 (2023) (cleaned up).[11]

49.      Accordingly, in California, all gambling losses that exceed 10 British pounds—about 13 US dollars—are recoverable as a matter of right in California.

---

[11] While other cases have stated without analysis that California lacks a Statute of Anne, those authorities do not discuss the import of Civil Code § 22.2.

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

**F.    DraftKings' California Gambling Operations.**

50.    DraftKings has been operating in California since approximately 2012 through the Gambling Websites, which consist of at least the DraftKings Daily Fantasy mobile apps for Android and IOS and the DraftKings website, DraftKings.com, and associated subpages. The primary sports gambling services that DraftKings currently offers in California are "Daily Fantasy Sports" and "Pick6." DraftKings consistently and explicitly represents to its customers that both Daily Fantasy Sports and Pick6 are legal in the state. They are not.

**1.    Daily Fantasy Sports.**

**a.    Traditional Daily Fantasy Sports.**

51.    A fantasy sport is a game where participants assemble imaginary teams composed of real professional sports players. These imaginary teams "compete" based on the statistical performance of those players in actual games, such as rushing yards, receiving yards, or points scored. This performance is converted into points that are compiled and totaled according to rules agreed to amongst the players.[12]

52.    Traditional fantasy sports were played with friends and family over the course of a sports season, for small amounts of collectively pooled money or for no money at all. In traditional fantasy games involving money, one participant may have held money for the group to payout at the end of the season, but all participant money was distributed to other players (and not any third-party) at the end of the season.[13]

---

[12] *See generally, Daily Fantasy Sports,* Wikipedia, available online at https://en.wikipedia.org/wiki/Daily_fantasy_sports#cite_ref-sg-dk500k_1-0 (last visited January 20, 2026).

[13] This type of non-commercialized, small scale fantasy sports betting is exempted from many of the criminal law prohibitions discussed in Section A, above. See also Cal. Penal Code § 336.9(b)(1).

1

**b. The Daily Fantasy Sports Offered by DraftKings in California.**

2

53.     On the Gambling Websites, DraftKings describes its Daily Fantasy Sports contests

3

as follows:

4

5

# What is daily fantasy sports?

6

Daily Fantasy Sports (DFS) mirrors season-long fantasy sports but condenses it into a shorter, more sweat-

7

inducing format. Heart-throttling contests range from a day to a week depending on the sport. Competitors draft
a player roster and those athletes earn points based on their in-game performance. Sweat the sweat each and

8

every play. Test your skills with friends or with other fans nationally and let victory chase you for a change.

9

DraftKings DFS is legal in most US states. Check out **where DraftKings DFS is legal.**

10

11

54.     DraftKings makes the representation that "DraftKings DFS is legal in most US

12

states" on DraftKings website(s).[14]

13

55.     In short, according to DraftKings, Daily Fantasy Sports are similar to traditional

14

fantasy sports, but the reality is that there are many critical differences.

15

56.     First, unlike traditional fantasy sports that are played between friends and family,

16

DraftKings Daily Fantasy Sports sets up contests between strangers through its Gambling Websites.

17

Many of the Daily Fantasy Sports contests offered by DraftKings include hundreds, thousands, or

18

tens of thousands of participants, as compared to traditional fantasy sports, that might have had

19

around a dozen participants.

20

21

22

23

24

25

26

27

28

---

[14] https://www.draftkings.com/how-to-play (last visited January 20, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

57.    Here is an example of how the Daily Fantasy Sports interface appears on desktop, reflecting some of the available contests in California, with total participant positions ranging from several hundred to over half a million:



-14-

58.     And here is an example of how the Daily Fantasy Sports interface appears on mobile, reflecting some of the available contests in California, with total participant positions ranging from 10,000 to over 882,000:



59.     Second, unlike traditional fantasy sports, in Daily Fantasy Sports, DraftKings receives, pools, documents (i.e., books), and holds all participant bets and wagers until the end of the contest, when DraftKings uses its records (i.e., DraftKings' betting book) to distribute a portion of the pooled bets and wagers to the winner(s).

60.     Third, unlike traditional fantasy sports, in Daily Fantasy Sports, DraftKings takes a portion of each pool of bets and wagers, even though it is not a direct participant in the game. In this way, DraftKings itself is also a winner as it receives a portion of each pool of bets and wagers from the losers of its daily fantasy sports services.

61.     Fourth, unlike traditional fantasy sports, in Daily Fantasy Sports, the size of the bets and wagers, the number of participants, the pool size of bets and wagers, the prize pools made available as "winnings," and the portions of the bets, wagers, and pools kept by DraftKings are all set by DraftKings.

62.     Fifth, unlike traditional fantasy sports, in Daily Fantasy Sports, the size of the bets and wagers, the number of participants, the pool sizes of bets and wagers collected, the prize pools made available as "winnings," and the portions of the bets, wagers, and pools kept by DraftKings vary dramatically, even when betting on the same underlying professional sporting event.

63.     For example, on May 2025, DraftKings offered thousands of Daily Fantasy Sports contests in California, with varied bet and wager amounts, pool sizes, and rakes percentages paid to DraftKings. Here are the terms on three fantasy contests DraftKings offered in California on the New York Knicks versus the Indiana Pacers NBA basketball game:

a.     "NBA Showdown Single Entry $5 Double Up (NYK @ IND)." There were 229 participant slots available, each for a $5 wager, forming a pool of $1,145. However, only $1,000 in "Total Prizes" were available to be distributed to participants, with DraftKings keeping $145 of the pool for itself. That $145 rake represents a percentage take of 12.7%.

b.     "NBA Showdown $30k Showtime [Single Entry] (NYK @ IND)." There were 334 participant slots available, each for a $100 wager, forming a pool of $33,400. However, only $30,100 in "Total Prizes" were available to be distributed, with DraftKings keeping $3,300 of the pool for itself. That $3,300 rake represents a percentage take of approximately 10%.

c.     "NBA Showdown $500k Shootaround [$100k to 1st] (NYK @ IND)." There were 29,411 participant slots available, each for a $20 wager, forming a pool of $588,220. However, only $500,000 in "Total Prizes" were available to be distributed to participants, with

DraftKings keeping $88,220 of the pool for itself. That $88,220 rake represents a percentage take of approximately 15%.

      d.     Sixth, unlike traditional fantasy sports, in Daily Fantasy Sports, DraftKings maintains records of all bets and wagers placed on Daily Fantasy Sports, and uses those records (i.e., the betting books) to calculate post-contest payouts to participants from the pool of bets and wagers.

64.     Seventh, unlike traditional fantasy sports, which generally last throughout an entire sports season (e.g., the NFL regular football season), Daily Fantasy Sports, as the name suggests, generally involve short periods of participation and are designed to entice multiple rounds of repeat betting over the course of a day, a weekend, or a week.[15]

65.     Eighth, unlike traditional fantasy sports, DraftKings offers a number of contest types simultaneously, including:



---

[15] In fact, DraftKings is facing lawsuits across the country related to the addictive nature of its online betting platforms. While those claims are not at issue in this lawsuit, because California law categorially prohibits Daily Fantasy Sports under the Penal Code, the California legislature has also expressly noted the addictive nature of gambling: "Gambling can become addictive and is not an activity to be promoted or legitimized as entertainment for children and families." Cal. Bus. & Prof. Code § 19801(c).

66.    Ninth, DraftKings, offers services that it calls Daily Fantasy Sports, which are actually just direct bets on player statistics:



67.    Finally, unlike traditional fantasy sports, in Daily Fantasy Sports, DraftKings offers users the opportunity to enter contests across a multitude of sporting types at the same time. For example, in May 2025, DraftKings offered Daily Fantasy Sports contests for MLB, the WNBA, the NBA, NHL, NFL, UFC, Soccer, NASCAR, and the PGA Tour, among others, on the Gambling Websites in California. Indeed, DraftKings even offered (in fact, enticed) California customers in May to make early bets and wagers on sports that would not be in season for months, including bets on the fall season of the NFL.

68.    Ultimately, regardless of which Daily Fantasy Sports contest-type DraftKings customers select, they have no control over the outcome of the fantasy game they have wagered on. The outcome is determined entirely based on athletes' actual in-game performances (i.e., the athletes' performances in the actual sporting events) and are entirely outside the control of the participants of Daily Fantasy Sports.[16]

69.    Moreover, "[c]hance affects the result not only as to the person or persons to receive the pool proceeds, but as to the amount received by any winning player, since more than one player may have selected the [same winning combination on] a particular day." *Finster*, 18 Cal. App. 3d at 845.

---

[16] Plaintiffs note that they are specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make their allegations in the alternative, and accordingly, allege that the gambling contests offered in California by DraftKings constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

70.     Put simply, the outcomes of the Daily Fantasy Sports contests are contingent and unknown at the time the bets and wagers are collected, recorded (i.e., booked), and pooled by DraftKings. And as a result, DraftKings' Daily Fantasy Sports violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j.

### c.  DraftKings Falsely Assures Customers that Daily Fantasy Sports Are Legal in California.

71.     DraftKings misleads California consumers into making illegal gambling contracts engaging in prohibited sports betting by misrepresenting that its services are permissible under California law when they are not.

72.     Well aware that customers would refuse to play its Daily Fantasy Sports contests if they knew and understood those contests violated California criminal law, on its Daily Fantasy Sports website, DraftKings repeatedly assures prospective customers that Daily Fantasy Sports are legal in California.

73.     For example, on the main DraftKings landing page, DraftKings.com, one of the featured "above the fold" menu options is a "Where is DFS legal" button:



/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

74.     If a California user follows the link to "where is DFS legal," they are taken to a page[17] which displays the following information, reflecting that Daily Fantasy Sports are legal in California, among many other states:



75.     DraftKings further represents on this page that it carefully monitors state and federal law and regulations to ensure that its practices are in compliance with applicable law[18]:

**Experience DraftKings Daily Fantasy Sports for yourself.**

DraftKings is a global sports technology and entertainment company whose Daily Fantasy Sports contests are governed by both federal and state law. Federal law specifically exempts fantasy sports contests from the prohibitions of the Unlawful Internet Gambling Enforcement Act, or UIGEA. At the state level, legislation and regulation vary state-to-state. In recent years, many state legislatures have passed laws confirming and clarifying the legality of Daily Fantasy Sports contests. DraftKings monitors new developments and acts quickly to ensure it is in compliance with the laws in any jurisdiction where it operates. As laws change or regulations are implemented, DraftKings will take steps to ensure its continued compliance, and changes to this site may take place to reflect any such new laws or regulations.

---

[17] https://www.draftkings.com/where-is-draftkings-legal (last visited January 20, 2025).

[18] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

1    76.    DraftKings next includes a list of states where Daily Fantasy Sports are (supposedly)

2  legal, which expressly identifies California as a "legal" jurisdiction[19]:



25  / / /

26  / / /

27

28  _____

[19] *Id.*

-21-

77.    Substantively identical representations were and/or[20] are made to customers on the "DraftKings Fantasy" mobile app:











---

[20] Between filing the Complaint and First Amended Complaint, DraftKings made certain changes to the mobile application.

78. On DraftKings' mobile application, in a section named "How will I know which Daily Sports Contests are restricted in my state?", DraftKings makes the following representations:

 

## 2. DraftKings Pick6.

### a. DraftKings Pick6 Contests.

79. DraftKings "Pick6" is a proprietary contest that DraftKings developed, on information and belief, in an attempt to circumvent state laws that prohibited traditional sports betting while still allowing participants to place bets on whether individual professional athletes will either meet the "under" or the "over" in certain statistical categories.

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

80.    DraftKings describes its Pick6[21] contests as a "fantasy game where you build an entry of 2+ players (3+ in Colorado) and select whether or not you believe each will outperform their listed stat projection. Once you craft your picks and choose your entry fee, your picks are entered into Pick6 contests to compete against those of other users. Get enough picks correct and win a share of huge cash prizes!":

**What is DraftKings Pick6?**

Pick6 is a peer-to-peer fantasy game where you build an entry of 2+ players (3+ in Colorado) and select whether or not you believe each will outperform their listed stat projection. Once you craft your picks and choose your entry fee, your picks are entered into Pick6 contests to compete against those of other users. Get enough picks correct and win a share of huge cash prizes!

