United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

ZHICHENG ZHEN, et al.,
Plaintiffs,
v.
DRAFTKINGS, INC., et al.,
Defendants.

Case No. 25-cv-04618-CRB

**ORDER ON MOTIONS TO DISMISS**

In a technical sense, this case is about a class of losers. In a legal sense, this case is about games that were prohibited by the California Penal Code. Plaintiffs ZhiCheng Zhen and Jonathan Smith gambled on DraftKings, Inc.'s online fantasy sports platform and lost money. And so, they sued, alleging that DraftKings offered illegal gambling. Plaintiffs allege that DraftKings represented that its games were, in fact, legal and that they would never have gambled had they known the truth. Accordingly, Plaintiffs brought a class action lawsuit against DraftKings, its executive officers Jason Robins, Matthew Kalish, and Paul Liberman (together, "Individual Defendants"), as well as Crown Gaming, Inc. (collectively, "Defendants"). They seek to represent every Californian who lost money while gambling based on DraftKings' misrepresentations. DraftKings moved to dismiss, as did Crown Gaming and Individual Defendants. This Court **GRANTS** DraftKings' motion in part and **GRANTS** Crown Gaming's and Individual Defendants' motion in full.

## I. BACKGROUND

### A. Legality of Online Sports Betting

California has a longstanding prohibition on gambling. In 1872, California enacted California Penal Code Section 330, which made it a misdemeanor to conduct any banking

or percentage game played with any device for money or other form of value. FAC (dkt. 70) ¶ 18 (citing Cal. Penal Code § 330). California Penal Code Section 337a further prohibits other gambling activities, such as pool selling or bookmaking and offering or accepting any bets or wagers based on contests of skill. Id. ¶ 20 (citing Cal. Penal Code § 337a). These prohibitions extend to lotteries and games of chance. Id. ¶ 25. One can only operate a gambling enterprise if it is expressly permitted by California law. Id. ¶ 29 (citing Cal. Bus. & Prof. Code § 19801(d)).

In 2022, Californians were asked to vote on Proposition 27, which aimed to legalize online sports betting in the state. FAC ¶ 33. DraftKings was one of the sponsors of the ballot proposition and millions were spent on political advertisements. Id. But California voters rejected Proposition 27, with 82% voting against it. Id. ¶ 35.

On October 5, 2023, California State Senator Scott Wilk reached out to the California Department of Justice for a legal opinion about whether online fantasy sports betting is illegal under state law. Id. ¶ 40. On July 3, 2025, the California Attorney General issued an opinion concluding that daily fantasy sports games violate California Penal Code Section 337a, as they consist of wagering on sports. Id. ¶ 42.

### B. DraftKings Platform

DraftKings is an online platform that provides gambling on fantasy sports. FAC ¶ 50. Fantasy sports are games that allow users to create imaginary teams made up of professional sports players. Id. ¶ 51. Users have their teams compete against those of other players by comparing points from team performance, such as the statistical calculation of rushing yards, receiving yards, or points scored. Id. DraftKings has two main types of contests: Daily Fantasy Sports (“DFS”) and Pick6.

#### 1. Daily Fantasy Sports

DraftKings describes DFS as condensing season-long fantasy sports “into a shorter, more sweat-inducing format.” FAC ¶ 53. The contests “range from a day to a week depending on the sport” and competitors can “earn points” based on the “in-game performance” of their player roster.” Id. Competitors can test their “skills with friends or

United States District Court
Northern District of California

with other fans nationally." Id. Competitors in California can participate in all kinds of betting contests in a diverse array of sports, with the number of participants ranging from hundreds to over half a million. Id. ¶ 57.

DraftKings gets a cut of the betting pool. FAC ¶ 60. DraftKings pools all the participant bets and wagers and then uses its records to distribute "a portion of the pooled bets and wagers to the winner(s)." Id. It takes a cut of the pool "even though it is not a direct participant in the game." Id. Moreover, DraftKings also decides the size of the bets and wagers, the number of participants, the pool size, and the part of the pool available as winnings. Id. ¶ 61. And DraftKings also varies these factors, even for the same underlying sporting event at times. Id. ¶ 62. DraftKings also permits competitors to enter many different contests at the same time—across a multitude of sporting types. Id. ¶¶ 63, 65.

DraftKings also advertised that DFS was legal in California.[1] Id. ¶¶ 71–72. It lists California on its webpage for where DFS is legal. Id. ¶ 74. And on that page, DraftKings specified that it monitors state and federal laws and regulations to "ensure it is in compliance with the laws in any jurisdiction where it operates." Id. ¶ 75. On another page listing where DFS is legal, DraftKings includes California again. Id. ¶ 76.