81.    On the same informational webpage, DraftKings also provides step by step information on "how to play" Pick6. First, a user makes selects his players and whether they will perform "over" or "under" a particular statistical category[22]:

**Make your Picks**
Build your entry of 2+ picks (3+ picks in Colorado). Your picks must contain athletes from the same sport and pick group (a set of picks available from a group of games/competitions). For each player, simply select if you think they'll have more or less than their listed stat projection. Please note: you can not pick the same player twice and you must pick players from at least two different teams.

82.    Next, the user chooses how much to bet and wager[23]:



**Choose your Entry Fee**
Once you finalize your picks, choose your entry fee amount. Your entries will be automatically distributed into available contests, subject to your confirmation. Get your picks in today for as little as $1!

---

[21] https://pick6.draftkings.com/how-to-play-pick6 (last visited June 1, 2025). DraftKings has since updated this page since Plaintiffs filed their initial complaint and it is available here: https://pick6.draftkings.com/how-to-play-pick6 (last visited January 20, 2026).

[22] *Id.*

[23] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

83.    Third, the user is encouraged to follow his bets and wagers in real time to see how the bets and wagers perform[24]:



**Sweat your Picks**
When the games go live, use the My Picks tab to follow your picks in real time to track how your players are performing against their projections and how they stack up against other users. View your estimated prizing update in real time as picks in your contests are graded as wins or losses!

84.    Finally, DraftKings notes the available prize pools collected and paid from participant bets and wagers[25]:

**Compete for Prizes**
Get enough correct picks and win a share of the contests' guaranteed prizes. Any prizes won will be credited to your DraftKings account after contests are finalized. View our **Pick6 Prizes page** to see what customers have won in recent days!

85.    Pick6 contests offered by DraftKings in May 2025 included events on MLB, the WNBA, the NBA, NHL, UFC, Soccer, NASCAR, and the PGA Tour, among others.

/ / /

/ / /

/ / /

---

[24] *Id.*
[25] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

86.    Here is an example of how the Pick6 user interface appeared in California on desktop in May 2025,[26] with two sample players:  selected from the MLB tab:[27]



/ / /

/ / /

/ / /

---

[26] https://pick6.draftkings.com/ (last visited May 31, 2025). The page looks substantially the same as of Plaintiffs filing of the First Amended Complaint.

[27] Despite advertising that bets can be placed for $1 on earlier DraftKings webpages, DraftKings instead defaults the users into a higher dollar value bets, here $10. In the fine print (which the user most scroll down and click through to see), the interface notes that the $10 bet will actually be divided into ten $1 entries, meaning there is no reason (other than to induce higher levels of betting) for the DraftKings interface to default to $10 instead of $1.

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

87.    And here are examples of how Pick6 displayed on the DraftKings mobile app in California in May 2025 from the MLB and NBA tabs:

 

/ / /

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

88.     Here is a step-by-step example of a Pick6 transaction conducted on desktop. The mobile app interface is materially identical.

89.     **First,** the user selects a sporting type (e.g., NBA, WNBA), specific athletes, and whether to bet the "over" or "under" on each athlete. Here the user has selected the WNBA, the "over" on Thornton, the "over" on Fagbenle, the "under" on McBride, and the "over" on Smith:



90.     The statistical line for each player that the user is betting the "over" or "under" on is pre-determined by DraftKings.

/ / /

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

91.    **Second,** the user chooses how much to bet. It is only after the wager amount is selected that the user is informed of the potential pooled prize that is available based on the bet. Here are two examples, one reflecting a potential bet of $30 resulting in potential winnings of $1,824, and the second reflecting a wager of $80 resulting in potential winnings of $4,864:



/ / /

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

92.    **Third,** if the user scrolls to the fine print (which requires scrolling in a specific section of the screen where no scroll bar is provided), the user learns that regardless of how much he bets, in reality, his wager will be entered as a series of $1 bets, across multiple contests. The user must select "View Contest Breakdown" to learn the specific details of where and how the bets are distributed:



93.    In this example from June 2025, if "View Contest Breakdown" was selected, the user would learn that his bets are being spread across nine separate Pick6 contests, with each of the nine contests having 1,667 participant slots, with a total prize pool of $1,000 per contest, meaning that DraftKings would take a rake on each contest of $667, representing 40% of the total pool of funds collected. The user has no control over which specific pools his bets and wagers were entered into or who he is playing against. DraftKings selects both for him.

94.    **Fourth,** if the user then completes the wager, he has a chance to win from the pooled funds. However, because multiple users could choose the same combination of players in a given contest, "[c]hance affects the result not only as to the person or persons to receive the pool proceeds, but as to the amount received by any winning player, since more than one player may have selected the [same winning combination]." *Finster*, 18 Cal. App. 3d at 845.

-30-

95.    **Finally**, after the underlying sports competitions resolve, DraftKings uses its records (i.e., its betting book) to determine the winners and losers and make payments to participants from the pooled wagers.

96.    Ultimately, regardless of which Pick6 sporting event type DraftKings customers select, the specific athletes' "overs" and "unders" chosen, or the amounts bet, the customers have no control over the outcome of the contest they have wagered on. The outcome is determined entirely based on athletes' actual in-game performances (i.e., the athletes' performance in the actual underlying sporting events) and are entirely outside of the customers' control.[28]

97.    Put simply, the outcomes of the Pick6 contests are contingent and unknown at the time the bets and wagers are collected, recorded (i.e., booked), and pooled by DraftKings.  And as a result, DraftKings' Pick6 contests violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j.

### b.  DraftKings' False Assurances that DraftKings Pick6 Is Permitted in California.

98.    Well aware that customers would decline to play DraftKings Pick6 if they knew and understood those contests to violate California criminal law, on DraftKings' Pick6 website, DraftKings repeatedly assures prospective customers that DraftKings Pick6 can be played in California.

---

[28] Plaintiffs note that they are specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make their allegations in the alternative, and accordingly, allege that the gambling contests offered in California by DraftKings constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

99.    For example, if a California user follows the link to "Where is Pick6 Available" he is taken to a page[29] which displays the following information, reflecting that Pick6 is available in California, among many other states:

100.    DraftKings next includes a list of states where Daily Fantasy Sports are available, which expressly identifies California as an "available" jurisdiction, leading users—even as recently as January 19, 2026[30]—to  believe use of Pick6 is legal in California:



---

[30] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

101.    Substantively identical representations are made to customers on the "DraftKings Fantasy" mobile app, with the "Where is Pick6 Available?" page (far left image) redirecting to the map reflected in the central image, where California is listed as a legal jurisdiction:

  

## G.    DraftKings' Half-Billion Dollar Advertising Budget.

102.    According to Scaleo.com, DraftKings is estimated to spend between $500 to $600 million per year on advertising and marketing, among the highest spends in the industry.[31]

103.    The reason DraftKings spends hundreds of millions of dollars each year on advertisements and marketing is to expand and maintain its userbase, including within California.

104.    Examples of DraftKings' advertising and marketing tactics within California include:

    a.    Sponsorship of Established Sports Leagues: According to its own website, "DraftKings is both an official daily fantasy and sports

---

[31] *How Much Sportsbooks Spend on Marketing (2025 Updated Stats!),* available online at https://www.scaleo.io/blog/how-much-sportsbooks-spend-on-marketing-2024-updated-stats/ (last visited January 19, 2026)

betting partner of the NFL, NHL, PGA TOUR, and UFC, as well as an official daily fantasy partner of NASCAR, an official sports betting partner of the NBA and an authorized gaming operator of MLB."[32]

b.    Traditional TV Ads: DraftKings runs extensive traditional TV advertisements featuring celebrities and promotional products and offers to attract new customers.[33]

c.    Digital Marketing: DraftKings invests heavily in online digital advertising, including Google Ads and social media advertising to target specific demographics and interests.

d.    Promotional Offers: DraftKings uses new user bonuses, deposit matches, and referral programs, among other tactics, to incentivize sign-ups.

e.    Seasonal Campaigns: DraftKings strategically times ad campaigns around major sporting events (e.g., the NBA Finals) to maximize potential reach and engagement.

f.    User Interface Design and Personalization: On information and belief, DraftKings utilizes data analytics to personalize marketing messages and platform experiences based on user preferences.

g.    Loyalty Programs: DraftKings incentivizes repeat engagement and loyalty through rewards programs, exclusive contests, and promotions.

h.    Content Creation: DraftKings provides content like sports news, player updates, expert analysis, and tips to drive potential customer engagement with its services.

---

[32] *DraftKings Becomes an Official Sports Betting and Daily Fantasy Partner of the WNBA,* available online at https://www.draftkings.com/draftkings-becomes-an-official-sports-betting-and-daily-fantasy-partner-of-the-wnba (last visited January 19, 2026).

[33] For example, DraftKings ran the following ad featuring Kevin Hart during the 2024 Super Bowl: https://www.youtube.com/watch?v=SLZ8Dl_G7k4 (last visited January 19, 2025).

i.      Direct Customer Marketing: DraftKings sends emails, texts, and push-notifications to its existing customers, particularly when existing customers decrease their use of the Gambling Websites.

105.    Further, DraftKings has expanded its marketing efforts in California to include co-branded products, including products that can be purchased and used by minors.

106.    For example, here is a picture of a DraftKings advertisement on a bag of Ruffles potato chips:



107.    Put simply, DraftKings has a comprehensive marketing and customer solicitation plan, that it spends approximately a half-billion dollars a year on, designed to entice new and existing customers to use the DraftKings services, including the Gambling Websites within California.

108.    Those advertisements continue to this day, including during 2026 NFL playoff football that is currently being watched by millions of Californians, including children.

**H.      Plaintiffs' Experiences.**

**3.      Plaintiff ZhiCheng Zhen's Experience.**

109.    At all times relevant to this action, Plaintiff ZhiCheng Zhen has resided in Alameda County, California.

110.    In or about May 2024, in response to advertisements he saw online and while watching NBA games on TV in California, Plaintiff Zhen created an account with DraftKings. DraftKings represented to Plaintiff Zhen that the services it offered in California were legal.

111.    Since the time of account creation, DraftKings has continued to represent to Plaintiff Zhen, including on the Gambling Websites themselves, that its services are legal in California.

112.    In setting up and using his DraftKings account, Plaintiff Zhen expressly relied upon DraftKings' representations that the services it provides in California are legal. Plaintiff Zhen believed that DraftKings' Gambling Websites were lawful in California, and did not discover that DraftKings' Gambling Websites were not legal in California until May 2025 when he engaged counsel.

113.    If DraftKings had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff Zhen would not have created an account with DraftKings in California and would not have placed bets while in California through the DraftKings Gambling Websites.

114.    Since May of 2024, Plaintiff Zhen has lost approximately $1,000 to DraftKings while in California.

115.    If DraftKings had not solicited bets and wagers from Plaintiff Zhen while representing that such activities were legal in California (when, unknown to Plaintiff Zhen at the time, they in fact were not legal), he would not have made any of those bets or wagers and would not have paid any money to DraftKings.

116.    In Plaintiff Zhen's experience, DraftKings pools together all bets and wagers from participants, documenting the bets and wagers that were placed, and then pays out prizes from the bet and wager pool, less the amount DraftKings collects and keeps for itself. The difference between the total bets and wagers collected and the prizes paid out is DraftKings' take.

117.    Plaintiff Zhen has gambled with DraftKings as recently as February 12, 2025, while in California, playing NBA Pick6 and lost around $400.

118.    While Plaintiff Zhen has now discontinued the use of DraftKings while in California, he remains interested in online gambling in California, and if it becomes legal, he would continue to gamble online in California. Plaintiff Zhen may be tricked by DraftKings in the future into engaging in unlawful gambling in California if DraftKings continues to claim that its practices are legal.

-37-

119.    Plaintiff Zhen's sole reason for setting up an account with DraftKings and purportedly consenting to DraftKings' terms of service (which he did not review and was not aware he was purportedly agreeing to at the time of account creation or otherwise) was to gain access to the gambling services in California offered by DraftKings that he now understands violate California law.

120.    Said differently, to the extent a contract was formed between Plaintiff Zhen and DraftKings, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

121.    Accordingly, Plaintiff Zhen's supposed contract with DraftKings was based exclusively on illegal and invalid consideration and no contract with DraftKings was ever formed. *See* Cal Civ. Code §§ 1607, 1608, 1667.