**2. Pick6**

Pick6 is a proprietary contest that allows participants to bet on whether athletes will meet the "under" or "over" in certain statistical categories. FAC ¶ 79. Competitors can make an entry of two or more players and choose whether they believe each player will outperform their listed stat projection. Id. ¶ 80. After they make their decision, competitors can choose how much to bet and wager. Id. ¶ 82. The available prize pool is collected and paid from those bets and wagers. Id. ¶ 84. Regardless of the size of a competitor's wager, it is entered as a series of $1 bets, across multiple contests that

[1] At this stage, DraftKings does not specifically raise an argument about the legality of its operations in California. Accordingly, the Court presumes—based on Plaintiffs' allegations—that online sports betting is currently illegal in the state.

United States District Court
Northern District of California

DraftKings unilaterally selects. Id. ¶ 92. After the sporting event, DraftKings uses its records to pay out the winners from the pool. Id. ¶ 95. DraftKings automatically takes a cut out of the pool before listing the total prize pool for a given contest. Id. ¶ 93.

Like for DFS, DraftKings represents that Pick6 is available in California. FAC ¶¶ 98–100. On the webpage for states where Pick6 is playable, California is included. Id. ¶ 99. And in the list of available jurisdictions, just like for DFS, California is explicitly named. Id. ¶ 100.

**C. Advertising**

DraftKings spends about $500 to $600 million every year on advertising and marketing. FAC ¶ 102. It does everything from league sponsorships to direct customer marketing. Id. ¶ 104. DraftKings' advertising presence is also felt in California, where branded products are sold in supermarkets. Id. ¶¶ 105–06.

**D. ZhiCheng Zhen**

Around 2024, Zhen saw DraftKings' advertisements and decided to make an account. FAC ¶ 110. Zhen relied on DraftKings' representation that its products and services were legal—a representation that has not changed. Id. He claims he would not have made an account or placed bets in California if not for DraftKings' representation of legality in the state. Id. ¶ 113.

Zhen has lost about $1,000 to DraftKings while in California, and $400 while playing Pick6 since February 12, 2025. Id. ¶¶ 114, 117. In Zhen's experience, DraftKings' take was the difference between the total bets and wagers collected and the prizes paid out. Id. ¶ 116. Zhen has since stopped gambling on DraftKings but remains interested in online gambling and would continue to participate if legalized in California. Id. ¶ 118. He represents that he "may be tricked by DraftKings in the future" and gamble online if DraftKings continues to represent it is lawfully compliant in California. Id.

**E. Jonathan Smith**

Smith's story is much the same as Zhen's. Around 2019, he saw television ads for DraftKings and created an account, based on the representation that DraftKings was legal

in California. FAC ¶ 123. He represents that he would not have done so if DraftKings had disclosed that its gambling operations were illegal. Id. ¶ 126. Since May of 2019, Smith has lost about $1,700 to DraftKings while in California. Id. ¶ 127. He primarily played DFS when on DraftKings. Id. ¶ 129. While he has stopped using DraftKings after learning it was not legal in California, Smith still wants to gamble online and alleges he "may be tricked by DraftKings in the future" if it continues to represent that it is legally operating. Id. ¶ 131.

### F. RICO Enterprises

Plaintiffs allege that there are two groups that are violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The first is the Natural Persons Enterprise, which consists of the Individual Defendants acting through DraftKings. FAC ¶ 154. The second is the Legal Entity Enterprise, which is an association in fact enterprise orchestrated by Defendants. Id. ¶ 155.

#### 1. Natural Persons Enterprise

Plaintiffs allege that the Individual Defendants run an illegal gambling service targeting California out of DraftKings. FAC ¶ 157. The Individual Defendants continuously violated federal and state gambling laws in California, even after the publication of the Attorney General's opinion. Id. ¶ 169. The Individual Defendants continued to operate in California despite losing Proposition 27, as well. Id. ¶ 170.

The Individual Defendants purportedly violated a series of federal laws:

- 18 U.S.C. § 1084: proscribing the use of wire communication in interstate commerce to transmit bets and/or wagers. FAC ¶ 174.
- 18 U.S.C. § 1955: prohibiting the operation of an illegal gambling business. Id. ¶ 175.
- 18 U.S.C. § 1953: proscribing the interstate transportation of wagering paraphernalia. Id. ¶ 177.
- 18 U.S.C. § 1343: banning the use of interstate wire communications to execute a scheme to defraud. Id. ¶ 179.

United States District Court
Northern District of California

#### 2. Legal Entity Enterprise

Defendants purportedly carried out an association in fact enterprise to perpetuate an illegal gambling scheme in California. FAC ¶ 190. Defendants worked in concert to offer illegal gambling through the interstate wires. Id. ¶ 191. As a subsidiary of DraftKings, Crown Gaming sought to design and maintain software solutions to offer illegal gambling to Californians. Id. ¶ 194. The Legal Entity Enterprise is alleged to have violated the same federal laws as the Natural Persons Enterprise. See id. ¶¶ 198–219.