### 4.    Plaintiff Jonathan Smith's Experience.

122.    At all times relevant to this action, Plaintiff Jonathan Smith has resided in California, presently residing in Napa County.

123.    In or about 2019, in response to advertisements he had seen on television while watching the NBA, Plaintiff Smith created an account with DraftKings. DraftKings represented to Plaintiff Smith that the services it offered in California were legal. Smith placed bets every year on DraftKings between 2019 until May 2025.

124.    Since that time, DraftKings has continued to represent to Plaintiff Smith—including on the Gambling Websites themselves—that its services are legal in California.

125.    In setting up and using his DraftKings account, Plaintiff Smith expressly relied upon DraftKings' representations that the services it provides in California are legal. Plaintiff Smith believed that DraftKings' Gambling Websites were lawful in California, and did not discover that DraftKings' Gambling Websites were not legal in California until May 2025 when he engaged counsel.

126.    If DraftKings had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff Smith would not have created an account with

DraftKings in California and would not have placed bets while in California through the DraftKings Gambling Websites.

127.    Since May of 2019, Plaintiff Smith, has lost a total of approximately $1,700 to DraftKings while in California, including losses in excess of 10 British pounds as recently as May 2025.

128.    If DraftKings had not solicited bets and wagers from Plaintiff Smith while representing that such activities were legal (when, unknown to Plaintiff Smith at the time, they in fact were not legal), he would not have made any of those bets or wagers and would not have paid any money to DraftKings.

129.    Among other gambling options offered by DraftKings in California, Plaintiff Smith has played Daily Fantasy Sports through DraftKings while in California and lost money to DraftKings.

130.    In Plaintiff Smiths' experience, DraftKings pools together all bets and wagers from participants, documenting the bets and wagers that were placed, and then pays out prizes from the bet and wager pool, less the amount DraftKings collects and keeps for itself. The difference between the total bets and wagers collected and the prizes paid out is DraftKings' take.

131.    While Plaintiff Smith has now discontinued the use of DraftKings while in California, he remains interested in online gambling in California, and if it becomes legal, he would continue to gamble online in California. Plaintiff Smith may be tricked by DraftKings in the future into engaging in unlawful gambling in California if DraftKings continues to claim that its practices are legal.

132.    Plaintiff Smith's sole reason for setting up an account with DraftKings and purportedly consenting to DraftKings' terms of service (which he did not review and was not aware he was purportedly agreeing to at the time of account creation) was to gain access to the gambling services in California offered by DraftKings that he now understands violate California law.

133.    Said differently, to the extent a contract was formed between Plaintiff Smith and DraftKings, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

-39-

134.     Accordingly, Plaintiff Smith's supposed contract with DraftKings was based exclusively on illegal and invalid consideration and no contract with DraftKings was ever formed. *See* Cal Civ. Code §§ 1607, 1608, 1667.

**I.     Continued, Ongoing Threat**

135.     DraftKings' continuous, coordinated, and ongoing scheme to offer illegal gambling services in California is continuing and has operated since at least 2012: operating an illegal gambling website, profiting from sales of illegal gambling services, illegally routing, concealing and distributing gambling funds; and continuing to falsely advertise supposed "DFS" and "Pick6" as legal in California, despite full knowledge and awareness that "DFS" and "Pick6", and more specifically, DraftKings' fantasy sports operation is operating illegally in California.

136.     Plaintiffs and the class members will continue to be harmed by the illegal advertisements and gambling operations in California.

137.     Historical screenshots of DraftKings' website and terms of service reflect the long term, and continuous scheme in California.

138.     On April 18, 2019, DraftKings' terms of service indicate an age requirement based on the "Jurisdictions, territories, and locations where the minimum age for permissible use" is met, but fails to "exclude" California for eligibility despite knowing its services were not legal in California:

**ELIGIBILITY**

You must be at least eighteen (18) years of age to open an account, participate in contests, or win prizes offered by the Website. In jurisdictions, territories, and locations where the minimum age for permissible use of the Website is greater than eighteen (18) years old, you must meet the age requirement in your local jurisdiction or territory. You must be at least nineteen (19) years of age at time of account creation if you are a legal resident of Alabama or Nebraska or twenty-one (21) years of age if you are a legal resident of Massachusetts. Legal residents physically located in any of the fifty (50) states and Washington, DC, excluding Alabama, Arizona, Hawaii, Idaho, Iowa, Louisiana, Montana, Nevada and Washington (the "Excluded States") are eligible to open an account and participate in contests offered by the Website. Legal residents of the Excluded States are eligible to open and maintain accounts on the Website for use only in games that do not offer prizes. However, legal residents of Alabama or Idaho who are physically located outside of the Excluded States are eligible to deposit funds, enter contests and earn prizes offered by the Website. Legal residents of Canada are eligible to open an account and participate in contests offered by the Website.

139.     DraftKings' website reflected the following on May 3, 2019 (when Plaintiff Smith started using DraftKings) regarding the "legality" of DraftKings and stated that DraftKings "monitors new developments and acts quickly to ensure it is in compliance with the laws in any state where it operates", despite knowing that California does not permit paid daily fantasy sports:

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**
Case No. 3:25-cv-04618-CRB

## LEGALITY

DraftKings is a pioneering American company operating in an innovative space where discussions of appropriate legal regulations are ongoing. Both federal and state laws govern DraftKings and its DFS contests. DraftKings operates in compliance with federal law, including a statute called the Unlawful Internet Gambling Enforcement Act, or UIGEA, which exempts fantasy sports contests from its regulation. State law regarding DFS contests varies by state, and is currently dynamic, with some states expressly regulating DFS contests while others continue to evaluate the legality of DFS contests and potential regulation of the industry. In some states, the legality of DFS contests has never been questioned. In states where politicians or other officials (and not the legislature) have made statements about the legality of DFS contests, DraftKings may ask a state's courts to clarify its right to operate. Some state legislatures have already passed laws confirming the legality of DFS contests. Still other legislatures are actively debating and considering laws and regulations. DraftKings monitors new developments and acts quickly to ensure it is in compliance with the laws in any state where it operates. As any changes in the law take place or regulations are implemented, DraftKings will take steps to ensure its continued compliance, and changes to this site may take place to reflect any such new laws or regulations.

140.    Even after the California Attorney General issued the July 3, 2025 legal opinion, DraftKings has continued to represent that its "Daily Fantasy Sports" services are legal in California, for example, based on Web Archives, DraftKings made this representation on October 27, 2025.—and continues to do so, today.[34]

141.    In response to the California Attorney General Opinion issued on July 3, 2025, DraftKings said in a statement to ESPN that DraftKings disagrees with the Attorney General's opinion and that it would continue to offer its contests in California as it has done for over 13 years.[35]

---

[34] https://web.archive.org/web/20251027010831/https://www.draftkings.com/where-is-draftkings-legal (last visited January 19, 2026).

[35] David Purdum, *California attorney general says daily fantasy sports illegal in state*, ESPN.com, July 3, 2025, https://www.espn.com/sports-betting/story/_/id/45661944/california-attorney-general-says-daily-fantasy-illegal-state (last visited January 19, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

142.    DraftKings has not indicated any intention to cease operations in California regarding paid daily fantasy sports competitions, or the advertisements concerning the same in California.

143.    It also has not added any representations to the Gambling Websites that Plaintiffs were able to readily identify regarding the California Attorney General's finding of illegality.

**J.    DraftKings' Affirmative Misrepresentations Have Tolled the Statute of Limitations.**

144.    As detailed above, DraftKings has consistently and explicitly represented to the public and its customers, including Plaintiffs and the Class (as defined below), that its operation of the Gambling Websites in California is legal.

145.    Among other things, DraftKings has held itself out as being an expert on gambling law and regulations, and induced Plaintiffs and the Class to rely on its affirmative false representations and statements in order to secure Plaintiffs' and the Class's use of the Gambling Websites and to keep Plaintiffs and the Class using the unlawful Gambling Websites in California.

146.    As a direct and proximate result of DraftKings' affirmative misrepresentations and statements, Plaintiffs and the Class believed DraftKings' contests were lawful in California and did not know that DraftKings' Gambling Services were unlawful at the time the fees were paid.

147.    Plaintiffs and the Class members did not discover, and could not reasonably discover, that DraftKings' Gambling Services were unlawful or illegal until the filing of this lawsuit and the California Attorney General's July 3, 2025 opinion. Previously, Plaintiffs and the Class members had no reason to investigate California gambling laws given DraftKings' affirmative representations, and were not aware of any prior litigation, regulatory actions, or public information to suggest the Gambling Services were not lawful.

148.    When Plaintiffs did finally learn the true unlawful nature of the Gambling Websites' operation in or about May of 2025 after retaining counsel, Plaintiffs promptly filed this lawsuit. Since Plaintiffs and the Class members became aware that DraftKings' Gambling Website was unlawful and illegal, DraftKings continued to operate the Gambling Website in California and represent to Californian's that its contests were lawful, causing ongoing harm, risk of inducing additional California consumers, and a continuing violation of California law.

**K.      DraftKings Acted with Malice, Oppression, and Fraud.**

149.    As detailed in this Complaint, DraftKings has acted with malice, oppression, and fraud.

150.    DraftKings acted with malice, because, among other reasons and as otherwise detailed in this Complaint, DraftKings' conduct was despicable and was done with a willful and knowing disregard of the rights of the public, Plaintiffs, and the Class (as defined below) because DraftKings knew (or should have known) that its gambling operations in California were illegal, but despite that induced Plaintiffs and the Class to gamble and lose money through its Gambling Websites while in California. As the California legislature has repeatedly made clear, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

151.    DraftKings' conduct was oppressive because, among other reasons and as otherwise detailed in this Complaint, it was despicable and subjected Plaintiffs and the Class to cruel and unjust hardship in knowing disregard of their rights, including by falsely inducing them to lose significant sums of money through the illegal gambling enterprise that DraftKings held out as being legal in California.

152.    DraftKings' conduct was fraudulent, because, among other reasons and as otherwise detailed in this Complaint, DraftKings intentionally misrepresented and concealed the true nature of its unlawful gambling enterprise from Plaintiffs and the Class by affirmatively representing that the Gambling Websites and associated contests were legal in California when DraftKings knew (or should have known) that such contests were not.

**L.      The RICO Enterprises**

153.    Plaintiffs' complaint alleges RICO claims involving two distinct groups of RICO "persons" and "enterprises."

154.    The first is the Natural Person Enterprise, which consists of the following RICO persons: Defendants Robins, Kalish, and Liberman, and the RICO enterprise, DraftKings, Inc., which is not a named defendant for purposes of the Natural Person Enterprise.

155.    The second is the Legal Entities Enterprise, an association in fact enterprise, which consists of the following RICO persons: Defendant DraftKings, Inc., Defendant Crown Gaming, Inc. and Defendants Robins, Kalish, and Liberman. The Legal Entities Enterprise exists outside of the respective entities' business activities and was formed between them as separate legal entities and persons for the purposes of carrying on an illegal gambling enterprise.

156.    Both enterprises are discussed immediately below.

### 1.    The Natural Person Enterprise

157.    In operating DraftKings and the Gambling Websites, Defendants Robins, Kalish, and Liberman, work in concert to perpetuate an illegal gambling enterprise throughout the state of California where it is clear that DraftKings' daily fantasy sports services are illegal. To be clear, DraftKings' services can be offered legally in jurisdictions that permit the daily fantasy sports and Pick6 gambling services DraftKings offers (subject to appropriate registration and regulatory filings), but DraftKings also offers its daily fantasy sports and Pick6 services in jurisdictions where their services are not legally permitted, such as California, despite knowing that their services are not legal.