### G. Procedural History

Plaintiffs brought a class action complaint against DraftKings on June 1, 2025. See Compl. (dkt. 1). Plaintiffs subsequently amended their complaint to add new claims and defendants. See FAC. They allege that Defendants' conduct violates California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200 et seq.), the Consumer Legal Remedies Act ("CLRA") (Cal. Civil Code §§ 1750 et seq.), RICO, California Civil Code § 22.2 and the Statute of Anne, civil theft under California Penal Code § 496, and the Declaratory Judgment Act (28 U.S.C. § 2201). Id. ¶¶ 236–310. Defendants all moved to dismiss the complaint. See DK MTD (dkt. 77); CG MTD (dkt. 78).

## II. LEGAL STANDARD

Under Rule 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief may be granted. The Court may base dismissal on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019) (citation modified). A complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation modified). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a 12(b)(6) motion. Id. (citing Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007)).

United States District Court
Northern District of California

When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

## III. DRAFTKINGS' MOTION TO DISMISS

DraftKings sets forth a litany of arguments for why Plaintiffs' complaint should be dismissed. The Court addresses each argument in turn and grants DraftKings' motion in part.

### A. Statutory Standing

DraftKings contends that Plaintiffs lack standing to assert RICO, UCL, and CLRA claims. DK MTD at 8. Its argument for all three is the same: Plaintiffs received the benefit of their bargain and could not have been injured. Id. at 8–10. Plaintiffs counter that legality was material to their decisions to bet and that an illegal contest has inherently lesser value. DK Opp'n (dkt. 80) at 14. The Court agrees with Plaintiffs.

For RICO standing, Plaintiffs must show an injury to their "business or property" and that those injuries were proximately caused by Defendants' alleged violations. Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd., 943 F.3d 1243, 1248 (9th Cir. 2019). And it is similar for standing under the UCL and CLRA. For those claims, Plaintiffs "must meet an economic injury-in-fact requirement, which demands no more than the corresponding requirement under Article III of the U.S. Constitution." Reid v. Johnson & Johnson, 780 F.3d 952, 958 (9th Cir. 2015) (citing Hinojos v. Kohl's Corp., 718 F.3d 1098, 1104 (9th Cir. 2013)). To meet this threshold requirement, a plaintiff "must demonstrate some form of economic injury" as a result of their transactions with the defendant. Kwikset Corp. v. Superior Ct., 51 Cal. 4th 310, 323

(2011). Importantly, "[i]f one gets the benefit of his bargain, he has no standing." Johnson v. Mitsubishi Digital Elecs. Am., Inc., 365 F. App'x 830, 832 (9th Cir. 2010).

But a plaintiff who relies on a statement by a defendant and then challenges a misrepresentation in that statement "can satisfy the standing requirement . . . by alleging . . . that he or she would not have bought the product but for the misrepresentation." Hawkins v. Kroger Co., 906 F.3d 763, 768 (9th Cir. 2018) (citing Kwikset, 120 Cal. Rptr. 3d 741, 246 P.3d at 890). "That assertion is sufficient . . . to allege economic injury." Id.

Plaintiffs adequately allege this kind of reliance-based standing. See DK Opp'n at 15 (discussing how Plaintiffs would not have gambled but for DraftKings' representations). Both Zhen and Smith clearly allege they only bet on the DraftKings platform based on DraftKings' representations "that the services it offered in California were legal." FAC ¶¶ 112, 123. And if they knew the truth, they would not have spent their money on DraftKings' contests. Id. ¶¶ 115, 126.

DraftKings' attempt to counter Plaintiffs' argument is unpersuasive. DraftKings asserts that Plaintiffs must allege that they were overcharged or received diminished value and that technical illegality is insufficient. DK Reply (dkt. 82) at 3. But that is inaccurate. For starters, the Ninth Circuit in Hawkins did not premise its holding on overpayment. Rather, the Hawkins court determined that, because the plaintiff "adequately alleged that she relied on the label's misrepresentations and would not have purchased the product without those misrepresentations, she has adequately alleged standing." Hawkins, 906 F.3d at 769.

The same is true in Hinojos. There, the Ninth Circuit specifically held "that when a consumer purchases merchandise on the basis of false price information, and when the consumer alleges that he would not have made the purchase but for the misrepresentation, he has standing to sue under the UCL and [False Advertising Law] because he has suffered an economic injury." Hinojos, 718 F.3d at 1107. Furthermore, the Hinojos court noted that there are "'innumerable ways' that a consumer can show economic injury." Id. at

1104 (quoting Kwikset, 120 Cal. Rptr. 3d 741, 246 P.3d at 885). Even if Plaintiffs were required to allege overpayment, it is common sense to conclude that Plaintiffs spent more than they otherwise would have on DraftKings, given that the alternative spend is alleged to be zero dollars.