158.    Defendants Robins, Kalish, and Liberman work in concert and together to play a specific role in the enterprise.

159.    The enterprise itself exists through DraftKings, Inc. While DraftKings, Inc. exists as an entity that undertakes business offering legal gambling services in states that have allowed such services into their markets, Defendants Robins, Kalish, and Liberman have used DraftKings, Inc., to offer illegal gambling services in California and as such DraftKings, Inc. is an "enterprise" as defined under 18 U.S.C. § 1961(4). Defendants Robins, Kalish, and Liberman use DraftKings, Inc. to undertake their illegal gambling enterprise in a way that is distinct from DraftKings' operations in states where they are legally allowed to offer their Daily Fantasy Sports and Pick6 services. Defendants Robins, Kalish, and Liberman use DraftKings, Inc. (and have used it for years) in California to perpetuate their illegal gambling enterprise, including by using DraftKings, Inc. to: (i) offer illegal gambling services in California, (ii) make representations regarding the legality of

its services in California as detailed in this complaint, and (iii) spend millions of dollars advertising the legality and availability of its illegal gambling services within California.

160.    Jason D. Robins is the Chief Executive Officer and Chairman of the Board. Robins co-founded DraftKings in December 2011 and served as its Chief Executive Officer since, and has served as the Chief Executive Officer and Chairman of the Board since April 2020.

161.    Mr. Robins DraftKings' biography states "Mr. Robins oversees the Company's strategy and operations, while also driving financings and strategic initiatives. . . Mr. Robins has led efforts at DraftKings to work with policy makers and regulators to pass fantasy sports, sports betting and iGaming legislation."[36]

162.    Mr. Robins has made specific efforts to target California consumers with DraftKings' illegal services. For example, he has conceded in an interview that he does not believe that sports betting would be legal in California by 2024 (at a time when DraftKings was operating in California as described above), and stated his opinion that "it's just self-evident that this is something California *should* be doing," (emphasis added), i.e., legalizing sports betting like the activities described herein.[37] Mr. Robins has actively promoted sports betting in California, admitting that it is not currently legal there while continuing to promote DraftKings services within California borders.[38]

163.    Matthew Kalish is the President, DraftKings North America, and a director. Kalish co-founded the Company in December of 2011 and served as its Chief Revenue Officer from 2014 until December 2019. Kalish is on the Board of Directors.

164.    Mr. Kalish DraftKings' biography states "Mr. Kalish's areas of responsibility have grown consistently to now oversee the performance of DraftKings' Sportsbook, iGaming, Daily

---

[36] Biography of Jason D. Robins, https://draftkings.gcs-web.com/board-member/jason-robins (last visited January 19 2026).

[37] https://www.legalsportsreport.com/108148/legal-ca-sports-betting-could-take-years-draftkings-robins/ (last visited January, 19 2026).

[38] See *id*.; see also, https://gamingamerica.com/news/14229/ceo-special-jason-robins-the-sequel (last visited 1/15/2026); https://www.marketwatch.com/story/draftkings-ceo-says-california-sports-betting-revenue-could-help-address-homelessness-and-mental-health-11645214820?gaa_at=eafs&gaa_n=AWEtsqf4JK_c_y1itW5BJn-adtPRfjsrIrcz7NlqGniMPwXxMX6f2oN99tZQtDKVYYY%3D&gaa_ts=6966c6b1 (last visited (1/15/2026).

Fantasy Sports and Marketplace offerings, and he leads DraftKings' operations, marketing and customer experience departments. Mr. Kalish focuses on developing and managing high-performing offerings and promotions that users love, and brining those offerings to market in order to drive user base growth and loyalty."[39] And further, "[u]nder Mr. Kalish's oversight, DraftKings has grown to offer a broad variety of sports and game variants in Daily Fantasy Sports, as well as highly competitive Sportsbook and iGaming offerings, which have resulted in DraftKings achieving a market leadership position in the rapidly expanding U.S. real-money gaming landscape."[40]

165.    Paul Liberman is the President, Global Technology and Product, and a director. Mr. Liberman co-founded the Company in December 2011 and served as its Chief Operations Officer ("COO") from 2015 to December 2019. Liberman is on the Board of Directors.

166.    Mr. Liberman's DraftKings' biography states "[h]e oversees our product development while leading efforts in maintain the Company's current product offerings. . . Under his leadership, Mr. Liberman's team has developed award-winning, stand-alone apps and product offerings including DraftKings' DK Live and Leagues, DraftKings Daily Fantasy Sports app, and most recently, the DraftKings Sportsbook and iGaming platforms."[41]

### a.  The Racketeering Acts

#### (1)    Violation of Federal Anti-Gambling Laws

167.    Defendants Robins, Kalish, and Liberman, by and through the enterprise, have engaged in multiple racketeering acts within the past ten years (and currently), including violating numerous federal statutes prohibiting gambling.

168.    From its inception, Robins, Kalish, and Liberman have engaged in an enterprise to violate federal gambling laws in California and offer DraftKings, Inc.'s Daily Fantasy Sports service—and later its Pick6 service—in California. California law has always prohibited daily

---

[39] Biography of Matthew Kalish, https://draftkings.gcs-web.com/board-member/matthew-kalish (last visited January 19, 2026).
[40] *Id.*
[41] Biography of Paul Liberman, https://draftkings.gcs-web.com/board-member/paul-liberman (last visited January 19, 2026).

fantasy sports gambling—but to the extent there was any uncertainty in the state of California law (there was not), any such uncertainty was definitively resolved with the release of the California Attorney General Opinion plainly stating that Daily Fantasy Sports services are illegal in California.

169.    Despite this, Defendants Robins, Kalish, and Liberman used DraftKings, Inc., to continue to violate federal gambling statutes anyway by continuing to offer DraftKings, Inc.'s daily fantasy sports services in California, despite the Attorney General's opinion. In fact, not only did Defendants Robins, Kalish, and Liberman offer DraftKings' illegal Daily Fantasy Sports services in California for years, Robins, Kalish, and Liberman introduced additional illegal gambling services into California—the Pick6 service—furthering their illegal enterprise through DraftKings, Inc.

170.    Prior to the Attorney General releasing his opinion, Defendant Robins was clear in the enterprise's intention to enter the California sports gambling market to offer additional illegal sports gambling services. After championing Prop 27, Defendant Robins conducted an interview with Joe Pompliano on YouTube where he expressed his views as an officer of DraftKings on California's failure to pass Prop 27 and the future of sports gambling in California: "I don't see this being a short-term thing. It's the biggest prize [getting DraftKings into the California market], so not surprisingly it's going to be the hardest battle."[42] And "it is self-evident that this is something [legalizing sports betting] California should be doing."[43] Despite this interview occurring on March 17, 2023, mere months later in December 2023, DraftKings announced that it would be launching a new service in California, the Pick6 service, despite no change in law authorizing the Pick6 service.[44]

171.    On information and belief, at least between Mr. Robins March 2023 interview where he acknowledged California's refusal to legalize sports betting and December 2023, Mr. Robins as

---

[42] Matthew Kredell, *CA Tribes Respond to DraftKings Retreat on '24 California Sports Betting*, PlayUSA, https://www.playusa.com/news/draftkings-ceo-comments-california-sports-betting/ (last visited January 20, 2026). *See also* https://www.youtube.com/watch?v=VSSV-jJS3Sk at 31:12-31:20 (last visited January 20, 2026).
[43] *Id.*
[44] Adam Hensley, *DraftKings Adds Pick'Em Offering in CA Despite Grim Legal Outlook*, PlayCA, https://www.playca.com/4015116/draftkings-expands-offerings-california/ (last visited January 20, 2026).

CEO, Mr. Kalish as President of DraftKings North America and overseer of DraftKings' daily fantasy sports operations, and Mr. Liberman as President of Global Technology and Product, devised the Pick6 service, decided they would offer the illegal Pick6 service in California as well as continuing to offer their illegal daily fantasy sports service. And, even after the Attorney General's opinion in July 2025, they continued this course of conduct despite the clear illegality.

172.    Defendants Robins, Kalish, and Liberman's conduct and enterprise violate a host of federal law as explained below.

173.    First, Defendants Robins, Kalish, and Liberman have violated 18 U.S.C. § 1084, which prohibits those engaged in the business of betting or wagering from knowingly using a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest where the bet or wager is illegal in the state where the bet or wager is placed.

174.    As discussed herein, Defendants Robins, Kalish, and Liberman are engaged in the business of betting or wagering as they offer a gambling service through DraftKings, Inc., namely their Gambling Websites, which facilitate illegal gambling on fantasy sports. Defendants Robins, Kalish, and Liberman as owners and officers of DraftKings knowingly use wire communication facilities—including the internet—in interstate commerce to transmit bets and/or wagers through DraftKings. DraftKings is based in Massachusetts and Plaintiffs and the Class are based in California. Therefore, Defendants Robins, Kalish, and Liberman transmitted bets in interstate commerce when DraftKings transmitted bets for offer in California, accepted bets from California residents, and paid California residents who won bets on DraftKings' illegal gambling services. Specifically, Defendants Robins, Kalish, and Liberman through DraftKings transmitted the "lines" users could wager against relating to numerous sporting contests, accepted bets, and paid out bets, all using the internet to facilitate the same. As such, Defendants Robins, Kalish, and Liberman violated 18 U.S.C. § 1084.

175.    Second, Defendants Robins, Kalish, and Liberman have engaged in running an illegal gambling business in violation of 18 U.S.C. § 1955, which provides that whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be

-48-

fined or imprisoned (not more than five years) or both. An illegal gambling business is one that "(i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervised, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of third days or has a gross revenue of $2,000 in any single day." 18 U.S.C. § 1955(b).

176.    Defendants Robins, Kalish, and Liberman engaged in running an illegal gambling business as follows. Defendants Robins, Kalish, and Liberman manage, direct, and in some cases own all or part of DraftKings, which offers its illegal Daily Fantasy Sports and Pick6 services in California. As detailed extensively in this Amended Complaint and the Attorney General's Opinion, DraftKings' Daily Fantasy Sports and Pick6 services are illegal in California. DraftKings has more than five individuals who conduct, finance, manage, supervise, direct, or own all or part of DraftKings.[45] Additionally, DraftKings has been in operation for more than thirty days (in fact for over a decade) in California, and has gross revenue from California alone of more than $2,000 per day. Because DraftKings offers gambling services (namely, engaging in pool-selling and/or bookmaking, among others) that are illegal in the state of California, its business involves five or more persons who finance, manage, supervise, direct, or own all or part of DraftKings, and DraftKings has been in continuous operations for more than thirty-days and/or has gross revenues of more than $2,000 in a single day, Robins, Kalish, and Liberman are engaged in an illegal gambling business under 18 U.S.C. §1955.

177.    Third, Defendants Robins, Kalish, and Liberman have engaged in the interstate transportation of wagering paraphernalia through DraftKings in violation of 18 U.S.C. § 1953, which provides that "whoever . . .  knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for us in (a) bookmaking; or (b) *wagering pools with*

---

[45] *See* DraftKings Board of Directors page, which identifies more than five individuals who conduct, finance, manage, supervise, direct, and/or own all or part of DraftKings, including the named individual Defendants. https://draftkings.gcs-web.com/governance/board-of-directors (last visited January 19, 2026).

*respect to a sporting event*; or (c) in a numbers, policy, bolita or similar game shall be fined under this title or imprisoned for not more than five years, or both." (emphasis added).

178.    Defendants Robins, Kalish, and Liberman violated this provision by knowingly sending in interstate commerce through DraftKings writings and other devices used or designed for use in wagering pools with respect to a sporting event. Specifically, Defendants Robins, Kalish, and Liberman, designed a website and mobile application, which were designed to allow participation in wagering pools with respect to sporting events. DraftKings website and mobile application facilitate the illegal Daily Fantasy Sports and Pick6 services DraftKings offers to users, which are wagering pools on sporting events. As detailed herein, users can bet on the outcome of sporting events based on the line DraftKings sets, and Defendants Robins, Kalish, and Liberman knowingly transmits these bets and betting information through interstate commerce through DraftKings to facilitate user participating in the wagering pools, which is a violation of 18 U.S.C § 1953.

### (2)    **Wire Fraud**

179.    In addition to DraftKings' illegal gambling operations, Defendants Robins, Kalish, and Liberman also, by and through DraftKings (the enterprise), engage in a systematic and ongoing scheme with the intent to defraud, deceive, and/or mislead the public, Plaintiffs, and others who used DraftKings services to illegally gamble. Defendants Robins, Kalish, and Liberman knowingly devised and/or knowingly participated in a scheme or artifice to defraud its users, namely falsely representing to its users DraftKings Daily Fantasy Sports and Pick6 services were legal through statements communicated through DraftKings, or to obtain money or property of its users by means of false or fraudulent pretenses or representation in violation of 18 U.S.C. § 1343.