Moreover, DraftKings' position on technical illegality does not change the calculus. For example, DraftKings cites an unpublished Ninth Circuit opinion where the court concluded that "injury-in-fact requires more than a mere statutory violation." Mai v. Supercell Oy, No. 23-15144, 2024 WL 2077500, at *1 (9th Cir. May 9, 2024) (no standing for injury stemming from purchases of loot boxes in online games). On this point, the Court agrees. Plaintiffs do not sufficiently explain how a legal bet has a different value from an illegal one. And the Court cannot think of such a reason. Put another way, if Plaintiffs won money, would their winnings be monetarily worth less if they were illegal as opposed to legal? Nevertheless, Mai is distinguishable here where Plaintiffs also allege that they were induced to part with their money based on misrepresentations of legality.[2]

At bottom, the question is not whether Plaintiffs received the benefit of their bargain, but whether they would have entered the bargain in the first instance. Accordingly, the Court determines that Plaintiffs have sufficiently alleged economic injury to support statutory standing.

**B. Public Policy**

DraftKings also argues that Plaintiffs' claims are barred by California public policy. DK MTD at 10. California has a "strong, broad, and long-standing policy against judicial resolution of civil disputes arising out of gambling contracts or transactions." Kelly v. First Astri Corp., 72 Cal. App. 4th 462, 477 (1999). Plaintiffs contend that this public

---

[2] DraftKings also cites cases such as Peterson v. Cellco Partnership to argue that spending money on illegal goods is insufficient for economic injury. See DK MTD at 9. But in Peterson, which involved the purchase of insurance from an unlicensed vendor, the court affirmed dismissal because the plaintiffs had not alleged that they could have bought cheaper insurance from a licensed vendor. 164 Cal. App. 4th 1583, 1591 (2008). That is not the case here, as Plaintiffs could not obtain cheaper online sports betting from a legitimate vendor, given that it is purportedly illegal statewide. The issue is whether Plaintiffs would have spent money gambling at all.

policy against gambling was misinterpreted and, nevertheless, is inapplicable in this case. DK Opp'n at 6–13. To the extent Plaintiffs are trying to recover their gambling losses, this Court agrees with DraftKings.

"Under California's in pari delicto doctrine, neither courts of law nor courts of equity will aid or assist a plaintiff to recover money lost in a gambling game that is prohibited by law, regardless of where it is played and even if the loss resulted from cheating, absent a statute authorizing recovery of the gambling losses." Kelly, 72 Cal. App. 4th at 490. This policy has long been understood to declare "the California courts off limits when it comes to enforcing gambling debts." Tak Chun Gaming Promotion Co. Ltd. v. Long, 96 Cal. App. 5th 1027, 1033 (2023), as modified on denial of reh'g (Nov. 17, 2023).

In the instant case, Plaintiffs do not point to any statute specifically authorizing recovery of gambling losses. Instead, they merely argue that the UCL and CLRA are broad enough to cover online gambling. DK Opp'n at 9. True enough. But Plaintiffs fail to identify language in the UCL or CLRA that permits recovery of gambling losses. See In re Apple Inc. App Store Simulated Casino-Style Games Litig., No. 5:21-CV-02777-EJD, 2025 WL 2782591, at *10 (N.D. Cal. Sept. 30, 2025) (dismissing UCL claims on public policy grounds because the "UCL does not expressly mention gambling at all"); Brill v. Postle, No. 2:19-CV-02027 WBS AC, 2020 WL 2936688, at *3 (E.D. Cal. June 3, 2020) (denying CLRA claim because the "legislature still has not created a statutory right to permit individuals to recover their gambling losses").

Moreover, despite Plaintiffs' protests, California's public policy is applicable to this case. Plaintiffs argue that Kyablue v. Watkins made the policy flexible, applied only by weighing the relative moral fault between parties. DK Opp'n at 9–10. That is not true. In that case, the court was evaluating "the general rule against enforcing contracts founded on illegal consideration," not gambling itself. Kyablue v. Watkins, 210 Cal. App. 4th 1288, 1292 (2012) (discussing an oral contract to advance money to be used in gambling). And the Kyablue court explicitly noted that the "clear policy against enforcement of gambling

losses and debts does not control the decision here." Id. at 1295 (emphasis added). Additionally, despite Plaintiffs' assertion to the contrary, courts routinely bar claims based on the public policy doctrine at the motion to dismiss stage. See, e.g., In re Apple, 2025 WL 2782591 at *10; cf. Tak Chun, 96 Cal. App. 5th at 1040.