180.    Defendants Robins, Kalish, and Liberman's facilitation of illegal gambling and other business practices described herein are contrary to public policy and/or fail to measure up to the reflection of moral uprightness, fundamental honesty, fair play, and right dealing in general and business life of members of society in violation of 18 U.S.C. § 1343.

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

181.    Defendants Robins, Kalish, and Liberman could foresee and in fact did foresee that the interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out the scheme, within the meaning of 18 U.S.C. § 1343.

182.    Defendants Robins, Kalish, and Liberman acting singularly and in concert, through the enterprise (DraftKings), used the interstate wires or caused the interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud the victims, within the meaning of 18 U.S.C. § 1343.

183.    By way of example, Defendants Robins, Kalish, and Liberman through DraftKings specifically used the interstate wires or caused the interstate wires to do the following:

       (a)  Transmitting information relating to an illegal gambling business across state lines.

       (b)  Transmitting information relating to the legality of its illegal gambling business across state lines.

       (c)  Accepting wagers related to an illegal gambling business and paying out "winnings" to those that placed illegal bets.

       (d)  Accepting money from users related to their illegal gambling.

184.    All of the wire communications described above crossed interstate and international borders by reason of the technology used to transmit the communications, namely the internet.

185.    It is not possible for Plaintiffs to plead with particularly all instances of wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars are within the exclusive control and within the knowledge of Defendants Robins, Kalish, and Liberman and other presently unknown individuals.

186.    Each and every use of interstate wires described above was committed by Defendants Robins, Kalish, and Liberman with the specific intent to defraud users or to obtain the property of users by means of false or fraudulent pretenses, representations, or promises. Defendants Robins, Kalish, and Liberman's acts of wire fraud in violation of 18 U.S.C. 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961.

### b. Effect on Interstate Commerce

187.    During the period applicable to this lawsuit, Defendants Robins, Kalish, and Liberman by and through DraftKings marketed, promoted, and distributed its illegal gambling services across state lines and throughout the United States, including by operating illegal Gambling Websites in contravention of state and federal law.

188.    To effectuate their illegal gambling scheme, Defendants Robins, Kalish, and Liberman by and through DraftKings transmitted funds, contracts, invoices, and other types of business transactions or communications, in a continuous flow of commerce across state lines and throughout the United States. Every time a user placed a bet on DraftKings, Defendants Robins, Kalish, and Liberman used interstate electronic communications to process the transaction by and through DraftKings. These thousands of communications in furtherance of their fraudulent scheme constitute wire fraud under federal law.

189.    Defendants' illegal gambling scheme and related activities were within the flow of and had substantial effects on domestic, import, and interstate commerce.

### 2.    The Legal Entity Enterprise[46]

190.    Defendant DraftKings, Inc., Defendant Crown Gaming, Inc. and Defendants Robins, Kalish, and Liberman operate as an association-in-fact enterprise to perpetuate an illegal gambling scheme throughout the state of California where it is clear that the enterprises' gambling services are illegal.

191.    Defendants DraftKings, Inc. and Crown Gaming, Inc. (collectively the "Entity Defendants"), work in concert and together to play a specific role in the association-in-fact enterprise. Plaintiffs understand that the Entity Defendants came together for the purposes of conducting their affairs through a RICO prohibited course of conduct, namely offering gambling products in violation of federal law outlawing those engaged in the business of betting or wagering

---

[46] Plaintiffs note that they are specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make their allegations in the alternative, and accordingly, Plaintiffs allege the existence of two separate RICO enterprises. To the extent finds that there is a conflict between the allegations, Plaintiffs request the right to amend.

from knowingly using a wire communication facility for the transmission of bets and wagers, illegally transporting wagering paraphernalia, running an illegal gambling business, and wire fraud.

192.    The Entity Defendants associated for a common purpose of engaging in a course of conduct, perpetuating an illegal gambling scheme throughout the state of California.

193.    As described throughout this complaint, Defendant DraftKings, Inc., is a corporation that offers gambling services throughout the United States, including its Daily Fantasy Sports and Pick6 services in California.

194.    Defendant Crown Gaming, Inc. is an entity that offers software solutions to facilitate gambling services. While Defendant Crown Gaming, Inc. is a subsidiary of DraftKings, Inc. it is its own legal entity and maintains a separate corporate form. Crown Gaming, Inc. has previously entered into contracts with third-parties to assist it in designing and maintaining software solutions to offer gambling services.[47] Crown Gaming, Inc. uses these third-party contracts as well as its own proprietary technology to create infrastructure necessary for gambling services.

195.    The two entities associated with one another for the purpose of offering gambling services to California users that the enterprise marketed as being legal for the purpose of attracting new users, including Plaintiffs, to use their gambling services to engage in illegal gambling and thus directly profit from the services the enterprise offered. Defendant DraftKings, Inc.'s role in the enterprise is to be consumer facing, advertise the enterprises' services, interface with users, and complete the functions necessary to pay-out wagers to users. Defendant Crown Gaming, Inc.'s role in the enterprise to be product-facing, maintaining and implementing software to allow users to participate in the enterprise's illegal California gambling operations.

196.    The Entity Defendants' operation is ongoing as the Entity Defendants continue to associate together to offer illegal gambling products within the state of California. As detailed herein, the gambling services at issue are still available in California.

---

[47] *See* https://www.sec.gov/Archives/edgar/data/1772757/000110465920039031/tv538896_ex10-5.htm, the initial agreement between Sports Information Services Limited and Crown Gaming, Inc. (last visited January 20, 2026); *see also* https://draftkings.gcs-web.com/static-files/0dd5d1d2-a6e8-4c21-9c14-aba57f1880ac#tm2025487d3_ex10-1.htm, an addendum between the parties (last visited January 20, 2026).

197.    Defendants Robins, Kalish, and Liberman role in the Legal Entity Enterprise is substantially the same as their role in the Natural Persons Enterprise, as alleged above.

### a.    The Racketeering Acts

#### (1)    Violation of Federal Anti-Gambling Laws

198.    Defendants, by and through their associated-in-fact enterprise, have engaged in multiple racketeering acts within the past ten years, including violating numerous federal statutes prohibiting gambling.

199.    Since at least 2018 (when Crown Gaming, Inc. was incorporated), the Entity Defendants associated with each other as an enterprise to violate federal gambling laws in California and offer the enterprises gambling services in California. California law has always prohibited daily fantasy sports gambling—but to the extent there was any uncertainty in the state of California law (there was not), any such uncertainty was definitely resolved with the release of the California Attorney General Opinion plainly stating that Daily Fantasy Sports services are illegal in California.

200.    As discussed herein, on July 3, 2025, the Attorney General of California released a report confirming that California law prohibits the operation of daily fantasy sports games as they constitute wagering on sports in violation of Penal Code section 337a. *See* Section D.

201.    Despite this, the Entity Defendants continue to use their associated-in-fact enterprise to offer Daily Fantasy Sports and Pick6 services to California residents, despite the clear proclamation that such services were illegal under California law. To be clear, the Entity Defendants were engaged in the same conduct prior to the Attorney General's opinion.

202.    The Entity Defendants illegal gambling enterprise violates a host of federal law as explained below.

203.    First, the Entity Defendants have violated 18 U.S.C. § 1084, which prohibits those engaged in the business of betting or wagering from knowingly using a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest where the bet or wager is illegal in the state where the bet or wager is placed.

-54-

204.     Defendants DraftKings, Inc. and Crown Gaming, Inc. are engaged in the business of bettering or wagering as Defendant DraftKings, Inc. is the entity offering the services to consumers and Crown Gaming, Inc. is the entity building, maintaining, and implementing the technological infrastructure necessary for users to engage in the gambling services.

205.     To ensure that their services could work and that users could gamble, the Entity Defendants utilized the Gambling Websites to transmit bets and/or wagers for the enterprise. Both entities are based in Massachusetts and Plaintiffs and the Class are based in California. Therefore, the Entity Defendants transmitted bets in interstate commerce when the enterprise transmitted bets for offer in California, accepted bets from California residents, paid California residents who won bets on the enterprises' illegal gambling services, and worked in concert to set-up the technological infrastructure to facilitate the same. Specifically, the Entity Defendants transmitted the "lines" users could wager against relating to numerous sporting contests, accepted bets, and paid out bets, all using the internet to facilitate the same.

206.     Second, the Entity Defendants have engaged in running an illegal gambling business in violation of 18 U.S.C. § 1955, which provides that whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined or imprisoned (not more than five years) or both. An illegal gambling business is one that "(i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervised, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of third days or has a gross revenue of $2,000 in any single day." 18 U.S.C. § 1955(b).

207.     The Entity Defendants engage in running an illegal gambling business (as the conduct is ongoing) as follows. Defendants DraftKings, Inc. and Crown Gaming, Inc. manage and direct the enterprise, which offers illegal gambling services in California (the Daily Fantasy Sports and Pick6 services). As detailed extensively in this Amended Complaint and the Attorney General's Opinion, the enterprise's Daily Fantasy Sports and Pick6 services are illegal in California. The enterprise has more than five individuals who conduct, finance, manage, supervise, direct, or own all or part of the enterprise as both of the Entity Defendants have individuals who conduct, manage,

-55-

supervise, direct, or own all or part of them. Additionally, the enterprise has been in operation for more than thirty days in California, and has gross revenue from California alone of more than $2,000 per day. Because the enterprise offers gambling services (namely, engaging in pool-selling and/or bookmaking, among others) that are illegal in the state of California, its business involves five or more persons who finance, manage, supervise, direct, or own all or part of the enterprise, and the enterprise has been in continuous operations for more than thirty-days and/or has gross revenues of more than $2,000 in a single day, the Entity Defendants are engaged in an illegal gambling business under 18 U.S.C. §1955.

208.    Third, the Entity Defendants have engaged in the interstate transportation of wagering paraphernalia through the enterprise in violation of 18 U.S.C. § 1953, which provides that whoever . . .  knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for us in (a) bookmaking; or (b) *wagering pools with respect to a sporting event*; or (c) in a numbers, policy, bolita or similar game shall be fined under this title or imprisoned for not more than five years, or both." (emphasis added).

209.    The Entity Defendants violated this provision by knowingly sending in interstate commerce writing and other devices used or designed for use in wagering pools with respect to a sporting event. Specifically, the Entity Defendants maintain certain Gambling Websites, which allows for participation in wagering pools with respect to sporting events. As detailed herein, users can bet on the outcome of sporting events based on the line the enterprise sets, and the Entity Defendants used the Gambling Websites to knowingly transmit these bets and betting information through interstate commerce to facilitate user participation in wagering pools, which is a violation of 18 U.S.C. § 1953.

### (2)    Wire Fraud

210.    In addition to the enterprise's illegal gambling operations, the Entity Defendants also engage in a systematic and ongoing scheme with the intent to defraud, deceive, and/or mislead the public, Plaintiffs, and others who used the enterprises services to illegally gamble. The Entity Defendants knowingly devised and/or knowingly participated in a scheme or artifice to defraud its

-56-

users, namely falsely representing to users that the gambling services were legal through statements communicated within the Gambling Websites the Entity Defendants utilize and maintain, or to obtain money or property of its users by means of false or fraudulent pretenses or representation in violation of 18 U.S.C. § 1343.

211.    The Entity Defendants facilitation of illegal gambling and other business practices described herein are contrary to public and/or fail to measure up to the reflection of moral uprightness, fundamental honesty, fair play, and right dealing in general and business life of members of society in violation of 18 U.S.C. § 1343.

212.    By way of example, the Entity Defendants specifically used interstate wires or cause interstate wires to do the following:

      (a)  Transmitting information relating to an illegal gambling business across state lines.

      (b)  Transmitting information relating to the legality of its illegal gambling business across state lines.

      (c)  Accepting wagers related to an illegal gambling business and paying out "winnings" to those that placed illegal bets.

      (d)  Accepting money from users related to their illegal gambling.

213.    All of the wire communications described above crossed interstate and international borders by reason of the technology used to transmit the communications, namely the internet.

214.    It is not possible for Plaintiffs to plead with particularly all instances of wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars are within the exclusive control and within the knowledge of the Entity Defendants and other presently unknown individuals.