Nevertheless, Plaintiffs assert that California Civil Code Section 22.2 incorporated the common law of England as the rule of decision in California courts, which included the Statute of Anne (Section Two of the Gaming Act of 1710). FAC ¶¶ 45–47. While the Statute of Anne did permit the recovery of gambling losses, it is not California law. See id. ¶ 44.

Despite Kelly's clear holding, Plaintiffs urge the Court to disregard it, contending that the decision overlooked the Statute of Anne and thus erred. DK Opp'n at 6–7. But although Kelly did not discuss that law, it did analyze California Supreme Court precedent around and after 1850, when Section 22.2 was enacted and purportedly incorporated the Statute of Anne. See Kelly, 72 Cal. App. 4th at 477–88 (collecting cases). And those cases consistently held that the courts would not assist parties seeking to recover gambling losses or debts based on the state's public policy. Id. Accordingly, this longstanding history demonstrates that California courts have rejected any inclusion of the Statute of Anne for gambling loss recovery in the common law. See Tak Chun, 96 Cal. App. 5th at 1033 (rejecting argument that the legislature's "use of a statute in 1850 to cut and paste English common law into California somehow transmogrified and elevated that decisional law into something statutory in nature" that courts could not modify); see also Schmier v. Supreme Ct., 78 Cal. App. 4th 703, 709 (2000) (noting that the courts are not "precluded from modifying or departing from the common law, and frequently do").

Plaintiffs only cite one case to support their position: Tak Chun. See DK Opp'n at 20. But Tak Chun does not change the Court's analysis. To be sure, the Tak Chun court did state that the Statute of Anne was adopted as California common law. Tak Chun, 96 Cal. App. 5th at 1033. This discussion, however, was limited to Section 1 of the statute, which declared that all gambling debts were void—not Section 2, which covers gambling

loss recovery. Id. Plaintiffs assert that the silence for Section 2 makes sense as only gambling debts were before the court. DK Opp'n at 20. Not quite. The Tak Chun court explained that the policy against litigating gambling debts was independently grounded in the rationale "that gambling itself was immoral and unlawful, such that the courts should not open their doors to vindicate rights grounded in immoral or unlawful contracts." Tak Chun, 96 Cal. App. 5th at 1034 (emphasis in original). The existence of such a public policy is difficult to square with Plaintiffs' insistence that California common law permits recovery of gambling losses pursuant to the Statute of Anne.

Accordingly, the public policy against gambling loss recovery bars Plaintiffs' claims to the extent they seek recovery of their losses in any form, whether it is damages or restitution. See FAC ¶ 244 (seeking "the total of net losses" from DraftKings); see also Ochoa v. Zeroo Gravity Games LLC, No. CV 22-5896-GW-ASX, 2023 WL 4291650, at *4 (C.D. Cal. May 24, 2023) (holding that the public policy against gambling loss recovery applied "irrespective of whether Plaintiffs label their claim as one for restitution rather than damages"), adopted, 2023 WL 12079144 (C.D. Cal. May 25, 2023). But the doctrine does not stretch as far as DraftKings would like. As the public policy doctrine and Kelly are only concerned with gambling losses and debts, the doctrine "does not so extend" as to prohibit public injunctive and declaratory relief for gambling based on deceptive advertising. Id. at *5 (determining that Kelly "did not purport to preclude from going forward any claim seeking public injunctive relief based on deceptive advertising under California's consumer protection statutes). And such relief is "expressly provided for under the UCL and CLRA." Id. It coheres with California's public policy by protecting unwitting citizens who engage in gambling through deceptive means.

Consequently, the Court dismisses Plaintiffs' claims to the extent that they seek recovery of their losses. That includes Plaintiffs' attempt at loss recovery through the UCL and CLRA. And it also includes Plaintiffs' claims against DraftKings under the Statute of Anne, civil theft under California Penal Code § 496, and RICO. All these latter claims seek damages in the form of gambling loss recovery. See FAC ¶¶ 288, 294, 302,

304.

### C. Standing for Injunctive Relief

DraftKings contends that Plaintiffs also lack standing for injunctive relief as they have not shown an imminent or actual threat of future harm. DK MTD at 15. It argues that it is absurd for Plaintiffs to claim they may be misled in the future by DraftKings' misrepresentations and gamble while it is still illegal, despite actively litigating the issue. Id. at 16. Plaintiffs argue there is a "significant" risk of future injury because Plaintiffs wish to gamble in California if it is legal and that is precisely what DraftKings continues to represent. DK Opp'n at 23. The Court agrees with Plaintiffs.

Both parties agree on the law but disagree on the sufficiency of the alleged future risk. "Where standing is premised entirely on the threat of repeated injury, a plaintiff must show a sufficient likelihood that he will again be wronged in a similar way." Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 967 (9th Cir. 2018) (citation modified). In assessing this risk, a court "must examine the questions realistically." Id. (internal quotation omitted). And realistically, there is a risk of repeated injury.