215.    Each and every use of interstate wires described above was committed by the Entity Defendants with the specific intent to defraud users or to obtain the property of users by means of false or fraudulent pretenses, representations, or promises. The Entity Defendants acts of wire fraud in violation of 18 U.S.C. 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961.

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

### b.    Effect on Interstate Commerce

216.    During the period applicable to this lawsuit, the Entity Defendants marketed, promoted, and distributed its illegal gambling services across state lines and throughout the United States, including by operating illegal Gambling Websites in contravention of state and federal law.

217.    To effectuate their illegal gambling scheme, the Entity Defendants transmitted funds, contracts, invoices, and other types of business transactions or communications, in a continuous flow of commerce across state lines and throughout the United States. Every time a user placed a bet through the enterprise, the Entity Defendants used interstate electronic communications to process the transaction by and through the enterprise. These thousands of communications in furtherance of their fraudulent scheme constitute wire fraud under federal law.

218.    The Enterprise Defendants' illegal gambling scheme and related activities were within the flow of and had substantial effects on domestic, import, and interstate commerce.

219.    The Enterprise Defendants illegal gambling scheme and related activities were within the flow of and had substantial effects on domestic, import, and interstate commerce.

### M.    Plaintiffs and the Class Lack an Adequate Remedy at Law

220.    Plaintiffs and the Class (defined below) have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of Defendants' violation of law and wrongful conduct alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiffs and Class are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. As such, the Court may award restitution even if it determines that Plaintiffs and the Class fail to sufficiently adduce evidence to support an award of damages. Further, damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money a defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds have grown far greater than the legal rate of interest would recognize. In

short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

221.    Equitable relief is appropriate because Plaintiffs and the Class may lack an adequate remedy at law if, for instance, damages resulting from their use of the Gambling Websites is determined to be an amount less than paid to use the Gambling Websites. Without compensation for the full amount paid, Plaintiffs and the Class would be left without the remedy they are entitled to in equity.

222.    Injunctive relief is needed to halt DraftKings' illegal operations in California. DraftKings' continuous, ongoing scheme, which has continued through despite failing to secure express legalization of sports betting in 2024, will continue to harm California consumers otherwise. And Plaintiffs have standing to seek an injunction despite now knowing now that DraftKings' services are illegal; if learning of the illegality deprived a party of standing to seek a public injunction, the issue would permanently evade review. Only permanent injunctive relief will protect California consumers from DraftKings' misrepresentations and predatory practices.

223.    Plaintiffs explicitly plead those equitable claims in the alternative to their legal claims as Plaintiffs are permitted to do under Fed. R. Civ. P. 8(d) to the extent required.

## **CLASS ALLEGATIONS**

224.    This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure Rule 23, including, without limitation, Sections (b)(1), (b)(2), and (b)(3) of Rule 23.

225.    Plaintiffs seek certification of the following class (the "Class"):

> All residents of California who placed a bet or wager on the Gambling Websites while in California.

226.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for

-59-

exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

227.    DraftKings' practices have resulted in actual injury and harm to the Class members in the amount of deposits made with DraftKings and/or losses incurred on the Gambling Websites for bets or wagers placed while in California.

228.    Plaintiffs explicitly reserve their right to amend, add to, modify, and/or otherwise change the proposed class definition as discovery in this action progresses.

229.    **Numerosity.** Plaintiffs are informed and believe that there are hundreds of thousands or potentially millions of members of the Class. The Class is so large that the joinder of all of its members is impracticable. The exact number of members of the Class can be determined from information in the possession and control of DraftKings.

230.    **Commonality.** DraftKings has acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on DraftKings and/or Plaintiffs and the Class. Numerous common issues of fact and law exist, including, without limitation:

a.    What gambling contests DraftKings offers in California.

b.    What mediums (e.g., website, app, in person, etc.) DraftKings offers its gambling contests through in California.

c.    The dates and number of gambling contests offered by DraftKings in California.

d.    Whether DraftKings violates California Penal Code Section 319 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

e.    Whether DraftKings violates California Penal Code Section 320 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

f.    Whether DraftKings violates California Penal Code Section 321 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

g.    Whether DraftKings violates California Penal Code Section 330 by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

h.    Whether DraftKings violates California Penal Code Section 330a by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

i.    Whether DraftKings violates California Penal Code Section 337a by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

j.    Whether DraftKings violates any additional sections of the California Penal Code or other applicable California law and/or regulation by operating the Gambling Websites in California and allowing California residents to place bets and wagers on the Gambling Websites.

k.    Whether DraftKings' violations of the California Penal Code give rise to liability under California's unfair competition law.

l.    Whether DraftKings is a "person" within the meaning of Section 1761(c) of the California Consumer Legal Remedies Act ("CLRA").

m.    Whether Plaintiffs are "consumers" within the meaning of Section 1761(d) of the CLRA.

n.    Whether DraftKings' practices violate the following CLRA Sections, among others:

i.    "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

ii.    "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

-61-

iii.     **"**Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

iv.     "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

v.     "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

vi.     "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

vii.     "Inserting an unconscionable provision in the contract" (a)(19).

o.     Whether DraftKings' operation of the Gambling Websites should be enjoined in California.

p.     The appropriate damages model for calculating restitution, disgorgement, and/or damages for violation of the unfair competition law and/or the CLRA.

q.     Whether DraftKings' affirmative misrepresentations that the Gambling Websites are legal tolled any otherwise applicable statutes of limitations.

r.     Whether any subset of claims held by the Class are barred by the statute of limitations.

s.     Whether Defendants violated 18 U.S.C. § 1955 concerning the prohibition of illegal gambling businesses.

t.     Whether Defendants violated 18 U.S.C. § 1952, which prohibits the interstate transportation of wagering paraphernalia.

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB

u.    Whether Defendants violated 18 U.S.C. § 1084, which prohibits knowingly using a wire communication facility to transmit betting information concerning a sporting event or contest.

v.    Whether Defendants committed wire fraud in violation of 18 U.S.C. § 1343.

w.    Whether Defendants violated RICO.

x.    Whether Defendants DraftKings, Inc. and Crown Gaming, Inc. violated 18 U.S.C. § 1955 concerning the prohibition of illegal gambling businesses.

y.    Whether Defendants DraftKings, Inc. and Crown Gaming, Inc. violated 18 U.S.C. § 1952, which prohibits the interstate transportation of wagering paraphernalia.

z.    Whether Defendants DraftKings, Inc. and Crown Gaming, Inc. violated 18 U.S.C. § 1084, which prohibits knowingly using a wire communication facility to transmit betting information concerning a sporting event or contest.

aa.    Whether Defendants DraftKings, Inc. and Crown Gaming, Inc. violated RICO.

bb.    The appropriate model for calculating damages, equitable restitution, and/or equitable disgorgement.

cc.    Whether DraftKings's affirmative misrepresentations that the Gambling Websites tolled any otherwise applicable statutes of limitations.

dd.    Whether any subset of claims held by the Class are barred by the statute of limitations.

231.    **Predominance.** These common issues predominate over individualized inquiries in this action because DraftKings' liability can be established as to all members of the Class as discussed herein.

-63-

232. **Typicality.** Plaintiffs' claims against DraftKings and experience with DraftKings are typical, if not identical, to the claims and experiences of members of the Class because, among other reasons, Plaintiffs' claims arise from DraftKings' practices that are applicable to the entire Class.

233. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class lost money to DraftKings. Plaintiffs also have no interests antagonistic to those of the Class, and DraftKings has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

234. **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to recover damages; the damages suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiffs and their counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

235. Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

**CAUSES OF ACTION**

A.   **First Cause of Action: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, ("UCL") on Behalf of Plaintiffs and the Class Against Defendant DraftKings.**

236.   Plaintiffs incorporate by reference all allegations contained in this First Amended Complaint.

237.   DraftKings, Plaintiffs, and Class are "persons" within the meaning of the UCL.

238.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

239.   DraftKings' practices of operating the Gambling Websites within California are "unlawful" within the meaning of the UCL because, among other things, the operation of the Gambling Websites violates California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j because, among other reasons, in the course of business and in the course of trade and commerce, DraftKings has:

      a.   Operated illegal lotteries and/or games of chance in violation of Penal Code Sections 319, 320, 321, 330a, and 337j by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.[48]

      b.   Operated banking and/or percentage gambling games in violation of Penal Code Section 330 by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

      c.   Engaged in pool selling in violation of Penal Code Section 337(a)(1) by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

---

[48] Plaintiffs note that they are specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make their allegations in the alternative, and accordingly, allege that the gambling contests offered in California by DraftKings constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

d.     Engaged in bookmaking in violation of Penal Code Section 337(a)(1) by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

e.     Violated Penal Code Section 337(a)(3) by "receiv[ing], hold[ing], or forward[ing] . . . money . . . staked, pledged, bet or wagered . . upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

f.     Violated Penal Code Section 337(a)(4) by "record[ing], or register[ing] any bet or bets, wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

g.     Violated Penal Code Section 337(a)(6) by "[o]ffer[ing] or accept[ing] any bet or bets, or wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus" by operating the Daily Fantasy Sports contests and Pick6 gambling contests in California.

h.     Engaged in racketeering in violation of 18 U.S.C. Section 1962(c), by and through an enterprise, by conducting and participating in the

-66-

conduct of the enterprise by operating an illegal gambling business, transmitting illegal bets and wagering information, transporting gambling paraphernalia in interstate commerce, and engaging in wire fraud.

i.    Conspired to violate 18 U.S.C. Section 1962(c).

j.    Violated Cal. Penal Code Section 496 by obtaining, retaining, and possessing money obtained by theft and/or fraudulent means, by receiving, concealing, and withholding funds obtained from Plaintiffs and class members through unlawful and fraudulent gambling transactions, knowing that such funds were obtained through conduct constituting theft.

k.    Recovered gambling losses in violation of California Civil Code Section 22.2 and by extension the Statute of Anne.

240.    DraftKings' operation of the Gambling Websites is also unlawful within the meaning of the UCL because DraftKings has violated the CLRA, as alleged in the Second Cause of Action, below.

241.    DraftKings' operation of the Gambling Websites is also unlawful within the meaning of the UCL because DraftKings has violated the California Business and Professions Code, because "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

242.    The acts and practices of DraftKings as alleged herein also constitute "unfair" business acts and practices under the UCL because DraftKings' conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of DraftKings' conduct outweighs any conceivable benefit of such conduct.

243.    DraftKings has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing operation of the Gambling Websites is lawful in California, when in fact, it is not, causing Plaintiffs and the Class to be tricked out of tens of millions of dollars.

244.    Plaintiffs and the Class have suffered injury in fact—in the form of all amounts paid to DraftKings and/or the total of net losses on the Gambling Websites run by DraftKings—as a result of DraftKings' unlawful and unfair business acts and practices and are at substantial risk of continuing to lose money and be injured by those acts and practices if the practices are not enjoined.

245.    Plaintiffs and the Class seek an order providing restitution and disgorgement in the form of all amounts paid to DraftKings by Plaintiffs and the Class and/or the total of net losses on the Gambling Websites by Plaintiffs and the Class.

246.    Plaintiffs and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiffs and the Class seek to enforce "an important right affecting the public interest" in bringing this cause of action.

**B.    Second Cause of Action: Violation of California's Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.*, on Behalf of Plaintiffs and the Class Against Defendant DraftKings.**

247.    Plaintiffs incorporate by reference all allegations contained in this First Amended Complaint.

248.    At all relevant times, Plaintiffs and Class members were "consumers" within the meaning of the CLRA, as they were individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

249.    DraftKings' actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA, namely the selling of the unlawful gambling goods and services that are at issue in this action through the Gambling Websites.

250.    DraftKings violated the CLRA by, among other things:

    a.    "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

    b.    "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

    c.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have

-68-

or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

    d.    "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

    e.    "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

    f.    "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

    g.    "Inserting an unconscionable provision in the contract" (a)(19).

251.    DraftKings' actions and misrepresentations were material, and DraftKings' violations of the CLRA were a substantial factor in causing Plaintiffs and the Class to lose money.

252.    As a direct and proximate consequence of these actions, Plaintiffs and the Class suffered injury.

253.    DraftKings' conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiffs and the Class for Defendants' own benefit to the detriment of Plaintiffs and the Class.