The picture on the ground is murky. Despite the Attorney General's (non-binding) opinion, no court—state or federal—has declared online fantasy sports betting illegal in California. There have been no enforcement actions by the California Department of Justice, either. Meanwhile, DraftKings continues to represent to the public that it is available in California. See, e.g., FAC ¶ 76; see also DK Reply at 13 ("DraftKings has consistently maintained that its contests are lawful."). A person in Plaintiffs' position could reasonably continue to participate in purportedly illegal gambling if not for injunctive relief provided by this Court, particularly if DraftKings offers similar illegal contests under different branding.[3] See Clark v. Eddie Bauer LLC, No. 21-35334, 2024 WL 177755, at *2 (9th Cir. Jan. 17, 2024) (standing for injunctive relief where the plaintiff

---

[3] DraftKings' argument also proves too much. If DraftKings' position were the law, no plaintiff could ever bring a suit for injunctive relief in cases like these because the mere act of filing would destroy standing.

alleged she was "left to guess" whether sales were legitimate or not). Indeed, Plaintiffs allege that they may be tricked into engaging in future online gambling if DraftKings continues to represent that its games are legal. See FAC ¶¶ 118, 131; see also Wedge v. Crayola LLC, No. 26-CV-00397-JSC, 2026 WL 1229582, at *3 (N.D. Cal. May 5, 2026) (no standing for injunctive relief as plaintiffs alleged a future consumer would be harmed but not themselves).

Consequently, the Court concludes that Plaintiffs sufficiently demonstrate standing for injunctive relief.

**D. Failure to State a CLRA or UCL Claim**

DraftKings advances two arguments for why it believes Plaintiffs are unable to state claims under the UCL and CLRA: (1) DraftKings' contests are not covered as a good or service under the CLRA; and (2) Plaintiffs' fraud allegations do not satisfy Rule 9(b). DK MTD at 17–18. The Court rejects both arguments.

**1. Good or Service**

Under the CLRA, the term "services" means "work, labor, and services for other than a commercial or business use." Cal. Civ. Code § 1761(b). DraftKings' contests fit comfortably under the clear definition of "services."

Plaintiffs clearly and repeatedly characterize DraftKings as a bookmaker for private individuals. See, e.g., FAC ¶¶ 63, 80. Such a service certainly requires work and labor. After all, it is unreasonable to think DraftKings' definitional argument would apply to a human bookmaker at a horse race. The mere fact that DraftKings operates online does not export its work outside the definition of "services." Even if being online was pertinent, courts in California have found that online services are still within the ambit of the CLRA. See, e.g., Ochoa, 2023 WL 4291650, at *13 (mobile app for online gambling fell "within the purview of the CLRA"); Doe v. Roblox Corp., 602 F. Supp. 3d 1243, 1263 (N.D. Cal. 2022) (virtual currency purchases were part of an "entertainment service" under the CLRA).

Consequently, the Court rejects DraftKings' definitional argument for a failure to

United States District Court
Northern District of California

state a claim.

**2. Rule 9(b)**

DraftKings contends that Plaintiffs have not provided a detailed account of all the specific misrepresentations at issue, such as which advertisements Plaintiffs saw or how they relied on them. DK MTD at 18. Plaintiffs assert that they have provided adequate notice as is required by Rule 9(b). DK Opp'n at 16–17. The Court agrees with Plaintiffs.

Rule 9(b) requires parties to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Rule does not demand copious detail. All that is required is "adequate notice to an adverse party" that helps them "prepare a responsive pleading." United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1298 (3d ed. 2016)). It is "sufficient to allege particular details of a scheme . . . with reliable indicia that lead to a strong inference" that that the fraud had the desired effect. See id. (citation modified).

Plaintiffs readily meet this threshold. They chronicle how DraftKings' contests work, how they held their contests out as lawful in California, how online sports betting is purportedly illegal in California, how Plaintiffs got involved with DraftKings, how Plaintiffs relied on DraftKings representations, and how DraftKings gets a cut of every betting prize pool. See DK Opp'n at 16–17. And Plaintiffs explain how DraftKings itself pushed a proposition to legalize online sports betting in California, raising the inference that DraftKings was aware its games were not legal at the time. See FAC ¶ 33.

This Court concludes that Plaintiffs have provided more than enough information to satisfy Rule 9(b).

**E. Declaratory Judgment**

DraftKings argues that Plaintiffs' Declaratory Judgment Act claim must be dismissed as it is a remedy and not a cause of action. The Court agrees. The Ninth Circuit has made clear that declaratory relief is a proper remedy for other causes of action but is not "an affirmative cause of action" in and of itself. City of Reno v. Netflix, Inc., 52 F.4th

874, 878 (9th Cir. 2022). Accordingly, Plaintiffs may still pursue declaratory relief based on their surviving claims.