254.    The CLRA provides robust enforcement tools for consumers, including:

    a.    Prohibiting the waiver of any substantive rights provided for under the CLRA. *Id.* § 1750.

    b.    Requiring that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760.

    c.    Establishing a substantive right to litigate in the forum where the transaction occurred. *Id.* § 1780(d).

| | | |
|---|---|---|
| | d. | Establishing a substantive right to pursue class claims. *Id.* § 1781; *see also* *id.* § 1752. |
| | e. | Authorizing injunctive relief. *Id.* § 1780(a)(2) |
| | f. | Authorizing actual damages. *Id.* § 1780(a)(1). |
| | g. | Authorizing restitution of unlawfully taken sums. *Id.* § 1780(a)(3). |
| | h. | Authorizing punitive damages. *Id.* § 1780(a)(4). |
| | i. | Authorizing statutory damages of $1,000 per violation. *Id.* § 1780(a)(1). |
| | j. | Authorizing statutory damages of $5,000 per injured individual, where the unlawful conduct was directed against the elderly or the disabled. *Id.* § 1780(b)(1). |
| | k. | Requiring that the Court "shall award court costs and attorney's fees to a prevailing plaintiff in litigation." *Id.* § 1780(e). |

255.    On June 20 2025, Plaintiffs' provided the pre-suit notice contemplated by the CLRA. A true and correct copy of that notice is attached to this Complaint as **Exhibit C.** DraftKings did not substantively respond to the notice and did not materially modify its California operations to cure the deficiencies identified in the notice.

256.    Plaintiffs seek all available remedies under the CLRA, including monetary relief for actual, punitive, and statutory damages.

257.    DraftKings violated the CLRA by marketing and representing the gambling services as legal.    In reality, the gambling services were not legal, and DraftKings' actions, misrepresentations, and omissions were falsely, deceptively, and unlawfully marketing gambling services to conceal this fact.

258.    DraftKings committed these acts with full awareness of the harm it would cause and engaged in such unfair and deceptive conduct despite this knowledge.

259.    DraftKings knew or should have known that its representations violated numerous regulations and laws, including consumer protection laws, and that these statements would be relied upon by Plaintiffs and Class Members.

260.     As a direct and proximate result of DraftKings' violations of the CLRA, Plaintiffs and Class Members suffered harm by paying for the gambling services, which they would not have purchased had they known that the services were unlawfully, falsely, unfairly, and deceptively marketed as legal, when the gambling services were not legal.

261.     Plaintiffs and the Class members suffered monetary harm as a result of DraftKings' conduct because: (a) they would not have purchased the services on the same terms had it not been for Defendant's unlawful, unfair, and deceptive actions as set forth herein; and/or (b) they paid a price premium for the services or chose them over competing services due to Defendant's marketing misrepresentations and deceptive labeling, as discussed herein.

262.     Plaintiffs were therefore harmed because their money was taken by Defendants as a result of Defendants' false, unlawful, unfair, and deceptive misrepresentations regarding the gambling services. These unlawful actions include misrepresenting the legality of sports betting in California, among numerous other states.

**C.    Third Cause of Action: Violation of RICO, 18 U.S.C. §§ 1962(c) and 1964(c), on Behalf of Plaintiffs and the Class Against Defendants Robins, Kalish, and Liberman.**

263.     Plaintiffs incorporate by reference all allegations contained in this First Amended Complaint.

264.     Defendants Robins, Kalish, and Liberman are all persons within the meaning of 18 U.S.C. § 1961(3) as they are all capable of holding a legal or beneficial interest in property.

265.     DraftKings constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and § 1962(c), as it is a corporation. The enterprise consists of DraftKings and any other participants in Defendants Robins, Kalish, and Liberman's scheme.

266.     The enterprise has an existence separate and distinct from the pattern of racketeering activity in which Defendants Robins, Kalish, and Liberman engaged as Defendants Robins, Kalish, and Liberman offers DraftKings' services in states where it is permissible to do so under the specific and distinct laws of those states. The corporate entity DraftKings was formed for the legitimate purpose of offering gambling services in states where it was permitted by law to do so, but Defendants Robins, Kalish, and Liberman—all employed and/or associated with DraftKings—have

-71-

also used the enterprise (DraftKings) to conduct and participate in the conduct of the enterprise through a pattern of racketeering activity.

267.    Defendants Robins, Kalish, and Liberman directed, conducted, and/or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c), consisting of multiple predicate acts, including operating an illegal gambling business as discussed above (*see* 18 U.S.C. § 1955(a)), illegally transmitting betting or wagering information as discussed above (*see* 18 U.S.C. § 1084), and illegally transmitting gambling paraphernalia as discussed above (*see* 18 U.S.C. § 1953).

268.    Defendants Robins, Kalish, and Liberman through the enterprise committed additional predicate acts in the form of wire fraud (18 U.S.C. § 1343). Defendants Robins, Kalish, and Liberman devised and executed a scheme to defraud Plaintiffs and Class members by, among other things:

> a.    Transmitting information relating to an illegal gambling business across state lines.
>
> b.    Accepting wagers related to an illegal gambling business and paying out "winnings" to those that placed illegal bets.
>
> c.    Accepting money from users related to their illegal gambling.

269.    Defendants Robins, Kalish, and Liberman committed at least two predicate acts of racketeering activity within a ten-year period. In fact, Defendants Robins, Kalish, and Liberman have committed thousands of predicate acts, as they have operated an illegal gambling business for years in California and committed wire fraud repeatedly in the furtherance of their scheme.

270.    The predicate acts constitute a "pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because, among other things:

> a.    The acts are related to each other as part of Defendants Robins, Kalish, and Liberman's overarching scheme to run an illegal gambling business.
>
> b.    The acts have the same or similar purposes, results, participants, victims, and methods of commission.

-72-

       c.     The acts are continuous and ongoing, having occurred regularly over several years with the threat of continued criminal conduct.

271.    By engaging in violations of 18 U.S.C. § 1962(b), Defendants Robins, Kalish, and Liberman damaged Plaintiffs and the putative class by depriving them of money that they believed was being used to legally gamble in DraftKings' Daily Fantasy Sports and Pick6 services while all the while engaging in an illegal gambling enterprise designed to part users with their money.

272.    By reason of the violations of 18 U.S.C. § 1962(c), Plaintiffs and Class members are entitled to treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**D.**    **Fourth Cause of Action: Violation of RICO, 18 U.S.C. §§ 1962(d) and 1964(c), on Behalf of Plaintiffs and the Class Against Defendants Robins, Kalish, and Liberman.**

273.    Plaintiffs incorporate by reference all allegations contained in this First Amended Complaint.

274.    Defendants Robins, Kalish, and Liberman have conspired to violate 18 U.S.C. § 1962(d) by agreeing to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity.

275.    Defendants Robins, Kalish, and Liberman knew that they and their co-conspirators were engaging in a pattern of racketeering activity and agreed to facilitate that pattern of racketeering activity. Robins, Kalish, and Liberman agreed that a conspirator would commit at least two acts of racketeering activity as Robins, Kalish, and Liberman agreed before launching services in California that they would offer their gambling services in California while knowing California law prohibits their illegal gambling services at issue in this action.

276.    Defendants Robins, Kalish, and Liberman's overt acts in furtherance of the conspiracy include the following, without limitation:

       a.     Developing the Gambling Websites where users are enticed to engage in illegal gambling.

       b.     Sharing profits from Defendants' illegal gambling scheme;

       c.     Making false representations to its users regarding the legality of their Gambling Websites; and

1

        d.     Concealing the true nature of their operations from users.

2

        e.     As a direct and proximate result of Defendants' conspiracy, Plaintiffs

3

and the Class members have been injured as described above.

4

    277.    By engaging in violations of 18 U.S.C. § 1962(d), Defendants Robins, Kalish, and

5

Liberman damaged Plaintiffs and the putative class by depriving them of money that they believed

6

was being used to legally gamble in DraftKings' Daily Fantasy Sports and Pick6 services while

7

conspiring to engage in an illegal gambling enterprise designed to part users with their money.

8

    278.    By reason of the violations of 18 U.S.C. § 1962(d), Plaintiffs and Class members

9

are entitled to treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

10

**E.    Fifth Cause of Action: Violation of Violation of RICO, 18 U.S.C. §§ 1962(c) and**

11

**1964(c), on Behalf of Plaintiffs and the Class Against All Defendants.**

12

    279.    Plaintiffs incorporate by reference all allegations contained in this First Amended

13

Complaint.

14

    280.    Defendants DraftKings, Inc. and Crown Gaming, Inc. Robins, Kalish, and Liberman

15

are all persons within the meaning of 18 U.S.C. § 1961.

16

    281.    Defendants DraftKings, Inc., Crown Gaming, Inc., Robins, Kalish, and Liberman

17

formed "enterprise" within the meaning of 18 U.S.C. § 1961(4) as they are associated in fact though

18

not a legal entity. The enterprise is an ongoing organization and continuing as it continues to offers

19

its gambling services within California.

20

    282.    The enterprise has an existence separate and distinct from the pattern of racketeering

21

activity in which Defendants engaged as Defendants provide gambling services in states where it

22

is permissible to do so, but Defendants have also used the enterprise to engage in a pattern of

23

racketeering activity.

24

    283.    Defendants directed, conducted, and/or participated in the conduct of the

25

enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §

26

1962(c), consisting of multiple predicate acts, including operating an illegal gambling business as

27

discussed above (*see* 18 U.S.C. § 1955(a)), illegally transmitting betting or wagering information

28

as discussed above (*see* 18 U.S.C. § 1084), and illegally transmitting gambling paraphernalia as discussed above (*see* 18 U.S.C. § 1953).

284.    Defendants through the enterprise committed additional predicate acts in the form of wire fraud (18 U.S.C. § 1343). Defendants devised and executed a scheme to defraud Plaintiffs and Class members by, among other things:

        a.    Transmitting information relating to an illegal gambling business across state lines.

        b.    Accepting wagers related to an illegal gambling business and paying out "winnings" to those that placed illegal bets.

        c.    Accepting money from users related to their illegal gambling.

285.    Defendants committed at least two predicate acts of racketeering activity within a ten-year period. In fact, the Entity Defendants have committed thousands of predicate acts, as they have operated an illegal gambling business for years in California and committed wire fraud repeatedly in the furtherance of their scheme.

286.    The predicate acts constitute a "pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because, among other things:

        a.    The acts are related to each other as part the Entity Defendants' overarching scheme to run an illegal gambling business.

        b.    The acts have the same or similar purposes, results, participants, victims, and methods of commission.

        c.    The acts are continuous and ongoing, having occurred regularly over several years with the threat of continued criminal conduct.

287.    By engaging in violations of 18 U.S.C. § 1962(b), Defendants damaged Plaintiffs and the putative class by depriving them of money that they believed was being used to legally gamble in the enterprises Daily Fantasy Sports and Pick6 services while all the while engaging in an illegal gambling enterprise designed to part users with their money.

288.    By reason of the violations of 18 U.S.C. § 1962(c), Plaintiffs and Class members are entitled to treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

F.    **Sixth Cause of Action: Violation of RICO, 18 U.S.C. §§ 1962(d) and 1964(c), on Behalf of Plaintiffs and the Class Against All Defendants.**

289.    Plaintiffs incorporate by reference all allegations contained in this First Amended Complaint.

290.    Defendants have conspired to violate 18 U.S.C. § 1962(d) by agreeing to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity.

291.    Defendants knew that they and their co-conspirators were engaging in a pattern of racketeering activity and agreed to facilitate that pattern of racketeering activity. Defendants agreed that a conspirator would commit at least two acts of racketeering activity as Robins, Kalish, and Liberman agreed before launching services in California that they would offer their gambling services in California while knowing California law prohibits their illegal gambling services at issue in this action.

292.    Defendants' overt acts in furtherance of the conspiracy include the following, without limitation:

a.    Developing the Gambling Websites where users are enticed to engage in illegal gambling.

b.    Sharing profits from the illegal gambling scheme;

c.    Making false representations to its users regarding the legality of the Gambling Websites; and

d.    Concealing the true nature of their operations from users.

e.    As a direct and proximate result of the Entity Defendants' conspiracy, Plaintiffs and the Class members have been injured as described above.