**F. Statute of Limitations**

DraftKings argues that Smith's CLRA and UCL claims are time-barred, as he alleges he began using his DraftKings account in 2019, which is outside the relevant statutes of limitations. DK MTD at 25. Plaintiffs counter that Smith continued to use DraftKings' platform into 2025 and that each bet restarts the statute of limitations. DK Opp'n at 24. Plaintiffs also argue that the statutes of limitations were tolled based on DraftKings' affirmative misrepresentations of legality. Id.

"When a motion to dismiss is based on the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." Palacios v. Interstate Hotels & Resorts Inc., No. 21-CV-05799-TSH, 2021 WL 4061730, at *2 (N.D. Cal. Sept. 7, 2021) (citation modified). But "where the statute of limitations question turns on factual issues that may be disputed, the question is more appropriately addressed at a later stage of the proceeding." Id. Based on the parties' arguments, the Court will revisit the statute of limitations issue at a later stage after some discovery.

**G. Equitable Jurisdiction**

DraftKings asserts that the Court lacks equitable jurisdiction over Plaintiffs' equitable claims because they have not shown an inadequate remedy at law. DK MTD at 14–15. But as discussed, Plaintiffs do not have any remaining legal remedies—only declaratory and injunctive relief. Moreover, Plaintiffs also allege that legal remedies "are not equally prompt and certain" as their requested equitable relief and thus inadequate. FAC ¶ 220. "That is sufficient" at this stage. See Murphy v. Olly Pub. Benefit Corp., 651 F. Supp. 3d 1111, 1129 (N.D. Cal. 2023) (denying motion to dismiss equitable relief because the plaintiffs were not required to demonstrate inadequacy at the pleading stage). Accordingly, the Court has equitable jurisdiction.

United States District Court
Northern District of California

## IV. CROWN GAMING'S MOTION TO DISMISS

Crown Gaming and Individual Defendants (collectively, "RICO Defendants") move to dismiss the RICO claims against them. CG MTD. They argue that the Court lacks personal jurisdiction over them, Plaintiffs lack RICO standing, Plaintiffs fail to state a claim under Sections 1962(c) and (d), and that the statute of limitations bars Smith's claims. See CG MTD. The Court has already addressed RICO standing and the statute of limitations for DraftKings and applies its conclusions with the same force here. The Court takes the remaining arguments in turn and grants the motion.

### A. Personal Jurisdiction

RICO Defendants argue that Plaintiffs have not shown that the Court has general or specific personal jurisdiction over them. CG MTD at 3. Plaintiffs assert that they have sufficiently alleged specific jurisdiction. CG Opp'n (dkt. 79) at 6. The Court concludes that Plaintiffs have failed to demonstrate specific personal jurisdiction over Defendants Kalish and Liberman.

To establish specific jurisdiction, a plaintiff must establish three elements: (1) purposeful direction to the forum or availment of its privileges; (2) the claims must arise out of or relate to the defendant's forum-related activities; and (3) jurisdiction must be reasonable by comporting with fair play and substantial justice. Mhmoud v. Cheetah X Inc., No. 25-CV-00198-JST, 2026 WL 618196, at *3 (N.D. Cal. Mar. 5, 2026). RICO Defendants contend that Plaintiffs fail to meet the first two elements. CG MTD at 4.

#### 1. Individual Defendants

RICO Defendants assert that Plaintiffs improperly impute DraftKings' forum contacts to its officers. CG MTD at 5. "Officers of a corporation are protected from a court's exercise of personal jurisdiction over them that is based solely on their employment status." Broad. Music, Inc. v. QM Ent., LLC, No. 3:24-CV-05981-TL, 2025 WL 1456593, at *4 (W.D. Wash. May 21, 2025). "If acts taken by a corporate officer subjects the officer to personal liability (i.e., the corporate officer authorized, directed or participated in tortious conduct), and those acts create contact with the forum state, such acts are not only

acts of the corporation but also acts of the individual" for personal jurisdiction. j2 Glob. Commc'ns, Inc. v. Blue Jay, Inc., No. C 08-4254 PJH, 2009 WL 29905, at *6 (N.D. Cal. Jan. 5, 2009).

Except for Defendant Robins, Plaintiffs fail to establish personal conduct separate from DraftKings' actions for Individual Defendants. Plaintiffs only allege that Individual Defendants "used DraftKings . . . to violate federal gambling statutes" by describing DraftKings' operations in California. See, e.g., FAC ¶ 160. As RICO Defendants note, the only individual conduct alleged comes from Defendant Robins. See CG MTD at 6. Plaintiffs describe how Robins publicly promoted DraftKings' services in the California market after losing the ballot proposition and asserted that the state should legalize sports betting. See id. ¶ 170. Although it is tenuous, Plaintiffs' allegations against Robins sufficiently show personal conduct aimed at California. And Robins' conduct plausibly relates to Plaintiffs' allegations that Defendants sought to impermissibly market gambling operations as legal in California. See FAC ¶ 168 (alleging that Defendants sought to offer illegal gambling in violation of federal gambling laws).