293.    By engaging in violations of 18 U.S.C. § 1962(d), Defendants damaged Plaintiffs and the putative class by depriving them of money that they believed was being used to legally gamble in DraftKings' Daily Fantasy Sports and Pick6 services while conspiring to engage in an illegal gambling enterprise designed to part users with their money.

294.    By reason of the violations of 18 U.S.C. § 1962(d), Plaintiffs and Class members are entitled to treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**G.    Seventh Cause of Action: Violation of Cal. Civ. Code § 22.2 and the Statute of Anne, on Behalf of the California Class Against Defendant DraftKings.**

295.    Plaintiffs incorporate by reference all allegations contained in this First Amended Complaint.

296.    Like many U.S. states, in the early days of statehood, California looked to the English common law to model its state law on.

297.    On April 13, 1850, the California passed an "Act adopting the Common Law," which read: "The Common Law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of the State of California, shall be the rule of decision in all Courts of this State."

298.    Since 1850, California continues to maintain the Act, and it is currently codified at Cal. Civ. Code § 22.2. Cal. Civ. Code § 22.2 currently provides: "The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all courts of this State." Courts have determined that when California imported the English common law that California imported not only the "whole" "body of judge-made" decision law of the English courts, but "also the written statutes enacted by Parliament." *Tak Chun Gaming Promotion Co. Ltd. v. Long*, 314 Cal. Rptr. 3d 890, 895 (2023), as modified on denial of reh'g (Nov. 17, 2023) (cleaned up).[49]

299.    One of the statutes of Parliament that was effective in 1850 (and therefore incorporated into California law) was the Gaming Act of 1710, commonly referred to as the "Statute of Anne." Section II of the Gaming Act of 1710 reads as follows:

> "And be it further enacted by the Authority aforesaid, That from and after the said first Day of May one thousand seven hundred and eleven, any Person or Persons whatsoever, who shall at any Time or

---

[49] The California Supreme Court cases addressing gambling debts as "off limits" did not consider the applicability of Civil Code Section 22.2, and the more accurate, recent, and comprehensive statement of the law is provided in *Tak Chun Gaming Promotion Co. Ltd. v. Long*, 314 Cal. Rptr. 3d 890, 895 (2023), as modified on denial of reh'g (Nov. 17, 2023).

Sitting, by playing at Cards, Dice, Tables, or other Game or Games whatsoever, or by betting on the Sides or Hands of such as do play at any of the Games aforesaid, lose to any one or more Person or Persons of playing or betting in the whole, the Sum or Value of ten Pounds, and shall pay or deliver the same or any Part thereof, the Person or Persons, so losing and paying or delivering the same, shall be at Liberty within three Months then next, to sue for and recover the Money or Goods so lost, and paid or delivered or any Part thereof, from the respective Winner and Winners thereof, with Costs of Suit, by Action of Debt founded on this Act, to be prosecuted in any of her Majesty's Courts of Record, in which Actions or Suits no Effoin, Protection, Wager or Law, Privilege of Parliament, or more than one Imparlance shall be allowed; in which Action it shall be sufficient for the Plaintiff to allege, that the Defendant or Defendants are indebted to the Plaintiff, or received for the Plaintiff's Use, the Money so lost and paid, or converted the Goods won of the Plaintiff to the Defendant's Use, whereby the Plaintiff's Action accrued to him, according to the Form of this Statute, without setting forth the Special Matter; and in café the Person or Persons who shall lose such Money or other Thing aforesaid, shall not within the Time aforesaid, really and bona fide, and without Covin or Collusion, sue, and with Effect prosecute for the Money or other Thing, so by him or them lost, and paid or delivered as aforesaid, it shall and may be lawful to and for any Person or Persons, by such Action or Suit aforesaid, to sue for and recover the same, and treble the Value thereof, with Costs of Suit, against such Winner or Winners as aforesaid; the one Moiety thereof to the Use of the Person or Persons that will sue for the same, and the other Moiety to the use of the Poor of the Prish where the Offense shall be committed."

300. Within the meaning of the Statute of Anne and by extension Cal. Civ. Code § 22.2, DraftKings is the "winner" as they received all or part of the money lost by Plaintiffs in Defendants' gambling services.

301. Within the meaning of the Statute of Anne and by extension Cal. Civ. Code § 22.2, Plaintiffs are "Persons" as they all lost money to Defendants using their gambling services. Defendants received all or part of the money Plaintiffs lost to Defendants. Plaintiffs have not colluded with any other individuals in bringing this action.

302. Plaintiffs and the class members all lost more than "ten Pounds" during the "playing or betting in the whole, the Sum of Value" within "three Months" as provided within the meaning of Cal. Civ. Code § 22.2, and by extension the Statute of Anne.

**H.    Eighth Cause of Action: Violation of Cal. Penal Code § 496, on behalf of Plaintiffs and the Class against DraftKings.**

303.    Plaintiffs incorporate by reference all allegations contained in this First Amended Complaint.

304.    Cal. Penal Code § 496 provides that every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year. If the value of the property does not exceed $950, the offense shall be a misdemeanor, punishable only by imprisonment in a county jail not exceeding one year, subject to certain statutory conditions. Further, Cal. Penal Code § 496(c) provides that any person who has been injured by a violation of the foregoing may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees.

305.    What constitutes "theft" under the Penal Code is enumerated in Cal. Penal Code § 484. For purposes of the Penal Code "theft" is defined as any person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property, or obtains labor or services of another.

306.    DraftKings has violated Cal. Penal Code § 496 as DraftKings received property (money) from Plaintiffs in a manner that constitutes theft. DraftKings knowingly designed their website and mobile application in a way that warranted to California residents that they were taking place in a legal gambling game in California when they used DraftKings' services. For example, DraftKings displayed to California users, and members of the putative California class, a map

-79-

showing that their games could be played in California. However, these representations were false as DraftKings' services have never been legal in California. As such, DraftKings knowingly, and by design, using fraudulent misrepresentations, defrauded Plaintiffs and the Class of their money by inducing them to pay for a service they understood to be legal while offering them an illegal service.

I.    **Ninth Cause of Action: Declaratory Judgment, 28 U.S.C. §§ 2201, on Behalf of Plaintiffs and the Class against Defendant DraftKings.**

307.    Plaintiffs incorporate by reference all allegations contained in this First Amended Complaint.

308.    The Declaratory Judgement Act, 28 U.S.C. § 2201, provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

309.    An actual, present, and justiciable controversy has arisen between Plaintiff and the Class (on the one hand) and DraftKings (on the other hand) regarding whether: (1) DraftKings' operation of the Gambling Websites within California, including DraftKings' Daily Fantasy Sports and Pick6 services, violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j; and (2) DraftKings' contracts with Plaintiff and the Class (to the extent any were formed) are void or voidable, including, without limitation, pursuant to California Civil Code Section 1667.

310.    Plaintiffs seek a declaration in their favor on behalf of themselves and the Class that: (i) DraftKings' operation of the Gambling Websites within California, including DraftKings Daily Fantasy Sports and Pick6 services violate California Penal Code Sections, 319, 320, 321, 330, 330a, 337a, and 337j; and (2) DraftKings' contracts with Plaintiffs and the Class (to the extent any were formed) are void or voidable, including, without limitation, pursuant to California Civil Code Section 1667.

**PRAYER FOR RELIEF**

311.    Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a.  Certifying the proposed Class pursuant to Rule 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b.  Public injunctive relief, including:

   i.   Cease representing paid daily fantasy sports as lawful in California

   ii.  Cease California residents from entering paid daily fantasy sports contests

   iii. Establish geo-blocking to prevent California residents from entering paid daily fantasy sports contests

c.  Declaring that DraftKings is financially responsible for notifying the Class members of the pendency of this suit;

d.  Declaring that DraftKings has committed the violations of law alleged herein;

e.  An Order awarding Plaintiffs damages, treble damages, costs of suit, and attorneys' fees for Defendants Robins, Kalish, and Liberman's RICO violations.

f.  Declaring that Defendants Robins, Kalish, and Liberman have committed the violations of law alleged herein;

g.  An Order awarding Plaintiffs damages, treble damages, costs of suit, and attorneys' fees for Defendants DraftKings, Inc. and Crown Gaming, Inc.'s RICO violations.

h.  An Order declaring that DraftKings' conduct violated the CLRA, California Civil Code §§ 1750, et seq., and awarding injunctive relief pursuant to Cal. Civ. Code § 1780(a) and (b);

i.  An Order declaring that DraftKings' conduct violated California's Unfair Competition Law, California Business & Professions Code §§ 17200, et seq; and awarding injunctive relief pursuant to Bus. & Prof. Code § 17203;

-81-

j. An Order requiring Defendant DraftKings to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

k. An Order requiring the imposition of a constructive trust and/or disgorgement of DraftKings' ill-gotten gains, compelling DraftKings to pay restitution to Plaintiffs and all members of the Class, and to restore to Plaintiffs and the Class all funds acquired through any act or practice declared by this Court to be unlawful, fraudulent, unfair, or deceptive; in violation of laws, statutes, or regulations; or constituting unfair competition, along with pre- and post-judgment interest thereon;[50]

l. For pre and post-judgment interest on all amounts awarded;

m. For an order of restitution and all other forms of equitable monetary relief, as pleaded, including awarding such relief pursuant to Bus. & Prof. Code § 17535; and/or Bus. & Prof. Code § 17203;

n. That DraftKings be enjoined from continuing the wrongful conduct alleged herein and required to comply with all applicable laws;

o. Providing for any other equitable monetary relief the Court deems appropriate;

p. Punitive damages including under Cal. Civ. Code § 3294;

q. General and compensatory damages in an amount to be determined at trial;

r. Awarding monetary relief, including but not limited to restitution in an amount that the Court or jury will determine, in accordance with applicable law;

---

[50] Plaintiffs seek restitution related to the "rake" and fees related to DraftKings withdrawals, notwithstanding the total lost by Plaintiffs and the class members as a result of entering into the transaction.

-82-

s.   Awarding Plaintiffs their reasonable costs and expenses of suit, including attorney's fees;

t.   Declaring and resolving the disputed points raised in the Seventh Cause of Action;

u.   Awarding pre- and post-judgement interest to extent the law allows; and

v.   Providing such further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs, on behalf of themselves and the putative Class, hereby respectfully demand a trial by jury on all claims for which a jury trial is available.

Dated: January 20, 2026

By: /s/ *Charles B. Stevens*

<div style="margin-left:2em">

Charles B. Stevens, SBN 324425
Margot Cutter, SBN 306789
**CUTTER LAW P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone: 916-290-9400
E-mail: cstevens@cutterlaw.com
E-mail: mcutter@cutterlaw.com

Wesley M. Griffith, SBN 286390
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd, Suite 426
Long Beach, CA 90802
Telephone: 310-896-5813
E-mail: wes@almeidalawgroup.com

David A. McGee, *pro hac vice*
**ALMEIDA LAW GROUP LLC**
3133 Connecticut Ave NW
Washington, DC 20008
Telephone: 202-913-5681
E-mail: dmcgee@almeidalawgroup.com

Katherine M. Aizpuru, *pro hac vice*
Robert M. Devling, *pro hac vice*
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006

</div>

-83-

1                                      Telephone: 202-973-0900

                                        E-mail: psilva@tzlegal.com

2                                        E-mail: kaizpuru@tzlegal.com

                                        E-mail: rdevling@tzlegal.com

3

4                                        F. Peter Silva II, SBN 348070

                                        **TYCKO & ZAVAREEI LLP**

5                                        333 H Street, Suite 5000

                                        Chula Vista, CA 91911

6                                        Telephone: 510-254-6810

                                        E-mail: psilva@tzlegal.com

7

8                                        James Bisborrow, *pro hac vice* to be filed

                                        Aaron Freedman, *pro hac vice*

9                                        **WEITZ & LUXENBERG PC**

                                        700 Broadway

10                                      New York, NY 10003

                                      Telephone: 212-344-5461

                                      E-mail: jbilsborrow@weitzlux.com

11                                     E-mail: afreedman@weitzlux.com

12                                      *Counsel for Plaintiffs and the Class*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:25-cv-04618-CRB