Accordingly, the Court only has personal jurisdiction over Defendant Robins.

**2. Crown Gaming**

RICO Defendants assert that Plaintiffs fail to establish personal jurisdiction against Crown Gaming because any allegations connecting it to California are vague and nonspecific. CG MTD at 7. Not so. Plaintiffs allege that Crown Gaming created and maintained the software infrastructure necessary for DraftKings' gambling services to be available for California consumers. See FAC ¶¶ 194–95. That is purposeful direction towards the forum state. And that directly relates to the claims against Crown Gaming. See, e.g., id. ¶¶ 198–223 (describing Crown Gaming's participation in a scheme to illegally offer gambling services to Californians).

**B. Failure to State a Claim**

RICO Defendants contend that each of Plaintiffs' RICO claims (for both types of enterprises) fail for one reason: Plaintiffs do not distinguish between a "person" and an

United States District Court
Northern District of California

"enterprise." CG MTD at 13–22. The Court agrees.

For liability under 18 U.S.C. § 1962(c), a plaintiff must allege "(1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir.2005) (quoting Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001)). In other words, a RICO "enterprise" must constitute an entity distinct from the RICO "person." Id. And an "enterprise" made up of "a corporation, a wholly-owned subsidiary and an employee of that corporate family is not a being sufficiently distinct from these entities as 'persons.'" Ice Cream Distributors of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc., No. 09-5815 CW, 2010 WL 2198200, at *5 (N.D. Cal. May 28, 2010). This "cannot be evaded by alleging that a corporation has violated the statute by conducting an enterprise that consists of itself plus all or some of its officers or employees." Ferrari v. Mercedes-Benz USA, LLC, No. 15-CV-04379-YGR, 2016 WL 7188030, at *2 (N.D. Cal. Dec. 12, 2016) (internal quotation omitted).

This case is on all fours with Ice Cream Distributors. RICO Defendants are all employees of DraftKings or its subsidiary. FAC ¶¶ 6–9. And the allegations in Plaintiffs' complaint are essentially directed at actions done via DraftKings itself, rather than entirely independent actions by RICO Defendants. See generally FAC. "This does not satisfy the distinctiveness requirement." See Ice Cream Distributors, 2010 WL 2198200, at *5.

Plaintiffs' efforts to distinguish Ice Cream Distributors are unpersuasive. They argue that the court did not engage with the requirement that a complaint may show "something more" to distinguish between a corporation and its officers and subsidiaries. CG Opp'n at 18. But that test has not been adopted by the Ninth Circuit. See In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Pracs. Litig., 601 F. Supp. 2d 1201, 1213 (S.D. Cal. 2009). Moreover, there is no liability, as here, where a subsidiary "simply conducts its affairs as delegated by the parent company for the profit of the parent company" in a standard corporate relationship. Id. at 1214 (internal quotation omitted). And RICO pleading requirements would be stretched "to the breaking point" if executive

United States District Court
Northern District of California

officers were proper RICO persons merely because "the corporation is engaged in fraudulent conduct." Ferrari, 2016 WL 7188030, at *3.

Because Plaintiffs fail to demonstrate distinctiveness, their claims based on Section 1962(c) fail. Without a substantive RICO violation, Plaintiffs' RICO conspiracy claim under Section 1962(d) fails as well. See Miletak v. Allstate Ins. Co., No. C 06-03778 JW, 2009 WL 1371412, at *7 (N.D. Cal. May 15, 2009) ("It is well established that there can be no RICO conspiracy without having committed a RICO violation."). Consequently, the Court grants RICO Defendants' motion to dismiss all of Plaintiffs' RICO claims.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** DraftKings' motion in part, and **GRANTS** RICO Defendants' motion. To the extent Plaintiffs' claims are dismissed, they are dismissed with prejudice, as amendment would be futile. Besides Plaintiffs' declaratory judgment claim, the dismissed claims against DraftKings are barred by California's public policy. And although Plaintiffs could potentially amend their claims against RICO Defendants, the public policy bar applies with equal force to those claims as it does for the RICO claims against DraftKings.

The parties are ordered to appear for a status conference via Zoom on August 14, 2026 at 10 A.M. The parties are directed to file a joint status report by August 10, 2026.

**IT IS SO ORDERED.**

Dated: July 29, 2026

CHARLES R. BREYER
United States District Judge